SALANS LLP
  Claude D. Montgomery
  Lee P. Whidden
  Paul C. Gunther
Rockefeller Center
620 Fifth Avenue
New York, NY 10020-2457
Tel: (212) 632-5500
Fax: (212) 632-5555

*Attorneys for Appellant Swedbank AB (publ)*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

**In re**                                                        :
                                                                 :
                                                                 :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*                      :
                                                                 :
              **Debtors.**                                       :
                                                                 :

------------------------------------------------------------------x

**SWEDBANK AB (PUBL),**                                          :
                                                                 :
                       **Appellant,**                            :
                                                                 :     **1:10-cv-04532 (NRB)**
         **v.**                                                  :
                                                                 :
**LEHMAN BROTHERS HOLDINGS, INC.,** *et al.*,                    :
**AND OFFICIAL COMMITTEE OF UNSECURED**                          :
**CREDITORS OF LEHMAN BROTHERS**                                 :
**HOLDINGS, INC.,**                                              :
                                                                 :
                       **Appellees.**                            

------------------------------------------------------------------x

**<u>APPELLANT SWEDBANK AB (PUBL)'S BRIEF ON APPEAL</u>**

PRELIMINARY STATEMENT ...................................................................................1

BASIS OF APPELLATE JURISDICTION...............................................................3

STATEMENT OF ISSUES PRESENTED ON APPEAL.........................................3

APPLICABLE STANDARD OF REVIEW ON APPEAL .....................................4

STATEMENT OF THE CASE....................................................................................4

I.      The Parties .......................................................................................................5

II.     The Debtors' Obligations to Swedbank Under the ISDA Master Agreements ..................5

III.    Swedbank's Obligations to LBHI - The Bank Deposit ......................................7

IV.     Defaults and the Chapter 11 Filings..................................................................7

V.      The Proceedings Below .....................................................................................8

        A.      The Underlying Motion ..........................................................................8

        B.      The Stay Motion .....................................................................................9

VI.     The Decision Below............................................................................................9

ARGUMENT ..............................................................................................................10

I.      Bankruptcy Code §§ 560 and 561  Unambiguously Protect Setoff of The SEK Account 10

        A.      Bankruptcy Code Provisions 560 and 561 Plainly  Command That
                No Other Code Provision Limits  the Contractual Setoff Rights of
                Parties to Swap Agreements ...................................................................11

                1.      Congress Gave Swap Participants a Setoff Safe Harbor ...........................12

                2.      Sections 560 and 561 Contain Notwithstanding  Clauses
                        Protect Setoff Rights Under Safe Harbor Transactions .............................15

        B.      The Financial Netting Improvements Act of 2006 Demonstrates
                Congress' Intent to Further Clarify that the No Bankruptcy Code
                Provision Would Limit Setoff Rights Under a Safe Harbor
                Provision ...............................................................................................18

        C.      Bankruptcy Code Section 553 Does Not Trump  Section 560 and
                561 Protections for Swedbank's Setoff Rights ....................................20

1. In Rejecting Swedbank's Safe Harbor Setoff Rights  The Bankruptcy Court Disregarded the Plain  Meaning of Sections 560 and 561 of the Bankruptcy Code ........................................... 21

2. The Bankruptcy Court Violated Several Canons  of Statutory Construction in Concluding  That Section 553 Governs Swedbank's Setoff Rights ................................................ 21

3. Congress' Protection of Pre-Petition and Post- Petition Setoff Rights in Sections 553, 560 and 561  are Mutually Reinforcing and Not Mutually Exclusive .................................................. 26

4. The Bankruptcy Court Mutuality Conclusion  Disregards The United States Supreme Court  Rejection of The Pre-Post-Petition Entity Distinction ................................................ 27

D. The Bankruptcy Court Overstated the Impact of  Enforcing the Safe Harbor Provisions According to Their Terms ................................................ 29

II. Bankruptcy Code Sections 560 and 561 Preserved  Swedbank's Rights to Freeze and Setoff Against The SEK Account ........................................................... 29

A. The SEK Account Created A Debt Obligation in Favor of LBHI and Setoff of Those Obligations is Permitted Under the Master Agreements ................................................ 29

B. Bankruptcy Code Section 560 Permits Setoff of The SEK Account .................... 30

C. Bankruptcy Code Section 561 Permits Setoff of The SEK Account .................... 31

D. The Bankruptcy Court Erroneously Held That  Swedbank's Automatic Freeze Violated the Automatic Stay ................................................ 32

III. The Legislative History of the Safe Harbor Provisions Supports Swedbank's Setoff Rights ........................................................... 33

A. Congress Enacted the Safe Harbor Provisions to  Provide Expansive Protections to Financial Contracts ........................................... 34

B. Congress Actually Intended Section 560 to Apply Notwithstanding Any Other Provision of The Bankruptcy Code ........................... 36

C. Congress Specifically Exempted Safe Harbor Transactions From the Section 553 Requirement that Both Obligations Arise Pre-Petition ................................................ 37

CONCLUSION ........................................................................... 39

NewYork 1356845.5

# TABLE OF AUTHORITIES

## CASES

Atlantic Cleaners & Dyers, Inc. v. United States,
     286 U.S. 427 (1932)................................................................................17

Bank of America, N.A. v. Lehman Bros. Holdings Inc. et al.,
     Adv. Pr. No. 08-01753 (Bankr. S.D.N.Y. 2009)......................................29

Biltmore Assocs., LLC v. Twin City Fire Ins. Co.,
     572 F.3d 663 (9th Cir. 2009) ..................................................................29

CBS Corp. v. Eaton Corp.,
     No. 07 Civ. 11344 (LBS), 2009 WL. 4756436 (S.D.N.Y Dec. 7, 2009)................................16

Chapman v. United States,
     500 U.S. 453 (1991)................................................................................15

Cisneros v. Alpine Ridge Group,
     508 U.S. 10 (1993)..................................................................................15

Citizens Bank of Maryland v. Strumpf,
     516 U.S. 16 (1995)..................................................................................20

Cohen v. de la Cruz,
     523 U.S. 213 (1998)................................................................................38

Connecticut Nat. Bank v. Germain,
     503 U.S. 249 (1992)................................................................................11

Dunham v. Omaha & Council Bluffs St. Ry. Co.,
     106 F.2d 1 (2d Cir. 1939).........................................................................16

FDIC v. Hirsch (In re Colonial Realty Co.),
     980 F.2d 125 (2d Cir. 1992).....................................................................22

Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,
     458 U.S. 141 (1982)................................................................................21

Green v. U.S.,
     79 F.3d 1348 (2d Cir. 1996).....................................................................16

Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,
     530 U.S. 1 (2000)....................................................................................11

Illinois Nat. Guard v. Federal Labor Relations Authority,
     854 F.2d 1396 (D.C. Cir. 1988)...............................................................15

NewYork 1356845.5

In re Air Vermont, Inc.,
  761 F.2d 130 (2d Cir. 1985).................................................................................18, 22

In re Allen,
  135 B.R. 856 (Bankr. N.D. Iowa 1992) .........................................................................28

In re American Home Mtg. Holdings, Inc.,
  411 B.R. 181 (Bankr. D.Del. 2009) ...............................................................................33

In re Barbieri,
  199 F.3d 616 (2d Cir. 1999)............................................................................................15

In re Bennett Funding Group, Inc.,
  146 F.3d 136 (2d Cir. 1998).......................................................................................5, 11

In re Bennett Funding Group, Inc.,
  212 B.R. 206 (2d Cir. B.A.P. 1997) ..............................................................................30

In re Cajun Elec. Power Co-op, Inc.,
  230 B.R. 693 (Bankr. M.D.La. 1999) ............................................................................28

In re Continental Airlines, Inc.,
  932 F.2d 282 (3d Cir. 1991)...........................................................................................18

In re Durso Supermarkets, Inc.,
  1995 WL 739549 (S.D.N.Y. Dec. 14, 1995) .................................................................28

In re Enron Corp.,
  306 B.R. 465 (Bankr. S.D.N.Y. 2004)...........................................................................27

In re Enron Corp.,
  419 F.3d 115 (2d. Cir. 2005)............................................................................................4

In re Footstar,
  323 B.R. 566 (Bankr. S.D.N.Y. 2005) .............................................................................3

In re General Motors Liquidation Co.,
  No. 09 Civ. 7794, 2010 BL 95496 (S.D.N.Y. Apr. 27, 2010)..........................................4

In re Lehman Holdings Bros. Inc.,
  404 B.R. 752 (Bankr. S.D.N.Y. 2009) ...........................................................................11

In re Mohar,
  140 B.R. 273 (Bankr. D.Mont. 1992) ............................................................................28

In re Mohawk Indus. Inc.,
  82 B.R. 174 (Bankr. D. Mass. 1987) ..............................................................................29

iv

*In re Ontario Locomotive & Indus. Ry. Supplies, (U.S.) Inc.,*
  126 B.R. 146 (Bankr. W.D.N.Y. 1991) ...................................................................28

*In re Pan Am. Corp.,*
  124 B.R. 960 (Bankr. S.D.N.Y. 1991) ....................................................................18

*In re Phoenix Rest.  Group, Inc.,*
  No. 301-12036, 2005 WL. 114327 (Bankr. M.D.Tenn. 2005) ...............................16

*In re R.J. Reynolds Patrick County Memorial Hosp. Inc.,*
  315 B.R. 674 (Bankr. W.D.Va. 2003) .....................................................................28

*In re Stoltz,*
  315 F.3d 80 (2d Cir. 2002).......................................................................................24

*In re United Airlines, Inc.,*
  406 F.3d 918 (7th Cir. 2005) ...................................................................................18

*In re Vanguard Airlines, Inc.,*
  302 B.R. 292 (Bankr. W.D.Mo. 2003).....................................................................18

*In re Women First Healthcare Inc.,*
  345 B.R. 131 (Bankr. D.Del. 2006) .........................................................................25

*In re Worldcom,*
  401 B.R. 637 (Bankr. S.D.N.Y. 2009) ....................................................................28

*Kemper Reins Co. v. Cocoran (In re Midland Ins. Co.),*
  590 N.E.2d 1186, 79 N.Y.2d 253 (1992).................................................................12

*Linkins v. Protestant Episcopal Cathedral Found.,*
  187 F.2d 357 (D.C. Cir. 1951) .................................................................................14

*Lockhart v. United States,*
  546 U.S. 142 (2005)..................................................................................................23

*Mirant Corp. v. Kern Oil & Refining Co., (In re Mirant),*
  310 B.R. 548 (Bankr. S.D. Tex. 2004) ....................................................................17

*N.L.R.B. v. Bildisco and Bildisco,*
  465 U.S. 513 (1984)..............................................................................................27, 28

*New York City Dep't of Finance v. 310 Assocs., L.P. (In re 310 Assocs. L.P.),*
  282 B.R. 295 (S.D.N.Y. 2002).................................................................................15

*Nickerson v. Martin,*
  374 A.2d 258 (Conn. Super. Ct. 1976) ....................................................................11

v

Nixon v. U.S.,
    506 U.S. 224 (1993)................................................................................33

Perrin v. United States,
    444 U.S. 37 (1979)..................................................................................15

Perry v. Commerce Loan Co.,
    383 U.S. 392 (1966)................................................................................11

Policy Realty Corp. v. Treber Realty LLC (In re Policy Realty Corp.),
    No. 99-5062, 2000 WL. 534265 (2d Cir. 2000) .....................................33

Reed v. Central Nat'l Bank of Wilmington
    184 A. 772 (Del. Super. 1936)................................................................11

Scherling v. Hellman Elec. Corp. (In re Westchester Structures, Inc.)
181 B.R. 730 (Bankr. S.D.N.Y. 1995)........................................................11

Schwab v. Reily
    S.Ct., No. 08-538, 2010 WL. 2400094 (U.S. Jun. 17, 2010)..................28

Shamrock Farms Co. v. Veneman
    146 F.3d 1177 (9th Cir.1998) .................................................................22

Texaco, Inc. v. Louisiana Land and Exploration Co.
    136 B.R. 658 (M.D.La. 1992).................................................................28

Thrifty Oil Co. v. Bank of America Nat. Trust and Sav. Ass'n
    322 F.3d 1039 (9th Cir. 2003) ................................................................13

TRW v. Andrews
    534 U.S. 19 (2001)..................................................................................30

United States v. Daniels
    279 F. 844 (2d Cir. 1922)........................................................................23

United States v. LaPorta
    46 F.3d 152 (2d Cir. 1994)......................................................................24

United States v. Novak
    476 F.3d 1041 (9th Cir. 2007) ................................................................23

United States v. Ron Pair Enter., Inc.
    489 U.S. 235 (1989)................................................................................33

Williams v. Taylor
    120 S. Ct. 1495 (2000)............................................................................32

## STATUTES

6A N.Y. Debt. & Cred. Law § 151 (2001) ................................................................12

11 U.S.C. § 101(53B) ........................................................................................36

11 U.S.C. § 101(53B)(A)(ii)(I) ..............................................................................12

11 U.S.C. § 101(53C) ....................................................................................11, 13

11 U.S.C. § 362(a) .............................................................................................17

11 U.S.C. § 362(b)(6) .........................................................................................12

11 U.S.C. § 362(b)(7) .........................................................................................12

11 U.S.C. § 362(b)(17) ........................................................................................19

11 U.S.C. § 362(b)(27) ........................................................................................12

11 U.S.C. § 365(e)(1) ...........................................................................................2

11 U.S.C. § 544 ................................................................................................22

11 U.S.C. § 546 ................................................................................................12

11 U.S.C. § 548 ................................................................................................12

11 U.S.C. § 553 ...........................................................................................passim

11 U.S.C. § 555 ...........................................................................................31, 38

11 U.S.C. § 556 ...........................................................................................passim

11 U.S.C. § 558 ................................................................................................25

11 U.S.C. § 560 ...........................................................................................passim

11 U.S.C. § 561 ...........................................................................................passim

11 U.S.C. § 1110(a)(1) .........................................................................................18

28 U.S.C. § 157 ..................................................................................................3

28 U.S.C. § 158 ..................................................................................................3

28 U.S.C.A. § 2254(d)(1) .......................................................................................7

128 Cong. Rec. S8132-33 (1982) .............................................................................13

NewYork 1356845.5

135 Cong. Rec. S1414-01, S1417 (1989) ...................................................................11

136 Cong. Rec. H2281-06, H2284 (1990) .................................................1, 9, 10, 11

136 Cong. Rec. 57534-07 ..........................................................................................35

Act of July 27, 1982, Pub. L. No. 97-222, 96 Stat. 235, § 6 (1982) ..........................23

Act of Nov. 6, 1978, Pub. L. No. 95-598, 92 Stat. 2549, § 92 (1978)........................23

Bankruptcy Abuse Prevention and Consumer Protection Act, Pub. L. No. 109-819, 119
  Stat. 178-79, §§ 907(j), 907(k) (2005) ...................................................................7

Bankruptcy Abuse Prevention and Consumer Protection Act, Pub. L. No. 109-8 (2005) ...........19

Bankruptcy: Swap Agreements and Forward Contract, Pub. L. No. 101-311, 104 Stat.
  267, §106(a) (1990) ..............................................................................................23

Debtor-Creditor Law. 6A N.Y. Debt. & Cred. Law § 151 (2001).................................12

Financial Netting Improvements Act of 2006 ............................................................18

## OTHER AUTHORITIES

4 Norton Bankr. L. & Prac. § 75:2 (3d ed. 2010) .................................................. 16-18

5 Collier on Bankruptcy § 555.04[2] .........................................................................17

Black's Law Dictionary .............................................................................................14

Fed. R. Bankr. P. 8013 ...............................................................................................4

Fed. R. Bankr. P. 8005 ...............................................................................................9

H.R. 2057 ...................................................................................................................1

H.R. 4612 ...................................................................................................................1

H.R. Rep. 109-648 (2006).........................................................................................18

H.R. Rep. No. 97-420 .................................................................................................9

H.R. Rep. No. 101-484 .........................................................................................17, 26

H.R. Rep. No. 109-31 (2005).................................................................................20, 25

ISDA News Release ISDA Publisher 2001 ISDA Master Agreement .........................25

S. Rep. No. 101-285 (1990).................................................................................12, 13

Webster's International Dictionary ..............................................................................16

NewYork 1356845.5

## PRELIMINARY STATEMENT

This appeal concerns an issue of vital concern not only to Appellant specifically, but also to the financial markets generally, namely, whether a non-debtor party to a swap or master netting agreement can rely with certainty upon its mutually-agreed upon contractual setoff rights once its counterparty commences bankruptcy proceedings in the United States. Swap agreements are vital tools routinely used by financial institutions, multinational corporations and governments to manage currency and other types of risk.  Since the passage of the Bankruptcy Code in 1978, Congress, in recognition of the sometimes volatile nature of the financial markets and their central importance to the well being of our economy, has afforded special treatment in bankruptcy to parties to financial contracts.  The importance of these protections was most recently highlighted in the 2005 and 2006 amendments to the Bankruptcy Code, pursuant to which Congress responded to the continuous innovation in the financial industry by extending the rights of acceleration, termination, liquidation and, most crucially here, setoff, to transactions under or in connection with master netting agreements.

Beginning in December 1996, Appellant Swedbank and Respondent LBHI and its affiliates entered into several ISDA Master Agreements (as defined below) and conducted swap transactions thereunder.  R.A. 4 at ¶ 6.  These Master Agreements were carefully negotiated by highly sophisticated parties to include a provision permitting the non-defaulting party to setoff *any* obligations owed to the defaulting party upon the other party's default.  One such default event was the commencement of insolvency proceedings.  Pursuant to the Master Agreements LBHI guaranteed the obligations of its subsidiaries.

Soon after LBHI filed its chapter 11 petition on September 15, 2008, Swedbank informed LBHI that the bankruptcy filing constituted an event of default under the Master Agreements and that it had terminated them.  In reliance upon the Master Agreements,

Swedbank further informed LBHI that it had frozen LBHI's deposit account with Swedbank and intended to setoff its obligations under that account, which consisted of sums deposited largely post-petition, against LBHI's obligations to Swedbank under the Master Agreements. LBHI, however, refused to recognize the obligations to which it had agreed in the course of its well-established contractual relationship with Swedbank. Instead, LBHI filed a motion with the Bankruptcy Court arguing that Swedbank's exercise of its rights under the Master Agreement violated the automatic stay and seeking to compel Swedbank to pay the amount of the deposit account.

The Bankruptcy Court, in contravention of the protections afforded to financial contract counterparties under the Bankruptcy Code, granted LBHI's motion. As demonstrated below, the Bankruptcy Court's decision was contrary to the plain language of the statutes protecting Swedbank's contractual setoff rights, Sections 560 and 561 of the Bankruptcy Code, which provide that the setoff rights of a non-debtor counterparty to a swap agreement shall not be limited by any provision of the Bankruptcy Code. The Bankruptcy Court also violated several fundamental canons of statutory construction in erroneously holding that Bankruptcy Code Section 553 prohibited Swedbank's exercise of its contractual rights. This ruling was contrary to Congress' intent, as demonstrated by both the plain meaning Sections 560 and 561 and their legislative history, that those setoff rights are fully protected in bankruptcy proceedings.

The Bankruptcy Court's decision has thus created precisely the kind of uncertainty that Congress sought to prevent through its enactment of Sections 560, 561 and the other "Safe Harbor" provisions of the Bankruptcy Code. The precedent set by the Bankruptcy Court leaves parties to swap agreements and master netting agreements unsure as to whether they can rely upon their carefully negotiated rights. The swap market has expanded exponentially

2

from its humble beginnings less than thirty years ago to today, and now measures in the trillions of dollars. The Bankruptcy Court's decision, if left to stand as precedent, has potential to increase systemic risk, increase volatility, and lock up liquidity in the massive swaps market in the event of the failure of major financial participant in that market.  Parties to swap agreements should be able to rely upon their duly negotiated contractual setoff rights not only when their counterparties are financially healthy, but also when those counterparties are ailing.

## BASIS OF APPELLATE JURISDICTION

This court has jurisdiction over this appeal pursuant to 28 U.S.C. §§ 158 and 1334(a), which grant federal district courts jurisdiction to hear appeals from final orders of bankruptcy courts entered in cases referred to bankruptcy judges under 28 U.S.C. § 157.  The Bankruptcy Court's Order is a final, appealable order.

## STATEMENT OF ISSUES PRESENTED ON APPEAL

1.      Where the Safe Harbor Provisions arising under Bankruptcy Code Sections 560 and 561 mandate that the exercise by any swap participant of "any contractual right" to offset or net "arising under or in connection with the termination, liquidation, or acceleration" of the swap agreements "shall not be stayed, avoided or otherwise limited by operation of any provision of [the Bankruptcy Code]", may a Master Agreement party exercise retention and setoff rights against a post-petition deposit into an account of a Chapter 11 debtor?

2.      In light of the Safe Harbor Provisions of Sections 560 and 561, did the Bankruptcy Court err in its conclusion that the existence of the automatic stay under Bankruptcy Code Section 362 rendered a deposit account of the Chapter 11 Debtor unavailable for both retention and setoff by a Safe Harbor swap counterparty as to post-petition deposits into the Chapter 11 Debtor's account?

3.      In light of the Safe Harbor Provisions of Sections 560 and 561, did the Bankruptcy Court err in its conclusion that the existence of setoff limitations under Section 553(a) rendered a deposit account of the Chapter 11 Debtor unavailable for both retention and setoff by a Safe Harbor swap counterparty as to post-petition deposits into the Chapter 11 Debtor's account?

## APPLICABLE STANDARD OF REVIEW ON APPEAL

A district court reviews a bankruptcy court's legal conclusions *de novo* and its findings of fact are reviewed for clear error. *In re General Motors Liquidation Co.*, No. 09 Civ. 7794, 2010 BL 95496, *19 (S.D.N.Y. Apr. 27, 2010) (citing *In re Enron Corp.*, 419 F.3d 115, 124 (2d. Cir. 2005); *see also* FED. R. BANKR. P. 8013 (on appeal a district court may modify or reverse a bankruptcy court order).

## STATEMENT OF THE CASE

### Nature of The Case

On September 15, 2008, Lehman Brothers Holdings Inc. filed a bankruptcy petition under chapter 11, title 11 of the United States Code, in the Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**").  In the following weeks, several of Lehman's affiliates and subsidiaries commenced insolvency proceedings in the United States and abroad.  This contested matter was commenced by LBHI to compel Swedbank to turn over funds deposited post-petition into a deposit account held by LBHI with Swedbank ("**SEK Account**").  R.A. 1 at ¶ 1. [1]  The Bankruptcy Court was asked to determine whether the Safe Harbor Provisions (as defined below) of the Bankruptcy Code authorized Swedbank to setoff the amount of the post-petition deposits into the SEK Account against pre-petition obligations owed by LBHI as obligor and guarantor of obligations of certain of its subsidiaries ("**Lehman**

---

[1] Citations to the Record on Appeal are cited herein as "R.A. 1, R.A. 2," etc.

**Subsidiaries**", as defined below), notwithstanding any other provision of the Bankruptcy Code. R.A. 3 at ¶ 2.

## Statement of Facts

### I.      The Parties

Swedbank is a bank and financial institution organized under the laws of the Kingdom of Sweden.  R.A. 4 at ¶ 5.  Lehman Brothers Holdings Inc. ("**LBHI**") and its affiliates were once the fourth largest investment bank in the world.  R.A. 1 at ¶ 4.  LBHI provided, *inter alia*, credit support in connection with swap agreements entered into between LBHI's affiliates and various counterparties, including Lehman Brothers Commercial Corporation ("**LBCC**"), Lehman Brothers Special Financing, Inc. ("**LBSFI**"), Lehman Brothers International (Europe) ("**LBIE**") and Lehman Brothers Finance, S.A. ("**LBFSA**", and together with LBCC, LBSFI, LBIE and LBSFA, "**Lehman Subsidiaries**").  R.A. 17 at ¶ 3.  LBHI was the ultimate parent and holding company for the Lehman Subsidiaries.

### II.     The Debtors' Obligations to Swedbank Under the ISDA Master Agreements

Commencing in 1996, LBHI, acting through its UK Branch and Swedbank, and each of the Lehman Subsidiaries entered into International Swaps and Derivatives Association, Inc. ("**ISDA**") Master Agreements (each one a "**Master Agreement**" and collectively "**Master Agreements**") with Swedbank.  R.A. 3 at ¶¶  3, 7.  Pursuant to each Master Agreement, Swedbank, LBHI and the Lehman Subsidiaries entered into various swap transactions.  R.A. 4, Ex. A at 32, Ex. B at 31, Ex. D at 30, Ex E. at 28.  LBHI issued guarantees of the obligations of the Lehman Subsidiaries ("**LBHI Guarantees**") under each Master Agreement.  R.A. 3 at ¶¶ 3-7.  A merger clause in each Master Agreement states that the Agreement and its attached

Schedules[2] and Transactions constitute a single agreement.  R.A. 4, Ex. A-E at 1.  The LBHI

Guarantees are exhibits to the Schedules.  R.A. 4, Ex. A at 36, Ex. B at 37, Ex. C at 35, Ex. D at

52.

        Under each Master Agreement, an Event of Default, whether subject to proper

notice or automatic termination, triggers an Early Termination Date that creates a payment

obligation that is subject to setoff.  R.A. 17 at 3-4.  The party entitled to receive payment may

credit setoff the obligation due to it against any obligation it may owe to the other party.  R.A. 4,

Ex. A-E at 9-10.  "Set-off" is defined as "set-off, offset, combination of accounts, right of

retention or withholding or similar right or requirement to which the payer of an amount under

Section 6 is entitled or subject (whether arising under this Agreement, another contract,

applicable law or otherwise) that is exercised by, or imposed on, such payer."  Id.

        Furthermore, the parties agreed to include in the Schedules to the Master

Agreement setoff provisions that both preserve extra-contractual rights of setoff and confer

additional contractual rights.  The setoff provision in the LBHI Master Agreement provides:

> In addition to any rights of set-off a party may have as a matter of
> law or otherwise, upon the occurrence of an Event of Default or an
> Additional Termination Event and the designation of an Early
> Termination Date pursuant to Section 6 of the Agreement with
> respect to a party ("X"), the other party ("Y") will have the right
> (but not be obliged) without prior notice to X or any other person
> to set-off or apply any obligation of X owed to Y (and to any
> Affiliate of Y) (whether or not matured or contingent and whether
> or not arising under this Agreement, and regardless of the
> currency, place of payment or booking office of the obligation)
> against any obligation of Y (and of any Affiliate of Y) owed to X
> (whether or not matured or contingent and whether or not arising
> under this Agreement, and regardless of the currency, place of
> payment or booking office of the obligation).

---

[2] Each capitalized term that is not defined herein shall have the same definition as in the LBHI Master
Agreement.

R.A. 4, Ex. E at 26 ("**Setoff Provision**").

After the commencement of the insolvency proceedings of LBHI and the Lehman Subsidiaries, Swedbank preserved all its rights under the Master Agreements and LBHI Guarantees, including the timely filing of claims against LBHI related to (i) Swedbank's Master Agreement with LBHI in the amount of SEK 356,712, and (ii) LBHI's guarantees of the obligations of the Lehman Subsidiaries under the Master Agreements in the amount of SEK 119,231,860, which included SEK 1,219,792 due from LBCC, SEK 43,296,206 due from LBIE, SEK 62,586,227 due from LBFSA, and SEK 12,129,635 due from LBSFI.  R.A. 4 at ¶¶ 7, 15.

III.     **Swedbank's Obligations to LBHI - The Bank Deposit**

In January 2008, LBHI, through its UK Branch, opened a deposit account at Swedbank identified as No. 17608 ("**SEK Account**").  The pre-petition balance in the SEK Account was SEK 2,640,124.06, but rose due to a series of unsolicited post-position deposits in the amount of SEK 82,765,466.45.  R.A. 17 at 4 n.5; R.A. 4 at ¶ 16.  The SEK Account balance reached its related peak on November 12, 2008 with a balance of SEK 84,906,363.85.  R.A. 17 at 4.

IV.     **Defaults and the Chapter 11 Filings**

On September 15, 2008 ("**LBHI Petition Date**"), LBHI filed a voluntary petition for reorganization under Chapter 11, Title 11 of the United States Code ("**Bankruptcy Code**") in the United States Bankruptcy Court of the Southern District of New York ("**Bankruptcy Court**").  *Id*.  Chapter 11 proceedings were commenced by LBSFA and LBSF on October 3, 2008, and by LBCC on October 5, 2008.  LBIE commenced administration proceedings in the United Kingdom on September 15, 2008.  R.A. 4 at ¶ 10.

Swedbank notified LBHI that it would, on December 1, 2008, setoff SEK 371,012 against the SEK Account under the Master Agreement with LBHI and the related LBHI

Guarantees.  R.A. 17 at 5.  Swedbank informed LBHI in a letter dated January 30, 2009 that it had placed an administrative freeze on the SEK Account arising from LBHI's obligations as guarantor of the Master Agreements with LBCC, LBFSA, LBIE and LBSFI.  *Id*.  The letter stated that "[Swedbank] also reserve[s] and retain[s] the right to *setoff against the account any claims in relation to qualified financial transactions under the safe harbor provisions* or otherwise."  R.A. 2, Ex. D at 1 (emphasis added).  After the imposition of the Administrative Freeze, the amount in the SEK Account remained at SEK 82,765,466.45 ("**Current SEK Account Balance**").  R.A. 17 at 4.  The Current SEK Account Balance was roughly $11,453,300 at the then exchange rates.  R.A. 8 at ¶ 19.

## V.   The Proceedings Below

### A.    The Underlying Motion

On January 22, 2010, LBHI filed a motion pursuant to 105(a) and 362 of the Bankruptcy Code arguing that Swedbank's retention of all funds wired into the SEK Account after the LBHI Petition Date violated the automatic stay and sought an order compelling the payment of such amount.  ("**Underlying Motion**") R.A. 1 at ¶ 1; R.A. 17 at 6.  On February 3, 2010, Swedbank filed an objection to the Underlying Motion and asserted its entitlement to setoff the SEK Account against the amounts owed by LBHI as guarantor of the Lehman Subsidiaries' obligations under the Master Agreements.  R.A. 3 at ¶¶ 1, 2, 20; R.A. 17 at 6.  The Bankruptcy Court granted the Underlying Motion at a hearing on April 14, 2010 ("**April 14 Hearing**").  R.A. 6 at 58-61.

On May 5, 2010, the Bankruptcy Court entered an Order and Memorandum Decision ("**Decision**") denying the Underlying Motion.  R.A. 17 at 7.  The Bankruptcy Court held that Swedbank could not exercise its contractual rights under the Master Agreements to setoff the post-petition deposits into the SEK Account against LBHI's obligations under the

Master Agreements.  RA. 17.  In so holding the Court disregarded (i) the plain meaning of

Sections 362, 560 and 561, (ii) the legislative history of those statutes, and (iii) the relevant case

law permitting such setoff.  *Id.* at 11-17.  The Bankruptcy Court further held that Swedbank's

administrative freeze of the SEK Account had violated the automatic stay.  *Id.* at 17.  Swedbank

filed its Notice of Appeal ("**Notice of Appeal**") on May 6, 2010.  R.A. 19 at 1.

### B.       The Stay Motion

Prior to the entry of the Decision but after the April 14 Hearing, Swedbank filed a

motion by Order to Show Cause on April 22 pursuant to Federal Rule of Bankruptcy Procedure

8005 seeking to stay the entry and execution of an order requiring Swedbank to pay LBHI the

amount of the SEK Account ("**Stay Motion**").  R.A. 17 at 6; R.A. 7 at 2.  Having considered

Swedbank's stay papers in forming its decision on the merits, the Bankruptcy Court denied the

Stay Motion at a hearing on May 6, 2010 ("**May 6 Hearing**") and entered an order lifting the

injunction that had been imposed by the Court pursuant to the Order to Show Cause.  R.A. 20 at

2.  During the May 6 Hearing LBHI's counsel advised the Court that if Swedbank were

successful on appeal the Debtors would comply with any order directing payment of monies to

Swedbank.  R.A. 23 at 20.  After entry of the stay denial order, Swedbank and the Debtors

entered into a letter agreement requiring Swedbank to transfer to LBHI the post-petition deposits

into the SEK Account.  The letter agreement further requires LBHI to return the SEK Account

Balance to Swedbank and to recognize setoff Swedbank's rights as of the time prior to the

bringing of the 362 Motion if Swedbank succeeds on its appeal.

## VI.    The Decision Below

The Bankruptcy Court held that Swedbank could not setoff Swedbank's pre-

petition obligations to LBHI under the SEK Account against LBHI's post-petition obligations to

Swedbank under the Master Agreements and LBHI Guarantees because those obligations were

not "mutual" under Section 553, which requires as a prerequisite to setoff that both sets of obligations arise prepetition.  R.A. 17 at 11-13.  The Court held that Section 553 of the Bankruptcy Code, which addresses the setoff rights of creditors generally, trumps the plain language of Sections 560 and 561, which specifically provide that the "any contractual rights" or parties to swap agreements shall not be "otherwise limited" notwithstanding "any other provision" of the Bankruptcy Code.  *Id.* at 10-13.

While acknowledging that (i) "notwithstanding" clauses trump other provisions of law, and (ii) that Sections 560 and 561 command that the setoff rights of parties to swap agreements "shall not be stayed, avoided, or otherwise limited by operation of any provision of this title", the Court concluded that Sections 560 and 561 do not contain "notwithstanding" clauses.  *Id.* at 13.  The Court further reasoned that those clauses merely operated to exempt safe harbor contracts from the provisions of the automatic stay.  *Id.*

The Bankruptcy Court also relied upon a selective recitation of the legislative history of Sections 560 and 561.  *Id.* at 14.  The Court ignored the extensive legislative history demonstrating the extensive protections granted to parties to swap agreements and other financial contracts in order to reduce systemic risk and prevent a chain reaction among financial institutions due to their inability to terminate and liquidate trades.  Instead, the Court concluded that Sections 560 and 561 were enacted merely to prevent the debtor from "cherry picking" contracts.  *Id.*

## **ARGUMENT**

### I.     **Bankruptcy Code §§ 560 and 561 Unambiguously Protect Setoff of The SEK Account**

It is axiomatic that the starting point in interpreting any statute, including the Bankruptcy Code, is to examine its plain meaning.  *See United States v. Ron Pair Enter., Inc.*,

10

489 U.S. 235, 241 (1989) (task of resolving a statute's meaning begins "with the language of the statute itself").  If the language of the statute is unambiguous, then this first canon is also the last and judicial inquiry is "complete," *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992), since "there is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *Perry v. Commerce Loan Co.*, 383 U.S. 392, 400 (1966) (internal quotation omitted); *see also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (Congress is presumed say what it means and mean what it says).  Thus, where a statue's language is plain the court's "sole function" is enforcement.  *Perry*, 383 U.S. at 400.

A.  **Bankruptcy Code Provisions 560 and 561 Plainly Command That No Other Code Provision Limits the Contractual Setoff Rights of Parties to Swap Agreements**

As a general principle, "[t]he right of setoff ... allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A" *In re Bennett Funding Group, Inc.*, 146 F.3d 136, 140 (2d Cir. 1998) (internal quotations omitted).  Under New York law,[3] setoff requires that the debt and credit be mutual, *i.e.* that they are "due to and from the same persons in the same capacity." *Kemper Reins Co. v. Cocoran* (*In re Midland Ins. Co.*), 590 N.E.2d 1186, 1189, 79 N.Y.2d 253, 259 (1992) (holding that the transactions need not be the same for setoff); *Scherling v. Hellman Elec.*

---

[3] With the exception of the Master Agreement between Swedbank and LBCC, the Master Agreements contain choice of law provisions stating that they be "governed and construed in accordance with English law." R.A. 4, Ex. A at 27, Ex. B. at 26, Ex. C. at 24, Ex. D. at 25, Ex. E at 25.  The Bankruptcy Court did not reach the issue of whether New York or English law governs Swedbank's setoff rights.  However, the question of which law applies need not be reached since England has a "venerable tradition that respects and preserves the right of setoff . . . of mutual creditors, mutual debtor or other mutual dealings . . . ." *In re Lehman Holdings Bros. Inc.*, 404 B.R. 752, 757 (Bankr. S.D.N.Y. 2009) (citing Insolvency Act, 1986 c. 45, Part IX, c. IV, § 323 (Eng.) as long recognizing rights of setoff).  Indeed, the concept of setoff in American jurisprudence traces its origins to English law.  *See, e.g.*, *Nickerson v. Martin*, 374 A.2d 258, 260 (Conn. Super. Ct. 1976) (noting setoff's origins in English law); *Reed v. Central Nat'l Bank of Wilmington*, 184 A. 772, 775 (Del. Super. 1936) (noting that setoff provisions in the English Bankruptcy statutes and Section 68a of the Federal Bankruptcy Act of 1898 were "very similar").

NewYork 1356845.5

*Corp. (In re Westchester Structures, Inc.)*, 181 B.R. 730, 739 (Bankr. S.D.N.Y. 1995) (mutuality requires that "the debts and credits are in the same right and are between the same parties, standing in the same capacity").  New York's right of setoff has been codified in its Debtor-Creditor Law. 6A N.Y. DEBT & CRED. LAW § 151 (2001).[4]

### 1.  Congress Gave Swap Participants a Setoff Safe Harbor

The "Safe Harbor Provisions"[5] of the Bankruptcy Code, which include Sections 560 and 561, govern the treatment in Bankruptcy of a broad array of financial agreements and transactions ("**Safe Harbor Transactions**"), including rights of setoff.  If a Safe Harbor Transaction falls within the purview of a Safe Harbor Provision, then "the exercise of any contractual right . . . to offset . . .  shall not be stayed, avoided, or otherwise limited by operation of any provision of this title . . . ."  *See*, *e.g.*, 11 U.S.C. §§ 560 and 561(a).  Section 560, which governs swap agreements, swap participants[6] and financial participants,[7] provides in relevant part that:

---

[4] Section 151 states in relevant part that:

> Every Debtor shall have the right upon:  (a) the filing of a petition under any of the provisions of the federal bankruptcy act or amendments thereto . . . to setoff off and apply against any indebtedness, whether matured or unmatured, of such creditor to such debtor, any amount owing from such debtor to such creditor . . .

6A N.Y. DEBT & CRED. LAW § 151 (2001).

[5] Sections 555, 556, 559, 560 and 561, along with their analogues in the Bankruptcy Code, Sections 362(b)(6), (7), (17) and (27); 546(e), (g) and (j); 548(d)(1) and (d)(2); 553(a)(2), (a)(3) and (b)(1) shall be referred to collectively as the "**Safe Harbor Provisions**").

[6] A "swap participant" is defined as any entity that has an outstanding swap agreement with the debtor prior to the commencement of the bankruptcy case.  11 U.S.C. § 101(53C).  In 2005, pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act ("**BAPCPA**"), Congress expanded the definition of "swap agreement" to include not only currency swaps, option, future, or forward agreements, but also any "similar agreement[s] or transaction[s]" that "presently, or in the future become the subject of recurrent dealings in the swap or other derivatives markets."  11 U.S.C. § 101(53B)(A)(ii)(I).  Congress expanded the definition of "swap agreement" to include "any security agreement or arrangement or *other credit enhancement related to* any [swap agreements]."  *Id.* (emphasis added).  Thus, setoff rights under a swap agreement serving as a credit enhancement are themselves swap agreements.  *See* H.R. 109-31(I), at 100, 2005 U.S.C.C.A.N 88 (2005) (noting that the amendments "ensure[] that any such agreement, arrangement or enhancement is itself deemed to be a swap agreement, and therefore eligible for treatment as such for purposes of . . . offset").

> *The exercise of any contractual right* of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind specified in section 365(e)(1) of this title or *to offset* or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements *shall not be stayed, avoided, or otherwise limited by operation of any provision of this title* or by order of a court or administrative agency in any proceeding under this title.

11 U.S.C. § 560 (emphasis added).  Section 561 of the Bankruptcy Code provides identical

treatment for parties to Safe Harbor Transactions governed by master netting agreements:

> (a) Subject to subsection (b), *the exercise of any contractual right*, because of a condition of the kind specified in section 365(e)(1), to cause the termination, liquidation, or acceleration of or *to offset* or net termination values, payment amounts, or other transfer obligations arising under or in connection with one or more (or the termination, liquidation, or acceleration of one or more)--
>
>> (1) securities contracts, as defined in section 741(7);
>>
>> (2) commodity contracts, as defined in section 761(4);
>>
>> (3) forward contracts;
>>
>> (4) repurchase agreements;
>>
>> (5) swap agreements; or
>>
>> (6) master netting agreements,
>
> *shall not be stayed, avoided, or otherwise limited by operation of any provision of this title* or by any order of a court or administrative agency in any proceeding under this title.

11 U.S.C. § 561(a) (emphasis added).  Transactions under the Master Agreements are "swap

agreements" within the meaning of the Bankruptcy Code.  *See, e.g., Thrifty Oil Co. v. Bank of*

*America Nat. Trust and Sav. Ass'n*, 322 F.3d 1039, 1053 (9th Cir. 2003) (finding an ISDA swap

---

*(cont'd from previous page)*

[7] A "financial participant" is an entity that, *inter alia*, at the time it enters into an agreement or transaction under one of the Safe Harbor Provisions, (i) has one or more agreements with a non-affiliate entity with a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding or (ii) has gross mark to market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements at such time or on any day during the 15-month period prior to the petition date.  11 U.S.C. § 101(22A).

transaction to be a swap agreement under the Bankruptcy Code).  As such, the Master

Agreements qualify as "swap agreements" under Section 560 and 561 of the Bankruptcy Code,

and as master netting agreements under Section 561.

Congress' decision to define "contractual rights"[8] broadly to include any right

"arising under common law," demonstrates its clear intent that bankruptcy impose no limits on

those contractual rights.  Common law rights, by definition, do not incorporate statutory

limitations.  *See Linkins v. Protestant Episcopal Cathedral Found.*, 187 F.2d 357, 361-62 (D.C.

Cir. 1951) ("[T]he very term 'common law' means a system of law not formalized by legislative

action…"); BLACK'S LAW DICTIONARY, at 231 (Abr. 8th ed. 2006).[9]  Had Congress intended to

impose statutory limits on the setoff rights of swap participants, it would not have incorporated

"common law" rights into the definition of setoff.  Indeed, it would have done just the opposite,

and specifically included limiting language stating that the protected contractual rights be rights

that are otherwise enforceable under the Bankruptcy Code.  In short, on their face, the *only*

limitations that the Safe Harbor Provisions impose on the contractual setoff rights of parties to

Safe Harbor Transactions are those agreed to by the parties themselves.

---

[8] The term "contractual right" is defined broadly in Sections 560 and 561 to include:

> [A] right set forth in a rule or bylaw of a derivatives clearing organization (as defined in the Commodity Exchange Act), a multilateral clearing organization (as defined in the Federal Deposit Insurance Corporation Improvement Act of 1991), a national securities exchange, a national securities association, a securities clearing agency, a contract market designated under the Commodity Exchange Act, a derivatives transaction execution facility registered under the Commodity Exchange Act, or a board of trade (as defined in the Commodity Exchange Act) or in a resolution of the governing board thereof[,] and a right, whether or not evidenced in writing, arising under common law, under law merchant, or by reason of normal business practice.

> 11 U.S.C. §§ 560, 561(c).

[9] Black's defines common law as the body of law derived from judicial decisions, rather than from statutes. BLACK'S LAW DICTIONARY, at 231 (6th ed. 1991).

14

2.      **Sections 560 and 561 Contain Notwithstanding
Clauses Protect Setoff Rights Under Safe Harbor Transactions**

Congress' intent to protect the setoff rights of parties to Safe Harbor Transactions

is further demonstrated by its placement of "not otherwise limited by operation of any provision

of this title" clauses in certain Safe Harbor Provisions, including 560 and 561.  Such clauses

express the mandate that the setoff rights of parties to Safe Harbor Transactions agreements

"shall not otherwise be stayed, avoided or otherwise limited by operation of any provision of this

title" ("**Notwithstanding Clauses**").  11 U.S.C. §§ 560, 561.  The use of such unequivocal

language provides plain evidence of Congress' intent.  *See*, *e.g.*, *Cisneros v. Alpine Ridge Group*,

508 U.S. 10, 18 (1993) (interpreting "notwithstanding any other provision" clause in a contract

to supersede all other provisions and noting that same principle applies to statutory

interpretation) (internal quotes omitted); *see also Illinois Nat. Guard v. Federal Labor Relations*

*Authority*, 854 F.2d 1396, 1403 (D.C. Cir. 1988) ("[a] clearer statement is difficult to imagine").

The use of the imperative "shall not . . . be . . . otherwise limited" further demonstrates that the

application of the Notwithstanding Clauses is mandatory.  *In re Barbieri*, 199 F.3d 616, 619 (2d

Cir. 1999) (When the term 'shall' is used in a statute it "generally is mandatory and leaves no

room for the exercise of discretion").

It is axiomatic that unless words are otherwise defined they will be interpreted to

take their "ordinary, contemporary, common meaning."  *Perrin v. United States*, 444 U.S. 37, 42

(1979).  Dictionary definitions provide clear guidance as to ordinary meaning.  *See*, *e.g.*,

*Chapman v. United States*, 500 U.S. 453, 461-62 (1991) (referencing WEBSTER'S dictionary for

the definition of "mixture"); *CBS Corp. v. Eaton Corp.*, No. 07 Civ. 11344 (LBS), 2009 WL

4756436, *4 (S.D.N.Y Dec. 7, 2009); *New York City Dep't of Finance v. 310 Assocs., L.P.* (*In re*

*310 Assocs. L.P.*) 282 BR 295, 299 (S.D.N.Y. 2002).  A dictionary analysis of the of the word

"notwithstanding" and the phrase "or otherwise limited" demonstrates that their meanings are identical.

The word "notwithstanding" means "despite" or "in spite of."  BLACK'S LAW DICTIONARY, at 900 (Abr. 8th ed. 2006).  A statute modified by the phrase "notwithstanding any other provision of law" applies despite or in spite of any other provisions; in other words, its operation is not limited by any other statute.  "Otherwise" means "in a different way [or] in another way."  *Dunham v. Omaha & Council Bluffs St. Ry. Co.*, 106 F.2d 1, 3 (2d Cir. 1939) (citing WEBSTER'S INTERNATIONAL DICTIONARY).  "Limited", in turn, means "restricted" or "characterized by enforceable limitations."  *See* WEBSTER'S DICTIONARY (2010), available at www.merriam-webster.com/dictionary/limited.

Thus, when Congress states that a right shall not be limited by identifying several restrictions that are inapplicable and subsequently modifying them by the term "or otherwise", Congress intends no restrictions to be imposed upon that protected right.  The Notwithstanding Clauses, which provide that contractual setoff rights 'shall not be . . . otherwise limited by operation of any provision [of the Bankruptcy Code]" prohibit any Bankruptcy Code restrictions upon such rights.  *See*, *e.g.*, *Greene v. U.S.*, 79 F.3d 1348, 1355 (2d Cir. 1996) (tax statute identifying means of terminating futures contracts and that was modified by the term "or otherwise" "necessarily [brought] transfers of all kinds within its compass"); *In re Phoenix Rest. Group, Inc.*, No. 301-12036, 2005 WL 114327, *7-9 (Bankr. M.D.Tenn. 2005) (finding that the phrase "otherwise unavoidable security interest" in 547(c)(4) was unambiguous and referred to transfers unavoidable for reasons other than § 547(c)(4)).  In other words, setoff rights that are

"not otherwise limited" are exercisable "notwithstanding" the effect of any other Bankruptcy

Code provisions.[10]

Given the foregoing, it is not surprising that the legislative history to Section 560

identifies the restrictive clause in Safe Harbor Provisions as a "notwithstanding" clause:

> The new section 560 makes clear that a swap participant may exercise any contractual rights to terminate and net out a swap agreement in the event that the other party files a bankruptcy petition, *notwithstanding* the automatic stay and trustee avoidance provisions of the Bankruptcy Code.

H.R. REP. NO. 101-484, at 6, *as reprinted* in 1990 U.S.C.C.A.N. 223, 228 (emphasis added).  The

two leading bankruptcy treatises are in accord.  COLLIER states that the Safe Harbor Provision in

analogous Section 555 applies "*notwithstanding* any other provision of the Code."  5 COLLIER ON

BANKRUPTCY ("COLLIER") 555.04[2], n.6 (emphasis added); *see also Mirant Corp. v. Kern Oil &*

*Refining Co.*, (*In re Mirant*), 310 B.R. 548, 554 (Bankr. S.D. Tex. 2004) (noting that the *ipso*

*facto* default provisions contained in Safe Harbor Provisions 556 and 560 permit the liquidation

of contracts "*notwithstanding* [the automatic stay provision of] 362(a)") (emphasis added).[11]

NORTON'S states that Section 556 excepts commodities broker and forward contract merchants

from the general prohibitions on liquidation "*notwithstanding* the general restriction on such

---

[10] Ironically, but tellingly, Judge Peck inadvertently stated that the Safe Harbor Provisions operate "notwithstanding" the other Bankruptcy Code provisions:

> Instead, the [Safe Harbor Exceptions] permit the exercise of a contractual right of offset in connection with swap agreements, *notwithstanding* the operation of any provision of the Bankruptcy Code that could operate to stay, avoid or otherwise limit that right, but that right must exist in the first place.

N.A. 17 at 11 (emphasis added).

[11] It is a basic canon of statutory construction that similar words in different parts of the same statute should be interpreted similarly.  *See, e.g.*, *In re Enron Corp.*, 306 B.R. 465, 473 n.6 (Bankr. S.D.N.Y. 2004) (citing *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)).  This canon applies to the Safe Harbor Provisions, especially given their similar origin and purposes.  *In re Enron*, at 465 (finding that "a comparison of section 560 and section 555 suggests that these provisions are analogous").

actions in Code 365(e)(1)." 4 NORTON BANKR. L. & PRAC. § 75:2 (3d ed. 2010) (emphasis added).[12]

**B.   The Financial Netting Improvements Act of 2006 Demonstrates Congress' Intent to Further Clarify that the No Bankruptcy Code Provision Would Limit Setoff Rights Under a Safe Harbor Provision**

Congress' recent amendments to the Safe Harbor Provisions in Section 362 of the Bankruptcy Code pursuant to the Financial Netting Improvements Act of 2006 ("**FNIA**") further demonstrate its intent to protect Safe Harbor Transaction setoff rights from any limits imposed by the Bankruptcy Statutes.[13]   The House Report in support of FNIA noted that the FNIA was necessary to "reduce systemic risk" and to "clarify" BAPCPA's netting and financial provisions amendments to the Bankruptcy Code and the treatment of financial products in bankruptcy.  H.R. REP. NO. 109-648, 2006 WL 6165926, at *2 (2006) (FNIA's "technical changes" were aimed at "strengthening and clarifying the enforceability of early termination and close-out netting provisions").

---

[12] Several Circuit Courts of Appeals, including this Circuit, have similarly interpreted other Bankruptcy Code provisions containing similar "notwithstanding" language.  For example, Section 1110(a)(1) of the Bankruptcy Code states that any available contractual right and remedy of a secured party with a security interest in aircraft equipment "*is not limited or otherwise affected* by any other provision of [the Bankruptcy Code]." 11 U.S.C. § 1110(a)(1) (emphasis added).[12]  In examining an earlier, *less* restrictive iteration of Section 1110,[12] the Second and Third Circuits held that Section 1110 permitted secured creditors to exercise their lien and security interests "notwithstanding" otherwise potentially limiting Bankruptcy Code provisions such as Section 362.  *In re Air Vermont, Inc.*, 761 F.2d 130, 133 (2d Cir. 1985) (Congress explicitly stated that the right to repossess collateral existed under Section 1110 "notwithstanding" the potential restrictions of Sections 362, 363 and 544); *In re Continental Airlines, Inc.*, 932 F.2d 282, 284 (3d Cir. 1991) (Section 1110 "on its face" permits secured parties to repossess aircraft "notwithstanding" Sections 362 and 363); *see also In re United Airlines, Inc.*, 406 F.3d 918, 922 (7th Cir. 2005) (interpreting current Section 1110 to "take[] aircraft out of the automatic stay"); *In re Vanguard Airlines, Inc.*, 302 B.R. 292, 299 (Bankr. W.D.Mo. 2003) (interpreting current Section 1110 and holding that creditor's right to dispose of equipment was not avoidable by Section 544); *cf. see also In re Pan Am. Corp.*, 124 B.R. 960, 965 n.3 (Bankr. S.D.N.Y. 1991) (noting that Bankruptcy Act predecessor statute to 1110 contained word "notwithstanding").

[13] As with the other Safe Harbor Provisions, the goal of these "technical" amendments was to "help reduce systemic risk in the financial markets by clarifying the treatment of certain financial products in cases of bankruptcy or insolvency . . . and to protect … all rights previously protected . . . . including … setoff rights."  H.R. REP. 109-648, pt. 1, 2006 WL 6165926, at *2-7 (2006) (emphasis added).

The amendments to Section 362(b)(17), which concern swap agreements, are particularly instructive.  Prior to FNIA, Section 362(b)(17)'s predecessor statute, Section 362(b)(14), provided that swap participants could offset free from the strictures of the automatic stay "mutual debts and claims" constituting "payments" due from the debtor "under or in connection with any swap agreement" against (i) any payment due to the debtor "under or in connection with any swap agreement", or (ii) "*against cash, securities or other property held by, pledged to, under the control of, or due from such swap participant or financial participant to margin guarantee, secure or settle any swap agreement*."  *See* BAPCPA, Pub. L. No. 109-8, § 907(d)(1)(C), 119 Stat. 23, 176 (2005) (emphasis added).  After the enactment of FNIA, Section 362(b)(17) excepted from the operation automatic stay:

> [T]he exercise by a swap participant or financial participant *of any contractual right* (as defined in section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement, or of any contractual right (as defined in section 560) *to offset* or net out any termination value, payment amount, or other transfer obligation *arising under or in connection with 1 or more such agreements, including any master agreement for such agreements* . . . .

11 U.S.C. § 362(b)(17) (emphasis added).

The FNIA amendments clarified the scope of the safe harbor setoff rights in two principal ways.  First, they substituted the reference to the "mutual debts and claims" with "any contractual right", thereby clarifying that setoff pursuant to Safe Harbor Transactions would not be limited by express or implied Bankruptcy Code limitations on the concept of "mutuality." FNIA demonstrates that when Congress intends the Safe Harbor Provisions to limit setoff to mutual debts and claims it does so by using the phrase "any mutual debt and claim."  Second, Congress' deletion of the itemized list of property used to collateralize swap agreements demonstrates its intent to permit swap participants to setoff obligations that do not arise from the

19

termination of the Safe Harbor Transactions, and that setoff in connection with Safe Harbor

Transactions is permitted even where no master netting agreements cover such trades.[14]

### C.   Bankruptcy Code Section 553 Does Not Trump Section 560 and 561 Protections for Swedbank's Setoff Rights

Notwithstanding the plain language of Sections 560 and 561, the Bankruptcy

Court held that Section 553 of the Bankruptcy Code barred Swedbank's proposed setoff.  N.A.

17 at 8.  In so holding, the Court disregarded not only several canons of statutory construction

but also, as discussed in greater detail in I(D)(2), *supra*, the legislative history of the Safe Harbor

Provisions.  Section 553 provides in relevant part that:

> Except as otherwise provided in this section and in sections 362
> and 363 of this title, this title does not affect any right of a creditor
> to offset a mutual debt owing by such creditor to the debtor that
> arose before the commencement of the case under this title against
> a claim of such creditor against the debtor that arose before the
> commencement of the case . . . .

11 U.S.C. § 553(a).

Section 553 does not create any federal right of setoff, but preserves in

bankruptcy, with certain exceptions, whatever right of setoff that "otherwise exists."  *Citizens

Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995).  However, setoff rights in bankruptcy are

generally subject to the following limitations: (1) the debt owed by the debtor must have arisen

prepetition; (2) the debtor's claim against the creditor must have arisen pre-petition; and (3) the

debt and claim must be "mutual."  *In re Bennett Funding Group, Inc.*, 212 B.R. 206, 211-12 (2d

Cir. B.A.P. 1997).  Relying exclusively on Section 553, the Bankruptcy Court concluded that

Swedbank could not exercise its Safe Harbor setoff rights because LBHI's indebtedness to

---

[14] Congress has recognized that the protection of offset and netting rights in Sections 560 and 561 are "in addition to" the protections afforded by the Section 362 Safe Harbor Provisions.  H.R. REP. NO. 109-31 (2005).

Swedbank under the Master Agreements arose pre-petition, the funds in the SEK Account were

deposited post-petition, and therefore mutuality was "lacking."  N.A. 17 at 8.

1. **In Rejecting Swedbank's Safe Harbor Setoff Rights**
**The Bankruptcy Court Disregarded the Plain**
**<u>Meaning of Sections 560 and 561 of the Bankruptcy Code</u>**

  In purporting to rely upon the plain meaning of Section 553 to compel Swedbank

to turn over the funds in the SEK Account, the Bankruptcy Court disregarded the plain meaning

of Code Sections 560 and 561.  Although the Court acknowledged the primacy of

notwithstanding clauses - "[i]t is true, as Swedbank points out, that the phrase 'notwithstanding

any other provision of law' has consistently been interpreted as written by the courts", *see* N.A.

17 at 13, it nonetheless attributed talisman-like import to the word "notwithstanding", and found

the Court found that Section 553 "otherwise limited" Swedbank's setoff rights.  *Id.* ("the safe

harbor provisions . . . by their terms, do **not** contain such a blanket notwithstanding clause")

(emphasis in original).  As noted above, *see infra*, I(B)(2), this holding was contrary to the

fundamental canon that words should be given their ordinary meaning.  *United States v. Ron*

*Pair Enter., Inc.*, 489 U.S. at 242.

2. **The Bankruptcy Court Violated Several Canons**
**of Statutory Construction in Concluding**
**<u>That Section 553 Governs Swedbank's Setoff Rights</u>**

  The Bankruptcy Court violates two canons and misapplies a third in reaching its

decision.  First, the Bankruptcy Court's interpretation of Sections 560 or 561 ignores the canon

of statutory construction that every portion of a statute shall be given meaning.  *Fidelity Fed.*

*Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 163 (1982) ("all parts of a statute, if possible,

are to be given effect").  The Bankruptcy Court concluded that the setoff of the SEK Account

was not excepted from the mutuality requirement of Section 553 because "if Congress had

intended to establish a plainly worded exception to the rule limiting setoff to mutual pre-petition

21

claims, it would have done so explicitly."  N.A. 17 at 14 (citing *FDIC v. Hirsch (In re Colonial*

*Realty Co.)*, 980 F.2d 125, 132-33 (2d Cir. 1992).  However, the Second Circuit rejected this

form of reasoning in interpreting the almost identical Notwithstanding Clause in Section 1110 of

the Bankruptcy Code.  In concluding that Section 1110 prevented the trustee from avoiding a

transaction under Code Section 544 although Section contained no reference Section 544, the

Second Circuit reasoned:

> According to the bankruptcy court, since Congress explicitly stated
> that the right to possess existed notwithstanding §§ 362 and 363
> (the automatic stay provisions), if Congress had wanted § 1110 to
> override § 544 (granting a hypothetical lien creditor rights superior
> to those of a creditor with an unperfected security interest), it
> would have said so.  The bankruptcy court concluded that the
> omission of § 544 meant that Congress did not intend § 1110 to
> abrogate § 544.

> From our perspective, however, we think it more significant that §
> 1110 makes no mention whatsoever that a conditional sales
> contract must be recorded in order for § 1110 to apply.  Rather, §
> 1110, on its face, empowers a vendor of aircraft pursuant to a
> conditional sales contract to repossess the aircraft provided only
> that elements of the section are satisfied. . . . *since the statute is*
> *unambiguous on its face* in this respect, and since this is not one of
> those rare and exceptional circumstances when there is something
> to make plain the intent of Congress that the letter of the statute is
> not to prevail, … *the statute's literal meaning must be applied, and*
> *no condition of recording may be superimposed on the*
> *requirements explicitly specified in order for § 1110 to apply.*
> *Furthermore*, since the language of § 1110 goes beyond excluding
> merely §§ 362 and 363 and, if the requirements of § 1110 are
> satisfied, allows creditors to repossess notwithstanding "any power
> of the court to enjoin such taking of possession," *the bankruptcy*
> *court is unable to grant relief to a trustee or a debtor-in-*
> *possession by virtue of its powers under § 544 or under any other*
> *provision of law.*

*See In re Air Vermont, Inc.*, 761 F.2d 130, 133-34 (2d Cir. 1985) (internal citations and

quotations omitted) (emphasis added); *see also Shamrock Farms Co. v. Veneman*, 146 F.3d

1177, 1180 (9th Cir.1998) (unambiguous provision in federal statute stating that nothing in "any

other provision of law" would interfere with California's regulation of milk content expressed Congress' manifest intent and insulated statute from Commerce Clause challenges notwithstanding fact that statute did not reference Commerce Clause).

In seeking additional express references to support an apparent exception to the typical pre-petition setoff only rule, the Bankruptcy Court did not give the language of Sections 560 and 561 any meaning at all.  Thus, the Bankruptcy Court, in finding that the Safe Harbor Provisions "do not directly address" the mutuality requirement of Section 553, N.A. 17 at 11, violated a statutory canon of construction and improperly failed to give effect to the Notwithstanding Clauses in Sections 560 and 561.

Second, the Bankruptcy Court also apparently disregarded the canon that where statutes are in conflict, a subsequent statute takes precedence over the earlier one.  *See*, *e.g.*, *Lockhart v. United States*, 546 U.S. 142, 149 (2005) ("When the plain import of a later statute directly conflicts with an earlier statute, the later enactment governs"); *United States v. Novak*, 476 F.3d 1041, 1052 (9th Cir. 2007) ("notwithstanding" provision in later statute deemed to govern contradictory earlier one where supported by legislative history). [15]  Section 553 was enacted as part of the original Bankruptcy Code in 1978.  Act of Nov. 6, 1978, Pub. L. No. 95-598, 92 Stat. 2549, § 92 (1978).  Sections 555 and 556 were enacted pursuant to the 1982 amendments to the Code, Section 560 was enacted in 1990 and Section 561 was enacted in 2005 as part of the BAPCPA.  Act of July 27, 1982, Pub. L. No. 97-222, 96 Stat. 235, § 6 (1982); Bankruptcy: Swap Agreements and Forward Contract, Pub. L. No. 101-311, 104 Stat. 267, §106(a) (1990); BAPCPA, Pub. L. No. 109-819, 119 Stat. 178-79, §§ 907(j), 907(k) (2005).  As

---

[15] A corollary to this canon is that the last statute in order of arrangement controls.  *See United States v. Daniels*, 279 F. 844, 849 (2d Cir. 1922).

later-enacted statutes, the language of Sections 560 and 561 control to the extent that there is any conflict with Section 553.

Third, in finding that any exception to setoff should have been placed in Section 553, the Bankruptcy Court incorrectly applied the canon that "a general section of a statute must give way to a specific one."  N.A. 17 at 12 (citing *United States v. LaPorta*, 46 F.3d 152, 156 (2d Cir. 1994).  Implicitly, the Court decided Section 553 "setoff" limitation was more specific than the later Sections 560 or 561 swap protection.  The Court concluded without any analysis that Section 553 was the more specific statute.  However, the Court should have concluded that the later enacted Safe Harbor Provisions are the more specific statutes.

In determining which of two Bankruptcy Code provisions is more specific, the Second Circuit has focused its analysis on which of the provisions applies to a more narrow class of interested parties.  *In re Stoltz*, 315 F.3d 80, 93 (2d Cir. 2002) (reversing district court's grant of motion).  For example, in *In re Stoltz* the Second Circuit concluded that the anti-discrimination provisions of Bankruptcy Code Section 525(a) trumped the executory contract provisions of Bankruptcy Code Section 365 because although the latter statute applied to landlords in general, Section 525(a) applied to landlords which were also governmental units.  *Id*.

Similarly, the Safe Harbor Provisions are more specific than Section 553 because they govern the rights of a narrow class of protected financial contracts and parties.[16]  In contrast, Section 553, which references the "right of a creditor to offset" without further any specificity, applies to creditors in general.  11 U.S.C. § 553.  Thus, interpreting the Safe Harbor Provisions as

---

[16] Bankruptcy Code Section 560 applies to "[t]he exercise of any contractual right of any swap participant or financial participant … to offset .. payment amounts…"  11 U.S.C. § 560.  Bankruptcy Code Section 561 applies to "[t]he exercise of any contractual right … to offset … payment amounts in connection with one or more…. (5) swap agreements or (6) master netting agreements."  11 U.S.C. § 561(a).

more specific than the plain terms of Section 553 is consistent with Second Circuit authority and undercuts the Decision.  In short, Section 553 does not control the determination of Swedbank's Safe Harbor contractual rights because it is a "a provision of this title [title 11]" whose applicability is rendered inoperable by Sections 560 and 561.[17]

Congress' judgment to give primacy and grant ever expanding protection to setoff rights continued financial control reflects the commercial realities of modern day derivatives trading.  In broadening the definition of "swap transactions" to include "any security agreement or arrangement or other credit enhancement" in the 2005 BAPCPA Amendments, Congress acknowledged that setoff is one such "security arrangement."  *See* H.R. REP. NO. 109-31, 2005 U.S.C.C.A.N. 88 (2005) ("An example of a security arrangement is a right of setoff . . . ."). ISDA master agreements have "wide acceptance" and document the "vast majority of derivatives transactions."  *See* ISDA News Release, "ISDA Publishes 2002 ISDA Master Agreement", dated January 8, 2003 ("**News Release**"), available at http://www.isda.org/press/press010803.html.  In a news release promoting the publication of its 2002 Master Agreement, ISDA specifically recognized the exercise of a right of setoff against a deposit accounts of a counterparty to a swap agreement is a valid form of "security arrangement" under its master agreements:

> A set-off provision, which is important in default situations because it allows the non-defaulting party to attempt to garner other assets of the defaulting party *other than the amounts it is owed*.  Thus, with a set-off provision, the non-defaulting party *can explore whether there are other assets such as a deposit account that can be attached and then set-off* against the amount the

---

[17] Swedbank's interpretation of the expansive rights recognized in the Safe Harbor Provisions finds additional support in Bankruptcy Code Section 558, which preserves the *debtor's* setoff rights.  *See* 11 U.S.C. § 558 (preserving for the estate any defenses available to the debtor); *see also, In re Women First Healthcare Inc.,* 345 B.R. 131, 134 (Bankr. D.Del. 2006) (noting that although Section 553 and 558 preserve the rights of setoff, its only Section 553 that prohibits the setoff of non safe harbor pre-petition claims against post-petition debts).  Given that the "technical changes" referenced by the Debtors were intended to clarify existing safe harbor protections for modern financial contracts, it would not make sense for Congress to ensure that only the Debtors could exercise setoff rights under safe harbor contracts.

> defaulting party owes the non-defaulting party.  The 1992 IDSA
> Master Agreement did not include a set-off provision.  (Emphasis
> added.)

*Id.*[18]  Permitting such setoff promotes the liquidity and flexibility that Congress sought to

enhance by increasing a non-breaching party's recourse to capital, preventing a chain of bank

failures and reducing systemic risk.  Again Congress' expressed evolutionary approach to setoff

supports the conclusion that the clarity of the later language of Sections 560 and 561 should

prevail to the extent of any recent perceived conflict with Section 553.

### 3.   Congress' Protection of Pre-Petition and Post-Petition Setoff Rights in Sections 553, 560 and 561 are Mutually Reinforcing and Not Mutually Exclusive

The Court cited to Congress' inclusion in Section 553 of protections for certain

setoffs "of a kind described" in the Safe Harbor Provisions made during the 90-day period *before*

the filing of a bankruptcy petition, and the absence in Section 553 of any such protections for

Safe Harbor Setoffs made *after* such filing, as proof that Congress did not intend to except Safe

Harbor Transactions from the limitations that Section 553 imposes on setoff rights.  N.A. 17 at

15-16.[19]  However, properly read, Sections 553, 560 and 561 reinforce one another.  By their

very nature, the pre-petition setoff of Safe Harbor Transactions protected in Section 553 can only

involve pre-petition obligations.  In contrast Sections 560 and 561 apply only if termination or

---

[18] The Setoff Provision in the Schedules to the Swedbank-LBHI Master Agreement was the issuance of the 2002 Master Agreements.  *See*  News Release, at 2.  Given ISDA's instrumental role in supporting the passage of Section 560, the setoff provisions in ISDA's form master agreements serve as a guide to interpretation of Sections 560 and 561.  *See, e.g.*, H.R. REP. 101-484, at 2, *as reprinted in* 1990 U.S.C.C.A.N. 223, 224 (1990) (noting testimony of ISDA Chairman Mark C. Brickell in support of H.R. 2057); *see also* 136 CONG.REC. H2281-06, H2284 (1990) (noting ISDA's support for H.R. 4612).

[19] Section 553(a) excepts from avoidance the setoff of claims "of a kind described" in the Safe Harbor Provisions (i) transferred to a creditor from another creditor during the 90-day period prior to the bankruptcy filing, *see* 11 U.S.C. § 553(a)(2), or (ii) incurred by the creditor during such period for the purpose of obtaining a right of setoff.  *See* 11 U.S.C. § 553(a)(3).  Section 553(b) excepts from avoidance any similar Safe Harbor setoff during the 90-day period to the extent that such setoff improved the creditor's position by reducing its unsecured claim.  11 U.S.C. § 553(b)(1).

setoff is based on, and *follows*, one of the *ipso facto*[20] events described in Section 365(e)(1), including the filing of a bankruptcy petition.  Indeed, Congress' choice of the phrase "of a kind" in the 2005 amendments to Section 553 was necessary because the transactions referenced therein *cannot* apply to Safe Harbor setoffs.  Thus, Sections 553(a)(2), 553(a)(3) and 553(b)(1) are consistent with Congress' desire to protect Safe Harbor Transactions regardless of whether they are terminated pre- or post-petition and whether the obligations arose pre-petition or post petition.

### 4. The Bankruptcy Court Mutuality Conclusion Disregards The United States Supreme Court Rejection of The Pre- Post-Petition Entity Distinction

Concepts of mutuality found outside of Section 553 do not trump the plain meaning of the Safe Harbor Provisions.  The foundation of the pre- post-petition mutuality distinction stems from the idea no pre-petition obligation can be mutual to a post-petition obligation because the entity that becomes the debtor upon the filing of a bankruptcy petition is a different entity post-petition (the so-called "new entity" theory).  However, the Supreme Court has rejected the "new entity" theory, holding that there is no change in the identity of the entity that enters bankruptcy; it is and remains the same entity.  *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 528 (1984); *see also* 5 COLLIER, 553.03[3][g](ii) (citing *Bildisco* for the proposition that for purposes of Section 553 "it is sensible to view the debtor-in-possession as the same 'entity' which existed before the filing of the bankruptcy petition").

---

[20] An "*ipso facto*" clause is a clause that is operative upon an insolvency event.  *In re Enron*, 306 B.R. 465, 472 (Bankr. S.D.N.Y. 2004).  Such clauses are historically unenforceable in bankruptcy.  The three *ipso facto* events are (1) the commencement of case under title 11, (2) the appointment of a trustee in a case under title 11, and (3) the insolvency or financial condition of the debtor at any time before the closing of the case. 11 U.S.C. § 365(e)(1). Congress has exempted Safe Harbor Transactions from the operation of 365(e)(1).  *See, e.g.*, 11 U.S.C. 560 (providing no provision of the Bankruptcy Code shall limit the "exercise of a contractual right" of a swap agreement party "because of condition of the kind specified in section 365(e)(1)"); *see also Enron*, 306 B.R. at 472 (demonstrating conditions under which a 560 swap agreement may be terminated).

The upshot of *Bildisco* is that any mutuality restrictions across the pre-petition / post-petition membrane, which party seeks to enforce, must be found in the text of the Bankruptcy Code since the pre and post petition debtors are in fact the same legal entity.  So when Congress states setoff "shall not be stayed, avoided or otherwise limited by operation of any provision of this title" in Sections 560 and 561 what ever mutuality can be found in the Master Agreements is preserved as to the legal entities describe in those agreements.

Indeed, the authority in this Circuit recognizes that *Bildisco* "laid to rest the notion that a debtor in possession should be deemed a different entity than the prepetition debtor."  *In re Footstar*, 323 B.R. 566, 574 n.4 (Bankr. S.D.N.Y. 2005); *see also, e.g.*, *In re Durso Supermarkets, Inc.*, 1995 WL 739549, *8 (S.D.N.Y. Dec. 14, 1995) (pre- and post-petition debtor same entity for *res judicata purposes*); *In re Ontario Locomotive & Indus. Ry. Supplies, (U.S.) Inc.*, 126 B.R. 146, 147 (Bankr. W.D.N.Y. 1991) (*Bildisco* settled pre- post-question "for all time"); *cf. In re Worldcom*, 401 B.R. 637, 649 (Bankr. S.D.N.Y. 2009) (recognizing *Bildisco's* continuing validity but holding that a customer as debtor and its Trustee are separate entities for the purposes of bringing statutory avoidance actions).  The Bankruptcy Court's rejection of *Bildisco* as irrelevant to interpreting Section 553, *see* Decision, at 12, is simply incorrect.  *See* 5 COLLIER ON BANKRUPTCY 553.03 (2010) (citing *Bildisco* in rejecting the prepetition requirement as a component of mutuality); *cf. Schwab v. Reily,* --S.Ct.--, No. 08-538, 2010 WL 2400094 (U.S. Jun. 17, 2010) (recognizing COLLIER as the "leading treatise on bankruptcy") (Justice Ginsberg, dissenting).[21]

---

[21] The decisions recognizing the continuing validity of *Bildisco* are many.  *See, e.g.*, *In re: R.J. Reynolds Patrick County Memorial Hosp. Inc.*, 315 B.R. 674, 680 (Bankr. W.D.Va. 2003) (*Bildisco* defines a prepetition debtor and the debtor-in-possession as the same entity); *In re Cajun Elec. Power Co-op, Inc.*, 230 B.R. 693, 705 (Bankr. M.D.La. 1999) (recognizing debtor-in-possession as a separate entity would result in virtual rejection of executory contracts under 365(f)); *In re Mohar*, 140 B.R. 273 (Bankr. D.Mont. 1992) (rejecting separate entity theory in Section 553 analysis); *In re Allen*, 135 B.R. 856, 868 (Bankr. N.D. Iowa 1992) (*Bildisco* "laid to rest" separate entity theory); *Texaco, Inc. v. Louisiana Land and Exploration Co.*, 136 B.R. 658, 669 (M.D.La. 1992)

28

### D. The Bankruptcy Court Overstated the Impact of Enforcing the Safe Harbor Provisions According to Their Terms

The Bankruptcy Court based its decision in part on its belief that denying LBHI's requested relief would raise questions about the "continued viability" of the mutuality requirement of Section 553(a).  N.A. 17 at 2.  This was an unfounded concern, and the mutuality requirement is alive and well.  As noted above, this dispute concerns only a limited, but important, Congressionally-recognized exception to the *additional* requirements for the exercise of setoff rights in bankruptcy imposed by Section 553(a).  Among these requirements are that the claims sought to be setoff have both arisen pre-petition.  The Safe Harbor Provisions neither except Safe Harbor Transactions from non-bankruptcy mutuality requirements outside of bankruptcy law, nor do they reach beyond their scope – protected financial contracts.

## II. Bankruptcy Code Sections 560 and 561 Preserved Swedbank's Rights to Freeze and Setoff Against The SEK Account

### A. The SEK Account Created A Debt Obligation in Favor of LBHI and Setoff of Those Obligations is Permitted Under the Master Agreements

Swedbank's right to setoff the SEK Account against the obligations of LBHI under the Master Agreements is unassailable.  It is settled that a deposit account creates a debtor-creditor relationship between the bank and the depositor, obligating the bank to the depositor in the amount of the deposit.  *Strumpf v. Maryland*, 516 U.S. 16, 21 (1996).[22]  As noted above, under both New York and English law a bank has both common law and statutory rights to setoff

---

*(cont'd from previous page)*

(*Bildisco* "squarely held" pre- and post-petition debtors are the same entity); *In re Mohawk Indus. Inc.*, 82 B.R. 174, 177 (Bankr. D. Mass. 1987) (new entity theory is "no longer supportable" after *Bildisco*).  However, some courts continue to recognize the separate entity distinction in certain, limited contexts, *see, e.g.*, *Biltmore Assocs., LLC v. Twin City Fire Ins. Co.*, 572 F.3d 663, 670-71 (9th Cir. 2009) (separate entity distinction recognized for purposes in dispute over coverage exclusion provision in D&O policy).

[22] Due to its conclusion that the mutuality requisite for setoff was lacking, the Bankruptcy Court found it unnecessary to address the question whether the scope of Swedbank's setoff rights under the Safe Harbor Provisions included the right to setoff the SEK Account.  The court further noted that the same issue had been fully briefed in another litigation and would be decided when that action was adjudicated.  *See*, N.A. 17 at 7 n.12 (citing *Bank of America, N.A. v. Lehman Bros. Holdings Inc. et al.*, Adv. Pr. No. 08-01753 (Bankr. S.D.N.Y. 2009).

funds in a deposit account against amounts owed by the depositor to the bank.  *See, e.g., In re Bennett Funding Group, Inc.*, 146 F.3d 136, 139 (2d Cir. 1998) ("funds in a general deposit account can be used to setoff debts owed to the bank").  As noted above, Swedbank has a statutory and common law right to setoff the SEK Account against any obligations of LBHI to Swedbank under the Master Agreements.

The Master Agreements specifically preserved Swedbank's extra-contractual setoff rights and created contractual rights to freeze and setoff against the SEK Account.  *See* Statement of Facts § 1 *infra*.  Those Agreements provided that any contractual rights of setoff would be "*in addition to* any rights of setoff" enjoyed by the parties "as a matter of law or otherwise."  *Id*.  The Master Agreements permitted the non-defaulting party to setoff "any obligation" of the defaulting party against "any obligation" of the non-defaulting party, "whether or not" those obligations arose under the ISDA Agreement.  *Id*.  All of Swedbank's rights were preserved under Bankruptcy Code.

## B. Bankruptcy Code Section 560 Permits Setoff of The SEK Account

Section 560 provides that "any *contractual right* . . . of a swap participant . . . to *offset* . . . arising *under or in connection with* the termination, liquidation or acceleration of one or more swap agreements, *shall not* be stayed, avoided or otherwise limited by operation of any provision [of the Bankruptcy Code].  11 U.S.C. § 560 (emphasis added).  Thus, Section 560, on its face authorizes Swedbank to setoff its obligations to LBHI against any obligations owing to Swedbank under or in connection with any swap agreements.  Since the Safe Harbor Provisions define "contractual rights" to include common law rights, any interpretation of the statute requiring both sets of obligations to arise under swap agreements would read common law rights out of the statute and run contrary to the canon that a statute should be interpreted in a manner that gives every provision meaning.  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a

30

cardinal principal of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence or word shall be superfluous, void or insignificant").

### C.     Bankruptcy Code Section 561 Permits Setoff of The SEK Account

Even if Section 560 did not permit setoff against of the SEK Account, it is clear that such setoff is permitted by Section 561, which recognizes even broader setoff rights. Section 561(a) protects rights to offset not only "termination values" and "payment amounts", but also "other transfer obligations."  11 U.S.C. § 561(a).  More importantly, although Section 561(b) specifically limits the protection of rights "to accelerate, liquidate or terminate" under a master netting agreement by providing that they are protected "*only* to the extent that" they could be exercised under the other Safe Harbor Provisions, Sections 555, 556, 559 and 560, the provision makes *no* reference to setoff or netting.  11 U.S.C. § 561(b) (emphasis added).  Since Section 561(a) specifically protects both rights of "termination, liquidation or acceleration" *and* setoff and netting rights, this distinction is crucial.  Congress' deliberate exclusion of any reference to setoff and netting in Section 561(b) demonstrates its intent that setoff rights under a master netting agreement be broader than those enjoyed under the other Safe Harbor Provisions. Had Congress intended to so limit such rights, it would have done so specifically.  In other words, 561(b) makes clear that the *only* limitations on Safe Harbor parties' setoff rights are contractual.

The Master Agreements permit Swedbank to setoff its obligations to LBHI whether or not they arose under the Master Agreements.  This includes Swedbank's obligation to LBHI for the amount of the SEK Account.  Indeed, any other conclusion would require a reading contrary to the plain language of Section 561.  If the only debts giving rise to termination values protected by Section 561 (and Section 560) were those debts resulting from the liquidation of

actual Safe Harbor Transactions themselves, then the reference to termination values arising "in connection with termination" would be superfluous.  Pursuant to the Master Agreements, the status of the deposit amount as a "termination value" against which Swedbank can exercise its contractual setoff rights clearly "arises under or in connection with" the Master Agreements.

For the same reason, Swedbank's obligation to LBHI under SEK Account is also a "transfer obligation . . . in connection with" the Master Agreements.  Furthermore, the fact that the right to offset "transfer obligation" is stated in the disjunctive - "termination values, payment amounts, *or* other transfer obligations" – demonstrates that Congress meant to represent all transfer obligations, and not just those arising from the pre-petition termination of the swap trades themselves.  *See Williams v. Taylor*, 120 S. Ct. 1495, 1498 (2000) (interpreting 28 U.S.C.A. § 2254 (d)(1) and giving independent meaning to clauses separated by the word "or" because it is "a cardinal principal of statutory construction that courts must give effect, if possible, to every clause and word of a statute").

> **D.    The Bankruptcy Court Erroneously Held That**
> **Swedbank's Automatic Freeze Violated the Automatic Stay**

As noted above, the Safe Harbor Provisions except the setoff of obligations arising from or in connection with Safe Harbor Transactions from the operation of the automatic stay.  Sections 560 and 561 clearly state that the right to setoff "shall not be stayed . . . or otherwise limited by operation of any provision of this title."  Since Swedbank's right of setoff is exempt from the automatic stay, Swedbank's administrative freeze on the SEK Account and refusal to release funds to preserve its rights of setoff is similarly protected.  Furthermore, Swedbank did not need to seek relief from the Bankruptcy Court lifting the stay in order to permit it to exercise its setoff rights.  Nor did Swedbank need permission to reject the Debtors'

request to release the funds.  Each of the actions were protected Safe Harbor Transactions.  In short, the automatic freeze did not constitute a violation of the automatic stay.

In compelling the enforcement of the automatic stay, the Bankruptcy Court relied on the basic proposition the stay is one of the "fundamental protections" of the Bankruptcy Code.  *See* N.A. 17 at 10.  It is no less equally true that Congress, in the exercise of its legislative power has for equally compelling policy reasons has excepted the Safe Harbor Transactions from the operation of the automatic stay.  Thus, the Bankruptcy Court was without power to issue an Order compelling Swedbank's compliance with the stay, where the stay did not in fact apply.  *Policy Realty Corp. v. Treber Realty LLC (In re Policy Realty Corp.)*, No. 99-5062, 2000 WL 534265, *2 (2d Cir. 2000) (noting that automatic stay was inapplicable and affirming district court's reversal of bankruptcy court automatic stay order).

### III.    The Legislative History of the Safe Harbor Provisions Supports Swedbank's Setoff Rights

As demonstrated above, Sections 560 and 561 of the Bankruptcy Code unambiguously mandate that *no* Bankruptcy Code provision may limit Swedbank's contractual rights to setoff the SEK Account.  The best indicator of intent is the plain language of statute itself.  *Nixon v. U.S.*, 506 U.S. 224, 232 (1993).  A review of the legislative history is improper where the statute is clear on its face, *Ron Pair*, 489 U.S. 235 at 241, and courts will only interpret a statute contrary to its plain meaning if a literal reading would frustrate Congress' legislative intent.  *Id.*  No such contrary reading is possible here, since the legislative history demonstrates Congress' intent in enacting the Safe Harbor Provisions is fully consonant with a literal reading of them, and with the protection of Swedbank's setoff rights.  *See In re American Home Mtg. Holdings, Inc.*, 411 B.R. 181, 189 (Bankr. D.Del. 2009) ("it is appropriate to identify, if possible, a congressional purpose consistent with the Court's interpretation of the text at issue").

33

### A.  Congress Enacted the Safe Harbor Provisions to Provide Expansive Protections to Financial Contracts

The legislative history of the Safe Harbor Provisions demonstrates Congress' clear intent to grant "special treatment" to financial contracts from the inception of the Bankruptcy Code in 1978.  *See* 136 CONG.REC. H2281-06, H2282 (1990) ("Congress has concluded certain rapid, high volume financial transactions warrant *special bankruptcy treatment* so as not to disrupt capital markets") (statement of Rep. Jack Brooks, Chairman, Subcom. on Economic and Commercial Law) (emphasis added).[23]  Congress has as a result occasionally exempted financial contracts from the "uniform application" of the Bankruptcy Code, including the principle that creditors should be treated equally.  *Id.*  Congress' justification for this treatment is threefold.

Most fundamentally, the "special treatment" of financial contracts is intended to alleviate the "great" "potential for confusion and disruption in the capital markets" due to the insolvency of a party to such contracts, including swap agreements.  *See Id.*; *see also* H.R. REP. NO. 101-484, at 2, as *reprinted in* 1990 U.S.C.C.A.N. 223, 224 (1990) (purpose of Section 560 is to ensure that the swap financial markets are not "destabilized" by their then "uncertain[]" treatment under the Bankruptcy Code).[24]  This risk arises from the nature of the financial markets, which "can change significantly in a matter of days, or even hours", raising the specter of "heavy losses" for the non-bankruptcy counterparty.  H.R. REP. NO. 101-484, at 2, *as reprinted in* 1990 U.S.C.C.A.N. 223, 224 (1990).  Furthermore, swap agreements are "vital risk

---

[23] *See also* H.R. REP. 101-484, at 2, as *reprinted in* 1990 U.S.C.C.A.N. 223, 224 (1990) ("US bankruptcy law has long accorded *special treatment* to transactions involving financial markets . . . ."); 136 CONG.REC. H2281, 2284 (1990) (high volume financial transactions deserve "different treatment" and are in a "different category" under the Bankruptcy Code) (statements of Sen. Schumer) (emphasis added).

[24] *See also* H.R. REP. No. 97-420, at 2, *as reprinted in* 1982 U.S.C.C.A.N. 583, 583 (1982) (stating that the safe harbor protections for commodities and securities contracts were enacted to prevent a party's insolvency from "threatening the collapse of the market").

management tools" used by financial institutions, corporations and even governments to manage interest rate and currency risks.  136 CONG.REC. H2281-06, H2284 (1990) (statement of Sen. Schumer); *see also* H.R. REP. NO. 101-484, at 3, *as reprinted in* 1990 U.S.C.C.A.N. 223, 224 (1990) (swap agreements permit entities to minimize borrowing costs and hedge fluctuations in interest and foreign exchange rates).

Protection for swap agreements was aimed at eliminating the "needless uncertainty about the potential impact of a bankruptcy filing on the right to terminate and net out" such transactions.  136 CONG.REC. H2281-06, H2283 (1990) ("[t]he stability of the swap market depends on the ability of a non-defaulting participant to terminate outstanding transactions quickly") (statement of Rep. Fish); 136 CONG.REC. S7534-01, S7535 (1990) ("The effect of the swap provisions will be to provide certainty for swap transactions by and thereby stabilize domestic markets by allowing the terms of a swap agreement to apply *notwithstanding* the bankruptcy filing") (statement of Sen. DeConcini) (emphasis added).  A non-debtor party to a swap agreement that is unable to terminate its transactions due to application of the various provisions of faces a risk of "heavy losses unless the transactions are resolved promptly and with finality."  H.R. Rep. No. 101-484, p. 2, *as reprinted in* 1990 U.S.C.C.A.N. 223, 224 (1990). Congress specifically noted the primacy of setoff rights in such termination, stating that such protections were necessary to prevent the bankruptcy filing of a contract party from "skew[ing]" the "setoff process, which is at the center of the swap agreement."  *Id.* at 3.

In addition to preventing systemic risk, Congress found the additional protections for swap agreements would help to ensure the international competitiveness and success of America's capital markets.  136 CONG.REC. H2281-06, H2284 (1990) (statement of Sen. Schumer).  The legislation was a necessary response to the development of what were at the time

novel financial instruments.[25]  Third, Congress believed that enacting the protections for swap

agreements would lower the cost of capital for American corporations, facilitate investment and

the movement of capital and in general increase the efficiency of the financial markets.  *Id.*[26]

Indeed, Congress specifically noted that the different policy rationales applicable to swap

agreements warranted a departure from the usual bankruptcy policy of discouraging setoff

against a debtor's bank accounts by subjecting such setoffs to avoidance under Section 553:

> While the setoff preference provision of section 553(b)(1) is
> designed to discourage bank account setoffs that may precipitate a
> bankruptcy filing, its operation in the swap market could materially
> interfere with customary operation of the market.  For these
> reasons, swap agreements . . . should be granted the same
> exception from ordinary preference rules and from the preferenced
> provisions of section 553(b)(1) as Congress has accorded securities
> contracts and other financial agreements.

> 135 CONG. REC. S1414-01, S1417 (1989).

### B.  Congress Actually Intended Section 560 to Apply Notwithstanding Any Other Provision of The Bankruptcy Code

At bottom the dispute is whether Congress preferred contract enforcement over

Debtor protection for derivate financial products.  Congress was unequivocal in its answer.

When Section 560 was enacted pursuant to the 1990 amendments to the Bankruptcy Code,

---

[25] Congress has continually expanded the Safe Harbor protections in response to the constant innovations of the financial industry, with swap agreements being added to this protected category in 1990 and master agreements in 2005.  *See* H.R. REP. NO. 101-484, at 2, *as reprinted in* 1990 U.S.C.C.A.N. 223, 224 (1990) ("As new financial instruments have been developed, Congress has amended the 1978 Bankruptcy Code to keep pace in promoting speed and certainty in resolving complex financial transactions").  Congress explicitly acknowledged the continuing need for flexibility in the application of the Safe Harbor Provisions by amending the definition of "swap agreement" in 2005 to add not only new categories of swaps, but also to include a catch-all category for "any agreement or transaction that is similar" to any of the swap agreements listed.  11 U.S.C. § 101(53B); *see also* HR REP. NO. 109-31(I), at 121, *as reprinted in* 2005 U.S.C.C.A.N. 88, 183 (2005) (definition of "swap agreement" in Section 101(53B) expanded to promote congressional desire for "flexibility to avoid the need to amend the definition as the nature and uses of swap transactions matured").

[26] The fear that a debtor or trustee would "cherry-pick" swap agreements favorable to the debtor was one cause of this uncertainty.  136 CONG.REC. S7534-01, S7535 (statement of Sen. DeConcini).

NewYork 1356845.5

Congress could not have more clearly stated its intent that the protections granted to swap

agreements pursuant to that statute preempted *all* other provisions of the Bankruptcy Code:

> [S]ection 560 . . . preserve['s] a swap participant's contractual
> right to terminate a swap agreement and offset any amounts owed
> under it in the event that one of the parties to the agreement files a
> bankruptcy petition or becomes insolvent, or in the event that a
> trustee or custodian is appointed for the party.  Section 560
> provides that the exercise of any such right shall not be stayed,
> avoided, or otherwise limited by operation of the Bankruptcy Code
> or by order of any court or government agency in any proceeding
> under the Bankruptcy Code. . . . This provision is not intended to
> preempt the statute of  frauds or any other provision of law*, except
> for the provisions of the Bankruptcy Code*.

H.R. REP. NO. 101-484, at 5-6, *as reprinted in* 1990 U.S.C.C.A.N. 223, 227-28 (1990) (emphasis

added).[27]  Furthermore, the Senate Report on Section 560 specifically addressed Section 560's

Notwithstanding Clause and stated that no proceeding under the Bankruptcy Code could interfere

with the setoff rights of parties to safe harbor contracts:

> [T]he right to setoff or net out termination values or payment
> amounts arising under or in connection with one or more swap
> agreements, can not be stayed, avoided or otherwise limited by the
> Code or by any court or administrative agency in any case under
> the Code.  *This provision means that these contractual rights are
> not to be interfered with by any court proceeding under the Cod*e,
> including a stay otherwise authorized by Code section 105.

S. REP. NO. 101-285, at 9 (1990).

### C.      Congress Specifically Exempted Safe Harbor Transactions From the Section 553 Requirement that Both Obligations Arise Pre-Petition

The legislative history of the Safe Harbor Provisions also clearly provides that the

parties to Safe Harbor Transactions can exercise setoff rights regardless of when their claims

arose before or after the filing of the bankruptcy petition.  In amending one of the first Safe

---

[27] Congress used identical language to discuss a similar amendment made to Section 556, stating that "similarly to the change made by section 106 of the bill, this provision is not intended to preempt the statute of frauds or any other provision of law, *except for the provisions of the Bankruptcy Code*."  H.R. REP. NO. 101-484, at 7, *as reprinted in* 1990 U.S.C.C.A.N. 223, 229 (1990) (emphasis added).

NewYork 1356845.5

Harbor Provisions, 362(b)(6), which is the automatic stay analogue to Sections 555 and 556,

Congress unequivocally stated that Safe Harbor protections of setoff rights applied to obligations

arising "before" *and* "after" the filing of the bankruptcy petition:

> [C]ommodity or securities brokerage firm has a claim for a margin
> or settlement payment against debtor *arising, before or after the*
> *filing of the petition*, out of commodity contracts, forward contracts
> or securities contracts – or the liquidation of those contracts … it
> would not be stayed from *setting* off that claim against such cash,
> securities, or other property, or against any amount with respect to
> such contracts that it would be required to pay.

128 CONG.REC. S8132-33 (1982).  Since the Safe Harbor Provisions are interpreted similarly,[28]

this statement regarding Section 555 applies to Section 560.  Congress also anticipated that the

safe harbor protections would apply to obligations arising post-petition in the legislative history

to the 1990 Amendments to the Safe Harbor Provisions.  In discussing the 1990 Amendment's

expansion of  the definition of discussion of "contractual rights" to include common law rights,

Congress noted that:

> In conjunction with section 556, section 362(b)(6) permits a
> forward contract merchant to net positive and negative exposures
> resulting from the liquidation of some or all of its open forward
> contracts with an insolvent counterparty, as well as any other
> amounts *that may arise out of or be owed* in connection with those
> contracts.

S. REP. NO. 101-285, at 2 (1990) (emphasis added).  Since the Safe Harbor Provisions only have

effect post-petition, the phrase "may arise" shows that Congress specifically envisioned that

obligations subject to setoff would arise post-petition.

In sum, the legislative history of the Safe Harbor Provisions supports their plain

language and further demonstrates Congress' specific intent to permit parties to safe harbor

---

[28] *See Cohen v. de la Cruz*, 523 U.S. 213, 220 (1998) (similar words are interpreted similarly); S. REP. NO.
101-285, at 9 (1990) (Section 560 gives swap participants the "same protection" that Sections 555, 556, and 559
give to participants to securities, commodities, forward and repurchase agreement participants).

contracts to exercise setoff obligations regardless of whether the obligations arose pre or post petition.

## CONCLUSION

For the foregoing reasons, the Decision Below should be reversed.

Dated: New York, New York
       July 14, 2010

SALANS LLP

By: _____
    Claude D. Montgomery, Esq.
    Lee P. Whidden, Esq.
    Paul C. Gunther Esq.
    620 Fifth Avenue
    New York, New York  10020
    (212) 632-5500

*Attorneys For Appellant Swedbank AB (publ)*

39