WEIL, GOTSHAL & MANGES, LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Richard P. Krasnow
Denise Alvarez
Eleanor H. Gilbane

*Attorneys for Appellee Lehman Brothers Holdings, Inc.*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                             :

In re                          :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,  :

              **Debtors.**       :

-----------------------------------------------------------------x
                             :

**SWEDBANK AB (PUBL)**         :

                   :

         **Appellant,**    :     **Case No. 1:10-cv-4532 (NRB)**

                   :

     **v.**               :

                   :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,  :

                 :

          **Appellees.**   :

-----------------------------------------------------------------x

## APPELLEE LEHMAN BROTHERS HOLDINGS INC.'S BRIEF ON APPEAL

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

COUNTER-STATEMENT OF ISSUES PRESENTED ...................................................... 3

STANDARD OF APPELLATE REVIEW .......................................................................... 4

COUNTER-STATEMENT OF THE CASE ........................................................................ 4

I.    NATURE OF THE CASE ............................................................................................ 4

    A.    LBHI's Bankruptcy ............................................................................................ 4

    B.    Swedbank's Administrative Freeze ................................................................ 5

II.   THE PROCEEDINGS BELOW ................................................................................. 6

    A.    The Debtors' Motion to Enforce the Automatic Stay and Compel Payment
        of Post-Petition Funds ...................................................................................... 6

    B.    The Bankruptcy Court's Order on Debtors' Motion ................................. 7

    C.    Swedbank's Motion for a Stay Pending Appeal ......................................... 8

ARGUMENT ........................................................................................................................... 9

I.    THIS COURT SHOULD AFFIRM THE BANKRUPTCY COURT'S RULING
    BECAUSE THE BANKRUPTCY COURT CORRECTLY RULED THAT
    SWEDBANK'S PROPOSED NON-MUTUAL SETOFF IS PROHIBITED BY
    SECTION 553 OF THE BANKRUPTCY CODE .............................................. 9

    A.    Swedbank's Proposed Setoff Lacks the Mutuality Required by Section
        553 of the Bankruptcy Code ........................................................................... 9

    B.    The Bankruptcy Court Correctly Ruled that No Exception to Mutuality for
        Safe-Harbored Transactions Appears in the Plain Reading of the
        Bankruptcy Code ............................................................................................ 11

        1.    The Exceptions for Safe-Harbored Transactions Contained in
            Section 553 Demonstrate that the Safe Harbor Provisions Do Not
            Override the Mutuality Requirement for Setoffs ................................... 12

        2.    The Plain Text of Sections 560 and 561 Do Not Override the
            Express Mutuality Requirement in Section 553 of the Bankruptcy
            Code. ................................................................................................................ 14

        3.    Sections 560 and 561 of the Bankruptcy Code Do Not Protect the
            Exercise of Non-Mutual Setoffs. ............................................................... 15

        4.    The Plain Language in Sections 560 and 561 Does Not Have the
            Same Meaning as the "Notwithstanding" Clause in Section 1110 of
            the Bankruptcy Code .................................................................................... 20

# TABLE OF CONTENTS

**Page**

C.   The Bankruptcy Court Correctly Ruled that Legislative History Confirms that There Are No Exceptions to Mutuality for Safe-Harbored Transactions ........................................................................................................ 22

   1.   Congress Did Not Intend that Sections 560 and 561 Override the the Mutuality Requirement of Section 553 of the Bankruptcy Code ...... 22

   2.   The Financial Netting Improvement Act of 2006 Supports the Bankruptcy Court's Conclusion that Sections 560 and 561 Do Not Override the Mutuality Requirement of Section 553 ............................ 23

D.   The Bankruptcy Court Correctly Ruled that No Relevant Case Law Exists Supporting Swedbank's Position ...................................................... 24

II.   THIS COURT SHOULD AFFIRM THE BANKRUPTCY COURT'S RULING BECAUSE SWEDBANK'S PROPOSED SETOFF AGAINST A GENERAL DEPOSIT ACCOUNT IS NOT SAFE-HARBORED UNDER SECTIONS 560 AND 561 OF THE BANKRUPTCY CODE ............................................... 27

A.   A Logical Reading of the Plain Language of Sections 560 and 561 Demonstrates that Their Protections Are Limited to Setoffs of Obligations Arising Under or in Connection with Swap Agreements or Other Derivative Contracts – Not Setoffs Against Commercial Deposit Accounts ...... 28

   1.   Sections 560 and 561 Protect Limited Contractual Rights of Setoff ....... 28

   2.   The Amounts Deposited in the Account Are Not "Transfer Obligations" or "Termination Values" "Arising Under or in Connection with" a Swap or Other Safe Harbored Contract. ................. 31

B.   The Legislative History, Underlying Policy, and Case Law Support a Finding that Sections 560 and 561 Do Not Apply to Setoffs Against LBHI's Account ........................................................................................ 33

III.   THE BANKRUPTCY COURT'S RULING SHOULD BE AFFIRMED BECAUSE SWEDBANK VIOLATED THE AUTOMATIC STAY ............................ 38

CONCLUSION ................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Adomah*, 340 B.R. 453 (Bankr. S.D.N.Y. 2006) ................................................. 39

*In re Air Vermont*, 761 F.2d 130 (2d Cir. 1985) ....................................................... 20

*In re Allen*, 135 B.R. 856 (Bankr. N.D. Iowa 1992) ................................................. 26

*In re Amcor Funding Corp.*, 117 B.R. 549 (D. Ariz. 1990) ....................................... 37

*In re The Bennett Funding Group, Inc.*, 146 F.3d 136 (2d Cir. 1998) ........................ 10

*BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) ................................................ 19

*Blava In-Line v. Midlantic National Bank/North*, 133 B.R. 33 (Bankr. S.D.N.Y. 1991) ........... 40

*In re Cajun Electric Power Co-op, Inc.*, 230 B.R. 693 (Bankr. M.D.La. 1999) ......................... 26

*Calpine Energy Servs. L.P. v. Reliant Energy Elec. Solutions, L.L.C.*, No. 05-60200, Adv. No. 08-1251, 2009 WL 1578282 (Bankr. S.D.N.Y. May 7, 2009) .................................................... 37

*Calyon N.Y. Branch v. American Home Mortgage Corp.*, 379 B.R. 503 (Bankr. D. Del. 2008) . 18

*In re Chateaugay*, 198 B.R. 848 (S.D.N.Y. 1996) ....................................................... 17

*Cherno v. Engine Air Serv. Inc.*, 330 F.2d 191 (2d Cir. 1964) .................................... 10

*Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995) .................................... 9, 39

*Cohen v Elephant Wireless, Inc.*, No. 03 Civ 4058, 2004 WL 1872421 (S.D.N.Y. Aug. 19, 2004) ......................................................................................................... 11

*In re Collins*, 199 B.R. 561 (Bankr. W.D. Pa. 1996) ................................................. 17

*In re Colonial Realty Co.*, 980 F.2d 125 (2d Cir. 1992) ............................................ 18

*Davidovich v. Welton*, 901 F.2d 1533 (10th Cir. 1990) ............................................. 10

*Dewsnup v. Timm*, 502 U.S. 410 (1992) ..................................................................... 13

*In re Doubleclick Inc. Privacy Litigation*, 154 F. Supp. 2d 497 (S.D.N.Y. 2001) ...................... 18

*In re Drexel Burnham Lambert Group, Inc.*, No. 90B-10421, 1990 WL 302177 (Bankr. S.D.N.Y. Dec. 14, 1990) ......................................................................................................... 37

iv

# TABLE OF AUTHORITIES

**Page(s)**

*Duncan v. Walker*, 533 U.S. 167 (2001)..................................................................... 16

*In re Durrett*, 187 B.R. 413 (D.N.H. 1995) ................................................................ 25

*In re Durso Supermarkets, Inc.,* No. 92 B43864, 1995 WL 739549 (S.D.N.Y. Dec. 14, 1995) .. 26

*Eastern Airlines, Inc. v. Chemical Bank, Inc.*, No. 95 Civ. 3981, 1997 WL 282264 (S.D.N.Y. May 28, 1997) ................................................................................................................. 39

*Emil v. Hanley*, 318 U.S. 515 (1943) ......................................................................... 13

*In re Enron Corp.*, 306 B.R. 465 (Bankr. S.D.N.Y. 2004)........................................... 37

*In re Enron Corp.*, 354 B.R. 652 (S.D.N.Y. 2006) ..................................................... 16

*In re Enron Corp.*, 379 B.R. 425 (S.D.N.Y. 2007) ..................................................... 32

*FDIC v. Hirsch*, 980 F.2d 125 46 F.3d 136 (2d Cir. 1998) ......................................... 14

*Fed. Ins. Co. v. Cont'l Casualty Co.*, No. 2:05-cv-305, 2006 WL 3386625 (W.D. Pa. Nov. 22, 2006)........................................................................................................................... 25

*In re Footstar*, 323 B.R. 566 (Bankr. S.D.N.Y. 2005) ............................................... 26

*In re Genuity*, 323 B.R. 79 (Bankr. S.D.N.Y. 2005).................................................. 25

*In re Genuity*, No. 02-43558, 2007 WL 1792252 (Bankr. S.D.N.Y. June 20, 2007) ................. 11

*Global Cable, Inc. v. Adelphia Commc'ns Corp.*, No. 02 Civ. 9770, 2006 WL 1559437 (S.D.N.Y. June 7, 2006)...................................................................................................... 10

*In re General Motors Liquidation Co.*, 428 B.R. 43 (S.D.N.Y. 2010)......................... 4

*Gray v. Rollo*, 85 U.S. 629 (1873).................................................................... 10, 13

*Greene v. United States*, 79 F.3d 1348 (2d. Cir. 1996) ............................................... 17

*In re Ionosphere Clubs, Inc.*, 164 B.R. 839 (Bankr. S.D.N.Y. 1994) ......................... 39

*Jenkins v. City of New York*, 478 F.3d 76 (2d Cir. 2007) ........................................... 28

*Johnson v. Home State Bank*, 501 U.S. 78 (1991) ..................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

*Kawaauhau v. Geiger*, 523 U.S. 57 (1998) ............................................................................. 16

*In re Kleather*, 208 B.R. 406 (Bankr. S.D. Ohio 1997)............................................................. 11

*In re Lehman Brothers Holdings, Inc.*, 404 B.R. 752 (Bankr. S.D.N.Y. 2009)........................... 10

*In re Lehman Brothers Holdings Inc*, No. 08-13555(JMP), 2010 WL 1783395 (Bankr. S.D.N.Y. May 5, 2010) ........................................................................................................................*passim*

*Lehman Brothers Special Financing, Inc. v. BNY Corp. Trustee Services Ltd.*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010) ......................................................................................................... 37

*Lincoln Sav. Bank, FSB v. Suffolk County Treasurer*, 880 F.2d 1540 (2d. Cir. 1989) ............... 38

*LNC Investments, Inc. v. First Fidelity Bank*, No. 92 Civ. 7584, 2000 WL 1072460 (S.D.N.Y. Aug. 3, 2000) ....................................................................................................................... 39

*MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615 (2d Cir. 1989) .......... 40

*McCollum v. Hamilton National Bank of Chattanooga*, 303 U.S. 245 (1938)............................ 10

*Midlantic National Bank v. N.J. Department of Environmental Prot.*, 474 U.S. 494 (1986)....... 38

*Mirant Corp. v. Kern Oil & Refining Co.*, 310 B.R. 548 (N.D. Tex. 2004)................................ 19

*Modern Settings, Inc. v. Prudential-Bache Securities, Inc.*, 936 F.2d 640 (2d Cir. 1991)........... 10

*Morales v. Trans World Airlines*, 504 U.S. 374 (1992) ............................................................ 17

*In re Mohar*, 140 B.R. 273 (Bankr. D.Mont. 1992) .................................................................. 26

*In re Mohawk Industrial*, 82 B.R. 174 (Bankr. D. Mass. 1987) ...........................................26, 27

*N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513 (1984)........................................................24, 25

*Nat'l Gas Distrib. LLC v. Smithfield Packing Co., Inc.*, 369 B.R. 884 (Bankr. E.D.N.C. 2007). 15

*Nat'l Gas Distrib. LLC v. Smithfield Packing Co., Inc*, 556 F.3d 247 (4th Cir. 2009)................ 32

*Nat'l R.R. Passenger Corp. et al. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453 (1974) ........ 18

*Official Comm. of Unsecured Creditors of Operation Open City, Inc. v. N.Y. Dep't*, 148 B.R. 184 (Bankr. S.D.N.Y. 1992) ......................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

*In re Ontario Locomotive & Industrial Ry. Supplies, (U.S.) Inc.*, 126 B.R. 146 (Bankr. W.D.N.Y. 1991)..................................................................................................................... 26

*In re Orr*, 234 B.R. 249 (Bankr. N.D.N.Y. 1999)...................................................... 10

*In re Pan Am Corp.*, 125 B.R. 372 (S.D.N.Y. 1991) ...........................................20, 21

*Park East Corp. v. Blue Cross & Blue Shield of Greater N.Y.*, 470 F. Supp. 147 (S.D.N.Y. 1979) ..................................................................................................................... 25

*Policy Realty Corp. v. Treber Realty LLC*, 213 F.3d 626 (2d Cir. 2000)................... 39

*In re R.J. Reynolds Patrick County Mem'l Hospital Inc.*, 315 B.R. 674 (Bankr. W.D.Va. 2003) ..................................................................................................................... 26

*Radzanower v. Touche Ross & Co.*, 426 U.S. 148 (1976)........................................ 17

*Scherling v. Hellman Elec. Corp.*, 181 B.R. 730 (Bankr. S.D.N.Y. 1995) ................ 10

*Shopmen's Local Union 455 v. Kevin Steel Prods. Inc*, 519 F.2d 698 (2d Cir. 1975)................ 26

*In re Shoppers Paradise, Inc.*, 8 B.R. 271 (Bankr. S.D.N.Y. 1980) ......................... 26

*In re Smart World Techns., LLC*, 423 F.3d 166 (2d Cir. 2005).....................11, 26, 32

*In re Springfield Casket Co.*, 21 B.R. 223 (Bankr. S.D. Ohio 1982) ......................... 11

*In re Stoltz*, 315 F.3d 80 (2d Cir. 2002)................................................................... 17

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001)................................................................ 29

*Texaco, Inc. v. La. Land and Exploration Co.*, 136 B.R. 658 (M.D.La. 1992) .......... 26

*Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Ass'n*, 322 F.3d 1039 (9th Cir. 2003) ..................................................................................................................... 15

*United States v. LaPorta*, 46 F.3d 152 (2d Cir. 1994)............................................. 16

*United States v. Ron Pair Enters. Inc.*, 489 U.S. 235 (1989) ..............................12, 18

*In re Women First Healthcare, Inc.*, 345 B.R. 131 (D. Del. 2006)........................... 38

*In re Worldcom, Inc.*, 401 B.R. 637 (Bankr. S.D.N.Y. 2009) ................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL STATUTES

11 U.S.C. § 101(38A) ........................................................................................... 31

11 U.S.C. § 101(38B) ........................................................................................... 21

11 U.S.C. § 101(47)(A) ......................................................................................... 32

11 U.S.C. § 101 (53B) ........................................................................................... 21

11 U.S.C. § 362 ....................................................................................................... 5

11 U.S.C. § 362(b)(17) .................................................................................... 23, 24

11 U.S.C. § 362(b)(27) ......................................................................................... 24

11 U.S.C. § 363(b)(4) ........................................................................................... 19

11 U.S.C. § 365(b)(4) ........................................................................................... 19

11 U.S.C. § 365(e)(1) ........................................................................................... 16

11 U.S.C. § 541 ..................................................................................................... 27

11 U.S.C. § 541(f) ................................................................................................. 19

11 U.S.C. § 552 ..................................................................................................... 27

11 U.S.C. § 553(a) ......................................................................................... 10, 12

11 U.S.C. § 553(a)(2)(B) ...................................................................................... 13

11 U.S.C. § 553(a)(3) ........................................................................................... 13

11 U.S.C. § 556 ..................................................................................................... 32

11 U.S.C. § 558 ..................................................................................................... 38

11 U.S.C. § 559 ..................................................................................................... 32

11 U.S.C. § 560 ......................................................................................... 2, 21, 29

11 U.S.C. §560(a) ................................................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

11 U.S.C. §561 ............................................................................................ 2, 21

11 U.S.C. §561(a) .......................................................................................15, 30

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No., 109-8, 119 Stat. 23 (2005) ............................................................................................13, 22

Financial Netting Improvement Act of 2006, Pub. L. No. 109-390, 120 Stat. 2692 (2006) ........ 23

Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, Pub. L. No. 106-181, 114 Stat. 61 (2000) .................................................................................... 20

## OTHER AUTHORITIES

*Bankruptcy Law and Repurchase Agreements: Hearings on H.R. 2852 and H.R. 3418 Before, H. Comm. on the Judiciary*, 98th Cong. 83 (1984) ........................................................ 32

*Bankruptcy Reform Act of 1999 Hearing (Part III), Hearing Before Subcomm. on Commercial and Administrative Law of the H. Comm. on the Judiciary*, 106th Cong. 6 (1999) ..................... 31

5 Collier on Bankruptcy §553.03 (2010) ...................................................... 27

136 Cong. Rec. S7535 .................................................................................. 22

Anthony C. Gooch & Linda B. Klein, *Documentation for Derivatives*, 304-05 (4th ed. 2002) ... 35

H.R. Rep. No. 101-484 (1990), 1990 WL 92539 .........................................19, 33, 34

H.R. Rep. No. 109-31 (2005) .....................................................................35, 36

H.R. Rep. No. 109-648 (2006), 2006 WL 6165926 ........................................ 23

*Interest Swap: Hearing Before the Subcomm. on Courts and Administrative Practice of the S. Comm. on the Judiciary*, 101st Cong. 17, 29 (1989) ...........................................22, 34

S. Rep. No. 101-285 (1990), 1990 WL 259288 ..........................................15, 24, 34

William A. Sabin, *The Gregg Reference Manual*, at 475 (7th ed. 1994) .................... 29

Edwin E. Smith, *Setoff Issues in Derivative Transactions: The Lehman Experience*, International Insolvency Institute (2010) ...................................................................... 36

ix

## PRELIMINARY STATEMENT

This appeal is about Swedbank AB (publ.)'s ("Swedbank") attempt to satisfy its
*pre-petition* claims arising under *pre-petition* contracts by seeking to offset such claims against
*post-petition* assets of Lehman Brothers Holdings Inc. ("LBHI").  Those post-petition assets are
deposits unrelated to Swedbank's swap agreements that were made to LBHI's general deposit
account at Swedbank (the "Account") after the commencement of LBHI's chapter 11 case.
Swedbank admits that it unilaterally placed an administrative freeze on the Account, including
the post-petition deposits, without moving for relief from the automatic stay.  This appeal arises
from the Bankruptcy Court's order compelling Swedbank to comply with the stay by releasing
the administrative freeze and turning over such deposits, which amounted to over $11 million.
After nearly twenty months of refusing to turnover such amounts, Swedbank did so only after
entry of the Bankruptcy Court's order, from which Swedbank now appeals.

Swedbank's attempt to seize post-petition deposits flies in the face of over 100
years of bankruptcy jurisprudence, which Swedbank contends was somehow abrogated by the
enactment of and/or amendments to sections 553, 362, 560, and 561 of the Bankruptcy Code.  As
the Bankruptcy Court correctly concluded, Swedbank's strained reading of these provisions is
not consistent with their plain language, legislative history, or relevant case law.  The
Bankruptcy Court correctly held, as a matter of law, that Swedbank has no right to setoff LBHI's
alleged pre-petition obligations against Swedbank's post-petition obligations to LBHI because
the mutuality required for any setoff under section 553 of the Bankruptcy Code is lacking.  This
fundamental requirement of mutuality for setoff long pre-dates, and was preserved in, the
Bankruptcy Code.  Swedbank asserts that its proposed setoff is permissible despite the absence
of mutuality because the setoff is protected under the Bankruptcy Code's so-called safe harbor

provisions in sections 560 and 561.[1]  As demonstrated below, however, there is nothing in the Bankruptcy Code, the straightforward legislative history, or relevant case law indicating that the safe harbor provisions eviscerate the long-standing requirement of mutuality.  Indeed, the Bankruptcy Court correctly concluded that the setoff was prohibited due to lack of mutuality, because while "Sections 560 and 561 preserve contractual rights of setoff for mutual *pre-petition* obligations . . . these sections do not improve the position of a nondebtor counterparty beyond its *pre-petition* commercial obligations."  *In re Lehman Brothers Holdings Inc.* (*"Swedbank Decision"*), No. 08-13555(JMP), 2010 WL 1783395 (Bankr. S.D.N.Y. May 5, 2010) (emphasis added).

Furthermore, sections 560 and 561 protect *only* the setoff of *mutual, pre-petition* claims that arise under or in connection with the termination, liquidation, or acceleration of swap agreements or other derivative contracts.  While LBHI's alleged pre-petition obligations arise under certain International Swaps and Derivatives Association ("ISDA") Master Agreements and guarantees (collectively, "ISDA Master Agreements"), Swedbank's post-petition obligations to LBHI under the Account are wholly unrelated to those agreements or any other swap agreement or derivative contract.  Thus, Swedbank's proposed setoff is not, and cannot, be protected by sections 560 or 561.

Finally, despite Swedbank's and ISDA's[2] contentions to the contrary, no cataclysmic economic events will occur as a result of the Bankruptcy Court's order.  Indeed, Swedbank ignores the practical, limited scope of the Bankruptcy Court's order:  it bars a swap

---

[1] Sections 560 and 561 of the Bankruptcy Code allow counterparties to certain derivative contracts to terminate those contracts and set off certain obligations arising under those contracts despite the commencement of one counterparty's bankruptcy case.  11 U.S.C. §§ 560 and 561; *see also infra* pp. 27-31.

[2] On July 14, 2010, ISDA filed a motion for leave to file a Brief as *Amicus Curiae* in Support of Neither Party ("ISDA Br."). Appellees did not oppose ISDA's motion, which has neither been granted nor denied by the Court. For purposes of Appellees' brief, however, Appellees assume that the Court will consider ISDA's brief.

counterparty from offsetting *pre-petition* debts arising from a swap agreement against *post-petition* assets of a debtor that have no relation whatsoever to a swap agreement. The Debtors agree that the safe harbor provisions were enacted to ensure the stability of the financial markets upon a swap counterparty's bankruptcy by permitting the close out of swap transactions. But, prohibiting a swap counterparty from setting off its pre-petition debts against a debtor's post-petition assets obtained through an ordinary commercial bank account does not cause financial instability or further any policy underlying the safe harbor provisions. To the contrary, reversing the Bankruptcy Court's order would create uncertainty by undermining over a century of bankruptcy jurisprudence.

## COUNTER-STATEMENT OF ISSUES PRESENTED

1.      Did the Bankruptcy Court correctly rule that Swedbank's proposed setoff of LBHI's alleged pre-petition obligations arising under the ISDA Master Agreements against amounts deposited in the Account after the commencement of LBHI's chapter 11 case is prohibited by section 553 of the Bankruptcy Code?

2.      Did the Bankruptcy Court correctly rule that sections 560 and 561 of the Bankruptcy Code do not eliminate the well-established requirement of mutuality for permissible setoffs?

3.      Is Swedbank's proposed setoff of LBHI's alleged pre-petition obligations arising under the ISDA Master Agreements against amounts deposited in the Account after the commencement of LBHI's chapter 11 case permitted by the safe harbor provisions in sections 560 and 561 of the Bankruptcy Code where the Account does not arise under, or have any connection with, a swap agreement or any other derivative contract?

4.      Did the Bankruptcy Court correctly rule that Swedbank violated the

automatic stay by placing an administrative freeze on the funds deposited in the Account after the commencement of LBHI's chapter 11 case without moving for relief from the automatic stay?

**STANDARD OF APPELLATE REVIEW**

A district court reviews a bankruptcy court's legal conclusions *de novo* and its findings of fact under the clearly erroneous standard. *In re General Motors Liquidation Co.*, 428 B.R. 43, 51 (S.D.N.Y. 2010) (Buchwald, J.).

**COUNTER-STATEMENT OF THE CASE**

The pertinent facts are set forth in the Debtors' Motion Pursuant to Sections 105(a) and 362 of the Bankruptcy Code for an Order Enforcing the Automatic Stay Against and Compelling Payment of Post-Petition Funds by Swedbank, dated January 22, 2010 [Docket No. 6734] (SD-1)[3] (the "Debtors' Motion"), the Declaration of Adrian Teng in Support of Debtors' Motion, dated January 22, 2010 [Docket 6736] (SD-2), *Swedbank Decision,* 2010 WL 1783395, and the Order Granting the Debtor's Motion, dated May 5, 2010 [Docket No. 8800] (SD-16) (the "Order").  The salient facts are set forth below.

I.    **NATURE OF THE CASE**

A.    **LBHI's Bankruptcy**

Commencing September 15, 2008, and periodically thereafter (as applicable, the "Commencement Date") LBHI and certain of its subsidiaries (collectively, "Debtors" or "Lehman") commenced with the Bankruptcy Court of the Southern District of New York (the "Bankruptcy Court") voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  SD-1 ¶ 3.  Prior to the events leading up to these chapter 11 cases, Lehman

---

[3] Citations to Swedbank's Amended Designation of Record and Statement of Issues on Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8006, dated May 27, 2010 [Docket No. 9311] shall be referred to herein as "SD-__."

was the fourth largest investment bank in the United States and a leader in the global financial markets worldwide.  *Id.* ¶ 4.

       B.    **<u>Swedbank's Administrative Freeze</u>**

           The material facts related to the Debtors' Motion are not in dispute.  *See* Tr. of Oral Argument of Debtors' Motion [Docket No. 8490] (SD-6) at 49.  Prior to the Commencement Date, LBHI established and maintained a general deposit account with Swedbank AB (publ.), located in Stockholm, Sweden.  SD-1 ¶ 9.  The Account, identified as No. 17608, is denominated in Swedish Krona ("<u>SEK</u>").  SD-2 ¶ 3.  The Account has no relationship whatsoever to a swap agreement or any other derivative contract.  *Id.*

           Shortly after the Commencement Date and without moving for relief from the automatic stay provided for in section 362(a) of the Bankruptcy Code,[4] Swedbank unilaterally placed an administrative freeze on the Account, preventing LBHI from making any withdrawals, but still allowing additional monies to be deposited and/or wired into the Account.  *Id.* ¶ 6.  On December 4, 2008, LBHI requested that Swedbank confirm that it would not offset any of LBHI's alleged indebtedness to Swedbank against the funds in the Account.  *Id.* ¶ 7, Exh. C at 2. Swedbank responded by letter dated January 20, 2009, informing LBHI that it had imposed the administrative freeze because it intended to offset amounts allegedly owed by LBHI to Swedbank under various pre-petition ISDA Master Agreements and guarantees.  *Id.* ¶ 8, Exh. D. Swedbank never moved for relief from the automatic stay.

           Between September 16, 2008 and November 12, 2009, the balance of the Account grew by SEK 82,765,466.45 due to various deposits and/or wire transfers credited to the Account

---

[4] The automatic stay becomes effective upon the commencement of a bankruptcy case and prohibits creditors from exercising certain rights and remedies absent a court order modifying the stay.  *See* 11 U.S.C. § 362; *see also infra* pp. 38-40.

after the Commencement Date.  SD-1 ¶ 16.  Swedbank refused to turnover these post-petition

deposits to LBHI, which, by January 11, 2010, amounted to approximately $11.7 million in U.S.

dollars.  *Id*.

II.     **THE PROCEEDINGS BELOW**

    A.     **The Debtors' Motion to Enforce the Automatic Stay and Compel Payment of
        Post-Petition Funds**

On January 22, 2010, the Debtors sought to remedy Swedbank's seizure of

LBHI's post-petition deposits by filing the Debtors' Motion seeking entry of an Order enforcing

the automatic stay pursuant to section 362 of the Bankruptcy Code and directing Swedbank to

release the administrative freeze placed on funds deposited into the Account after the

Commencement Date.  *Id.* ¶ 1.  The Debtors also sought an order requiring Swedbank to pay

those funds to LBHI on the grounds that the proposed setoff of LBHI's alleged pre-petition

obligations against the post-petition deposits held by Swedbank lacked mutuality in violation of

section 553 of the Bankruptcy Code.  *Id.* ¶ 2.  On February 3, 2010, Swedbank filed an Objection

to Debtors' Motion [Docket No. 6976] (SD-3) (the "Swedbank Objection") arguing that the

proposed setoff was permitted by the safe harbor provisions in sections 560 and 561 because

LBHI's alleged obligations to Swedbank arose under the ISDA Master Agreements, and thus, the

setoff was exempt from the mutuality requirement of section 553.[5]  SD-3 ¶ 2.  On April 9, 2010,

the Debtors filed a Reply Memorandum [Docket No. 8196] (SD-5) demonstrating that

Swedbank's proposed setoff is not protected by sections 560 and 561 because Swedbank's

obligation to pay LBHI post-petition deposits in a general bank account does not arise under or

in connection with the termination, liquidation, or acceleration of a swap agreement or any other

---

[5] The details regarding these ISDA Master Agreements are set forth in Swedbank's Objection on pages 2-3.  While
LBHI did not, for purposes of the Debtors' Motion, contest the amounts that Swedbank claims are due by LBHI
under the ISDA Master Agreements, the Debtors reserved their right to contest, object to, or otherwise challenge the
amounts sought by Swedbank under such agreements.  *See* SD-5 at n.3.

derivative contract.  SD-5 ¶¶ 8-14.  The Debtors also argued that even if the setoff were

protected by sections 560 and 561, these safe harbor provisions do not trump the mutuality

requirement of section 553.  *Id.* ¶¶ 15-17.

    B.    **The Bankruptcy Court's Order on Debtors' Motion**

On April 14, 2010, the Bankruptcy Court granted the Debtors' Motion in its

entirety from the bench, holding that Swedbank's proposed setoff violates section 553 of the

Bankruptcy Code because LBHI's pre-petition obligations to Swedbank lack mutuality with the

funds deposited in the Account post-petition.  *See generally* SD-6.  In its bench decision, the

Bankruptcy Court stated:

> This is money that is *indisputably post-petition funds received*
> *after the petition date.*  And Swedbank somehow argues that the
> traditional distinction between pre- and post-petition funds for
> purposes of construing mutuality under Section 553 should be
> disregarded simply because they [sic] exist[s], a fourteen-year old
> ISDA agreement relating to swaps between Lehman and
> Swedbank.  *I do not read Section 560 and 561 as overriding so*
> *fundamental a precept of U.S. bankruptcy law as the requirement*
> *that there may be mutuality for purposes of setoff.*  I do not believe
> that Section 560 and 561 can be read to override such a
> fundamental part of our law.  And if Congress actually intended to
> do what [Swedbank] is today arguing, Congress would have said in
> clear, understandable and plain language that Section 553, to the
> extent it relates to mutuality, does not apply in circumstances of
> netting permitted under Section 560 and 561.

*Id*. at 59-60 (emphasis added).

The Bankruptcy Court followed its bench ruling with the Order and Memorandum

Decision, both dated May 5, 2010, holding that Swedbank violated the automatic stay and

directing that Swedbank "immediately release its administrative freeze and return to LBHI all

funds held in the Swedbank Account that were deposited after the Commencement Date."

*Swedbank Decision*, 2010 WL 1783395, at *8; *see also* SD-16.  In its decision, the Bankruptcy

Court explained that sections 560 and 561 of the Bankruptcy Code do not nullify the mutuality

requirement of section 553(a) and that "Swedbank's self-interested interpretation of the relevant provisions of the Bankruptcy Code is without precedent and unsupported by a fair reading of the textual language." *Swedbank Decision*, 2010 WL 1783395, at *4. In reaching its decision, the Bankruptcy Court relied on the plain language of sections 560 and 561 as well as the legislative history of the safe harbor provisions. *See generally id.* The Bankruptcy Court held that Congress' intent in enacting sections 560 and 561 was to "preserve contractual rights of setoff for *mutual* pre-petition obligations – essentially assuring the nondebtor swap counterparty that the advent of the bankruptcy will not frustrate pre-petition commercial expectations relating to setoff and netting" *Id.* at *9 (emphasis added), and that sections 560 and 561 had "done nothing to alter the mutuality requirement found in section 553(a)." *Id.* at *7. The Bankruptcy Court stated, "[t]he [safe harbor] exceptions do not repeal or nullify the basic legal precepts that govern the right to setoff in bankruptcy cases, nor do they authorize a party to a swap agreement to effectuate a setoff without satisfying the underlying requirements for such a setoff (i.e., mutuality)."[6] *Id.*

C.    **Swedbank's Motion for a Stay Pending Appeal**

On April 22, 2010, Swedbank filed a Motion Pursuant to Bankruptcy Rule 8005 for Stay Pending Appeal of the Order Granting the Debtors' Motion [Docket No. 8564] (SD-7) (the "Stay Motion"). On April 30, 2010, the Debtors filed the Debtors' Objection to the Stay Motion [Docket No. 8740] (SD-10), and on May 4, 2010, Swedbank filed a Reply in Support of the Stay Motion [Docket No. 8782] (SD-12).

After a hearing (*see* Tr. of 5/6/10 Hearing [Docket No. 9060] (SD-23)), the

---

[6] The Bankruptcy Court also concluded that it was unnecessary to reach the issue as to whether "sections 560 and 561 of the Bankruptcy Code permit Swedbank to exercise a right of setoff with respect to funds in a general deposit account that was not identified as arising under a swap agreement." *Swedbank Decision*, 2010 WL 1783395, at *3, n.12.

Bankruptcy Court denied the Stay Motion, finding that Swedbank failed to demonstrate a likelihood of success on the merits or any potential of irreparable harm. *See* Order Denying Swedbank's Stay Motion [Docket No. 8844] (SD-20). Specifically, the Court held that Swedbank's "likelihood of success" was "close to zero" and that "this [was] not really that close a question and that a fair reading of the Bankruptcy Code leads to the conclusion that mutuality remains a necessary ingredient in every setoff in bankruptcy including setoffs such as those at issue here that arise under ISDA Master Agreements." SD-23 at 5, 22. Further, the Court found that the Debtors were harmed by Swedbank "illegally holding the money" and that the public was likewise harmed. Judge Peck stated, "if other lenders think they can get away with this, they will." *Id.* at 16. On May 11, 2010, Swedbank transferred the post-petition deposits made to the Account to LBHI in accordance with the Bankruptcy Court's Order.[7]

## **ARGUMENT**

I.   **THIS COURT SHOULD AFFIRM THE BANKRUPTCY COURT'S RULING BECAUSE THE BANKRUPTCY COURT CORRECTLY RULED THAT SWEDBANK'S PROPOSED NON-MUTUAL SETOFF IS PROHIBITED BY SECTION 553 OF THE BANKRUPTCY CODE**

A.   **Swedbank's Proposed Setoff Lacks the Mutuality Required by Section 553 of the Bankruptcy Code.**

The Bankruptcy Court's order and decision should be affirmed because section 553 of the Bankruptcy Code prohibits the setoff of LBHI's alleged *pre-petition* obligations against amounts deposited in the Account *post-petition*. As recognized by Swedbank, section 553 preserves the setoff rights that may exist under applicable non-bankruptcy law, but only under certain limited circumstances. *See* Swedbank Br. at 20; *see also Citizens Bank of*

---

[7] Swedbank misleadingly asserts that the letter agreement between LBHI and Swedbank requires LBHI to recognize Swedbank's setoff rights should Swedbank be successful on appeal. Swedbank's Brief on Appeal ("Swedbank Br.") at 9. However, the letter agreement, which is not in the record on appeal, merely acknowledges that should Swedbank prevail on appeal, the positions of the parties would return to the status quo ante.

*Maryland v. Strumpf,* 516 U.S. 16, 18-19 (1995); *In re The Bennett Funding Group, Inc.,* 146 F.3d 136, 138-39 (2d Cir. 1998). Specifically, section 553 requires that setoff be of "a *mutual debt* owing by such creditor to the debtor that *arose before the commencement of the case* under this title against a claim of such creditor against the debtor that *arose before the commencement of the case . . . .* " 11 U.S.C. § 553(a) (emphasis added); *see also Modern Settings, Inc. v. Prudential-Bache Secs., Inc.*, 936 F.2d 640, 648 (2d Cir. 1991); *In re Bennett Funding,* 146 F.3d at 139; *In re Lehman Bros. Holdings, Inc. ("DnB Nor Bank"),* 404 B.R. 752, 757 (Bankr. S.D.N.Y. 2009).

Mutuality has been firmly grounded in bankruptcy law as a requirement for setoff for over a century before the enactment of the current bankruptcy statute. *See, e.g., Gray v. Rollo,* 85 U.S. 629, 633-634 (1873) (mutuality required for setoff under both the Bankruptcy Act of 1800 and the Bankruptcy Act of 1867); *McCollum v. Hamilton Nat. Bank of Chattanooga*, 303 U.S. 245, 248 (1938) (mutuality required for setoff under section 68A of the Bankruptcy Act of 1898); *Cherno v. Engine Air Serv. Inc.*, 330 F.2d 191, 193 (2d Cir. 1964) ("Mutuality is required by §68 of the Bankruptcy Act for a valid set-off . . .").

It is well recognized that a debt is considered "mutual" and thus potentially subject to setoff where "it is due to and from the *same party* in the *same capacity.*" *Global Cable, Inc. v. Adelphia Commc'ns Corp.*, No. 02 Civ. 9770, 2006 WL 1559437, at *4 (S.D.N.Y. June 7, 2006) (citing *In re Bennett Funding,* 146 F.3d at 138) (emphasis added). Courts have consistently interpreted section 553's mutuality requirement to mean that "a pre-petition debt cannot offset a post-petition debt." *Scherling v. Hellman Elec. Corp.,* 181 B.R. 730, 739 (Bankr. S.D.N.Y. 1995); *see also DnB Nor Bank,* 404 B.R. at 758-61; *In re Orr,* 234 B.R. 249, 254-55 (Bankr. N.D.N.Y. 1999); *Davidovich v. Welton*, 901 F.2d 1533, 1538 (10th Cir. 1990); *In re*

*Kleather*, 208 B.R. 406, 414 (Bankr. S.D. Ohio 1997); *In re Springfield Casket Co.*, 21 B.R. 223, 228 (Bankr. S.D. Ohio 1982).[8]  Moreover, regardless of whether or not pre- and post-petition obligations are "mutual," as noted above, section 553 specifically requires that offsetting debts of both parties must arise "before the commencement of the case."

All parties here agree that to the extent LBHI incurred obligations to Swedbank arising under the ISDA Master Agreements, those are *pre-petition* obligations, and that Swedbank's obligations to LBHI (which are undeniable) arise from amounts deposited in LBHI's general deposit account *post-petition*, and thus, such obligations arose after the commencement of these cases.  SD-6 at 49:22-24 ("It is also unquestioned that we are dealing with both pre- and post-petition deposits in connection with this setoff dispute").  The parties also agree that these alleged obligations do not satisfy the setoff requirements of section 553.  *See, e.g.*, SD-12 at 7 (recognizing that limitations on Swedbank's right of setoff, "including the statutory pre-petition/post-petition separate entity distinction" would "have been imposed by virtue of section 553" allegedly but for the safe harbor provisions); SD-6 at 49:22-24.  Swedbank, however, contends that the setoff is safe harbored under sections 560 and 561, and thus, is not subject to the mutuality requirement of section 553.  *See, e.g.,* Swedbank Br. at 11-14.  As set forth below, this argument fails for several reasons.

B.    **The Bankruptcy Court Correctly Ruled that No Exception to Mutuality for Safe-Harbored Transactions Appears in the Plain Reading of the Bankruptcy Code.**

---

[8] As Swedbank explains, mutuality is also a basic requirement for setoff under New York and English law, both of which Swedbank contends applies to its alleged contractual right of setoff.  *See* Swedbank Br. at 11, n.3.  Under New York law, mutuality also requires that the debts be due to and from the same person in the same capacity. *Cohen v. Elephant Wireless, Inc.*, No. 03 Civ 4058, 2004 WL 1872421, at *3 (S.D.N.Y. Aug. 19, 2004).  Because the Chapter 11 debtor-in-possession, as the fiduciary of the bankruptcy estate, stands in a different capacity than the pre-petition debtor, *see In re Smart World Techns., LLC*, 423 F.3d 166, 175 (2d Cir. 2005); *In re Genuity*, No. 02-43558, 2007 WL 1792252, at *4 (Bankr. S.D.N.Y. June 20, 2007), Swedbank's proposed setoff lacks mutuality, and thus, is impermissible under state law.

The plain text of section 553 demonstrates that the mutuality requirement for setoffs applies to even those setoffs that may be within the safe harbors of sections 560 and 561. The Supreme Court held in *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989) that the "[p]lain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of the statute will produce a result demonstrably at odds with the intentions of its drafters." *Id.* at 242.  As demonstrated above, section 553 expressly preserves a creditor's right to "offset a *mutual* debt owing by such creditor to the debtor that *arose before the commencement of the case* under this title against a claim of such creditor against the debtor that *arose before the commencement of the case*." 11 U.S.C. § 553(a) (emphasis added).  Nowhere does this language indicate an exception for non-mutual setoffs safe harbored under sections 560 and 561.  Swedbank cannot – and does not – dispute this point.  *See* SD-7 at 8 (conceding that section 553 "explicitly differentiates between pre- and post-petition obligations.").

      1.     The Exceptions for Safe-Harbored Transactions Contained in Section 553 Demonstrate that the Safe Harbor Provisions Do Not Override the <u>Mutuality Requirement for Setoffs.</u>

Swedbank implies that the Bankruptcy Court misplaced its reliance on the exceptions contained in section 553(a)(2)(B)(ii), 553(a)(3)(C) and 553(b)(1) as "proof that Congress did not intend to except Safe Harbor Transactions from the limitations that Section 553 imposes on setoff rights."  *See* Swedbank Br. at 26.  Swedbank errs; the Bankruptcy Court correctly ruled that those provisions exclude "claim[s] arising under a safe harbored contract" from the mandates of section 553(a)(2)(B)(ii), 553(a)(3)(C) and 553(b)(1).  *See Swedbank Decision*, 2010 WL 1783395, at *7.  Swedbank's argument that those exceptions "cannot apply to Safe Harbor setoffs" because they involve the setoff of pre-petition obligations misses the point.  *See* Swedbank Br. at 27.  As set forth in the statute, sections 553(a)(2)(B) and 553(a)(3) prohibit a setoff that would otherwise be permissible under section 553(a)(1) when the setoff

right was created by (i) claims transferred to a creditor during the ninety day period preceding a bankruptcy filing and while the debtor was insolvent (11 U.S.C. § 553(a)(2)(B)), or (ii) debts incurred by a creditor during the ninety day period preceding a bankruptcy filing while the debtor was insolvent and for the purposes of creating a setoff right (11 U.S.C. § 553(a)(3)).  But, sections 553(a)(2)(B)(ii) and 553(a)(3)(C) exclude from those prohibitions setoffs of the kind described in sections 560 and 561.  Likewise, section 553(b)(1) renders certain setoffs voidable when they occur during the ninety day period prior to a debtor's bankruptcy filing, but excludes setoffs of the kind described in sections 560 and 561 from that risk.  The exceptions in these subsections of 553 were added by Congress in 2005, at the same time that Congress amended section 560 and enacted section 561.  *See* Bankruptcy Abuse and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No., 109-8, §§ 907(j), 907(k)(1), 907(n), 907(o)(10), 119 Stat. 23, 178-182 (2005).  No other exception has been enacted with regard section 553, including any exception to the mutuality requirement or the requirement that setoffs must be of pre-petition debts against pre-petition claims.

   "When Congress amends the bankruptcy law, it does not write on a 'clean slate.'" *Dewsnup v. Timm,* 502 U.S. 410, 419 (1992) (quoting *Emil v. Hanley,* 318 U.S. 515, 521 (1943)).  If Congress intends "to make . . . a major [legislative change], some clear and unambiguous indication of that purpose [should] appear."  *Emil,* 318 U.S. at 521.  Given the century old requirement of mutuality for all setoffs, *see, e.g., Gray v. Rollo,* 85 U.S. 629, 633-634 (1873), had Congress intended to enact exceptions to mutuality, it would have used clear and conspicuous language.  At minimum, Congress' intention to nullify this basic requirement would have been reflected in the legislative history.  Absent clear language in the statute or evidence of such intent, the Court should not – and cannot – read an implicit exception to mutuality into the

Bankruptcy Code.  *See FDIC v. Hirsch*, 980 F.2d 125, 132-33 (2d Cir. 1992) (Congress will "expressly designate the provisions whose application it wishes to suspend, rather than leave that consequence to the uncertainties of implication compounded by the vagaries of judicial construction").  The Bankruptcy Court's decision should, therefore, be affirmed.

> 2.      The Plain Text of Sections 560 and 561 Do Not Override the Express
>         Mutuality Requirement in Section 553 of the Bankruptcy Code.

Just as section 553 contains no mutuality exception for sections 560 and 561, the plain text of sections 560 and 561 of the Bankruptcy Code does not reveal an exception to the requirement in section 553 that all setoffs be of mutual, pre-petition claims.  As explained below, *infra* pp. 27-31, sections 560 and 561 were enacted to allow a counterparty to certain derivative contracts, such as swap agreements, to proceed with the netting or setoff process that occurs upon the termination, liquidation, or acceleration of one or more derivative contracts despite the bankruptcy filing of the other counterparty.  Sections 560 and 561, therefore, allow parties to exercise setoff rights despite the automatic stay; *they do not create any new or validate otherwise invalid setoff rights*.  Section 560 plainly states:

> The exercise of any contractual right of any swap participant . . . to
> offset or net out any termination values or payment amounts
> arising under or in connection with the termination, liquidation or
> acceleration of one or swap agreements shall not stayed, avoided,
> or otherwise limited by operation of any provision of this title or
> by order of a court or administrative agency in any proceeding
> under this title.

11 U.S.C. § 560(a).  Similarly, section 561 states:

> [T]he exercise of any contractual right . . . to cause the termination,
> liquidation, or acceleration of or to offset or net termination values,
> payment amounts, or other transfer obligations arising under or in
> connection with one or more (or the termination, liquidation, or
> acceleration of one or more) . . . (5) swap agreements . . . shall not
> be stayed, avoided, or otherwise limited by operation of any
> provision of this title or by any order of the a court or
> administrative agency in any proceeding under this title.

14

11 U.S.C. § 561(a).  Nowhere do these provisions state that the applicable setoff rights are

exempt from the mutuality requirement of section 553.  The legislative history is clear that the

setoff protections provided by the safe harbor provisions are the exemption of the "setoff of

mutual debts and claims arising under or in connection with swap agreements *from the automatic*

*stay* provisions of the Code."  S. Rep. No. 101-285 (1990), 1990 WL 259288, at *3 (emphasis

added).  Likewise, courts have interpreted the safe harbor provisions to exempt certain setoffs

from the automatic stay, while maintaining the mutuality requirement of section 553.  *See Thrifty*

*Oil Co. v. Bank of America Nat'l Trust & Savings Ass'n*, 322 F.3d 1039, 1051 n.13 (9th Cir.

2003) (stating that "the Swap Amendments exempt from the automatic stay the creditor's rights

to terminate a swap, setoff *mutual* obligations and net out termination damages…") (emphasis

added); *Nat'l Gas Distribs., LLC v. Smithfield Packing Co., Inc.*, 369 B.R. 884, 899 (Bankr.

E.D.N.C. 2007) (recognizing that "setoffs by a swap participant of *mutual* debt and claims under

a swap agreement, are excepted from the automatic stay") (emphasis added), *rev'd on other*

*grounds,* 556 F.3d 247 (4th Cir. 2009).  Swedbank has not cited any case law to the contrary.

        3.      Sections 560 and 561 of the Bankruptcy Code Do Not Protect the Exercise
              of Non-Mutual Setoffs.

        Swedbank argues that because sections 560 and 561 provide that the exercise of

"any contractual right to offset . . . shall not be stayed, avoided, or otherwise limited by operation

of any provision of this title," sections 560 and 561 override the express requirement in section

553(a)(1) that setoff be of mutual pre-petition debts.  Swedbank Br. at 20.  This argument finds

no support in the plain reading of the statutes or anywhere in the law.  As demonstrated in *infra*

pp. 27-31, Swedbank's proposed setoff does not fall within the "contractual rights" protected by

sections 560 and 561.  Further, as the Bankruptcy Court correctly observed, sections 560 and 561

do not contain a blanket "notwithstanding" clause.  *Swedbank Decision*, 2010 WL 1783395, at

*6.  Rather, the clause "shall not be stayed, avoided or otherwise limited" ensures that the

*automatic stay* and the prohibition on *ipso facto* clauses in section 365(e)[9] will not interfere with

a swap counterparty's rights to exercise setoff upon the termination, liquidation or acceleration

of a swap agreement.  Those setoff rights, however, must exist in the first place.  *Id.* at *5.

        Swedbank's self-serving attempt to characterize "shall not be stayed, avoided, or

otherwise limited" as an all-excluding "notwithstanding" clause by using selective dictionary

definitions is unavailing.  *See* Swedbank Br. at 15-18.  First, Swedbank does not cite a single

case supporting its argument that sections 560 and 561 contain a "notwithstanding" clause.  *See*

*id.*  Indeed, the cases cited by Swedbank are inapplicable because each concerns statutory

provisions that expressly provide that they apply "notwithstanding" other provisions of law.  *See*

*id.* at 15.  Second, section 553 already contains specific exceptions for certain setoffs that are

safe harbored under sections 560 and 561.  *See supra* p. 12.  Had Congress intended that these

provisions allow setoff "notwithstanding" all other provisions of the Bankruptcy Code, the

exceptions in section 553 would be superfluous.  Thus, this interpretation should be rejected.  *See*

*Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998); *In re Enron Corp.*, 354 B.R. 652, 656 (S.D.N.Y.

2006) (citing *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

        Furthermore, it is a "longstanding principle[] of statutory construction that "a

general section of a statute must give way to a specific one," *United States v. LaPorta*, 46 F.3d

152, 156 (2d Cir. 1994), and section 553 is more specific with regard to setoff rights than

sections 560 and 561.  To the extent that Congress could have intended to nullify a basic

requirement such as mutuality, it would have done so only with clear and explicit language, not

---

[9] The *ipso facto* clauses identified in section 365 of the Bankruptcy Code that are rendered unenforceable by that provision are the "insolvency or financial condition of the debtor at any time before the closing of the case," the "commencement of a [chapter 11 case]," and the "appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement."  *See* 11 U.S.C. § 365(e)(1).

the general language contained in sections 560 and 561.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992); *In re Chateaugay Corp.,* 198 B.R. 848, 860 (S.D.N.Y. 1996).

Swedbank attempts to avoid this inevitable conclusion by arguing that sections 560 and 561 are more specific than section 553 because they affect a more "narrow class of protected financial contracts and parties," citing *In re Stoltz,* 315 F.3d 80, 93 (2d Cir. 2002).  *See* Swedbank Br. at 24.  The *Stoltz* Court, however, did not hold that the determinative factor in the analysis was the *size* of the group protected by the statute, but rather, which statute more specifically addresses the matter at issue, here, the retention or non-retention of setoff rights. *Stoltz*, 315 F.3d at 93 (specificity is based on the meaning of the statutes in the particular "context" at issue, which in *Stoltz*, was the "housing context"); *see also Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) ("It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum.").  Indeed, it is clear that "[w]hen two statutes are in conflict, that statute which addresses the matter at issue in *specific terms* controls over a statute which addresses the issue in general terms, unless Congress has manifested a contrary aim."  *Greene v. United States*, 79 F.3d 1348, 1355 (2d. Cir. 1996) (emphasis added); *see also In re Collins,* 199 B.R. 561, 567 (Bankr. W.D. Pa. 1996) (holding section 365 of the Bankruptcy Code is more specific than section 525(a) because section 365 is "about as specific as it can be about what it takes to assume a lease and section 525(a) does not even mention leases.").  As the Bankruptcy Court correctly held, section 553 specifically requires that all setoffs, safe harbored or not, be of pre-petition mutual obligations, while sections 560 and 561 are silent on the issue. *See Swedbank Decision*, 2010 WL 1783395, at *5.  Thus, in the absence of conspicuous language, no exception to mutuality can be read into sections 560 or 561.

ISDA argues that the terms, "stayed," "avoided," or "otherwise limited", "must be given independent meaning."  ISDA Br. at 17-18.  However, as courts have repeatedly held, the plain reading of a statute must be in interpreted in context with Congress' intention when it enacted the statute.  *See Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991) (construing 11 U.S.C. § 101(5) in accordance with the "text, history, and purpose of the Bankruptcy Code"); *In re Doubleclick Inc. Privacy Litig.*, 154 F.Supp.2d 497, 512 (S.D.N.Y. 2001) (Buchwald, J.) (holding "[the] plain language controls in the absence of any legislative history suggesting that Congress intended" the contrary); *Calyon N.Y. Branch v. American Home Mortgage Corp.,* 379 B.R. 503, 515 (Bankr. D. Del. 2008) (noting that in interpreting the safe harbor provision in section 559, "it is appropriate to identify, if possible, a congressional purpose consistent with the Court's interpretation of the text at issue.").  If the supposed plain reading of sections 560 and 561 as construed by Swedbank or ISDA "will produce a result demonstrably at odds with the intentions of its drafters," *Ron Pair Enters., Inc.*, 489 U.S. at 242, the plain reading must be rejected and the statutes must be read consistent with their legislative purpose.  *See Nat'l R.R. Passenger Corp. et al. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458 (1974) ("[E]ven the most basic general principles of statutory construction must yield to clear contrary evidence of legislative intent."); *In re Colonial Realty Co.,* 980 F.2d 125, 132-133 (2d Cir. 1992) (rejecting the FDIC's contention that its rights were superior to the automatic stay, despite statutory language giving the FDIC superior rights, where the legislative history did not indicate that Congress intended such a modification).  As demonstrated *infra* pp. 20-24, Congress did not intend that sections 560 and 561 override *every single* provision in the Bankruptcy Code, and neither section expressly overrides the well-established requirement of mutuality.  Thus, the Bankruptcy Court's decision rejecting Swedbank's contention that sections 560 and 561 contain

a "notwithstanding" clause should be affirmed.

   Finally, it is worth noting that the Bankruptcy Code already contains numerous "notwithstanding" clauses.  *See, e.g.,* 11 U.S.C. § 363(b)(4); 11 U.S.C. § 365(b)(4); 11 U.S.C. § 541(f).  If Congress had intended to include a "notwithstanding" clause in sections 560 and 561, it would have done so expressly.  *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994) ("It is generally presumed that Congress acts intentionally and purposefully when it includes particular language in one section of a statute but omits it in another.").  Swedbank's reliance on a House Report to establish that sections 560 and 561 contain a broad "notwithstanding" clause further demonstrates the fallacy in Swedbank's argument.  As Swedbank acknowledges, the House Report states that "a swap participant may exercise any contractual right to terminate and net out a swap agreement in the event that the other party files a bankruptcy petition, *notwithstanding* the automatic stay and trustee avoidance provisions of the Bankruptcy Code."  Swedbank Br. at 17 (quoting H.R. Rep. No. 101-484 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 1990 WL 92539, at *6) (emphasis added by Swedbank).  The specific reference to only "the automatic stay and trustee avoidance provisions," contradicts Swedbank's contention that section 560 applies notwithstanding *the setoff requirements of the Bankruptcy Code*.  Swedbank's leap to broaden the reach of these provisions beyond the express language of the statutes is completely unfounded.[10]  *See id.* (relying on *Mirant Corp. v. Kern Oil & Refining Co.*, 310 B.R. 548, 554 (N.D. Tex. 2004) for a similar proposition – that sections 560 and 561 permit liquidation of contracts "notwithstanding" *the automatic stay*).

---

[10] Swedbank's contention that Judge Peck "inadvertently" referred to the safe harbor provisions as clauses that allow setoff "notwithstanding" other provisions of the Bankruptcy Code is likewise flawed.  Swedbank Br. at 17, n.10. Judge Peck expressly stated that sections 560 and 561 allow the exercise of the contractual right of setoff "notwithstanding" any provision of the Bankruptcy Code that "could operate to stay, avoid or otherwise limit that right, *but that right must exist in the first place*."  *Swedbank Decision*, 2010 WL 1783395, at *5 (emphasis added). In other words, sections 560 and 561 protect the exercise of setoff rights, but only those setoff rights that already exist under section 553 of the Bankruptcy Code.

4.      The Plain Language in Sections 560 and 561 Does Not Have the Same
        Meaning as the "Notwithstanding" Clause in Section 1110 of the
        Bankruptcy Code.

Swedbank further contends that the "shall not be stayed, avoided, or otherwise

limited" language in sections 560 and 561 is "almost identical to the Notwithstanding Clause" in

section 1110 of the Bankruptcy Code, which governs the repossession of aircraft equipment.

Swedbank Br. at 22.  Swedbank argues, for the first time, that the Second Circuit holding in *In re*

*Air Vermont,* 761 F.2d 130 (2d Cir. 1985) that section 1110 permits a vendor to repossess aircraft

equipment "notwithstanding 'any power of the court to enjoin taking such possession,'" *In re Air*

*Vermont,* 761 F.2d at 134, was an anticipatory rejection of the Bankruptcy Court's reasoning

below that had Congress actually "intended to establish a plainly worded exception to the rule

limiting setoff to mutual pre-petition claims, it would have done so explicitly."[11]  Swedbank Br.

at 21-22 (citing *Swedbank Decision*, 2010 WL 1783395, at *6).  Swedbank misses the point.

The Second Circuit reached its conclusion because section 1110 unambiguously "on its face"

permits "a vendor of aircraft pursuant to a conditional sales contract to repossess the aircraft"

despite conflicting provisions in the Bankruptcy Code *and* because this was not a circumstance

where there was "something to make plain the intent of Congress that the letter of the statute is

not to prevail."  *See In re Air Vermont,* 761 F.2d at 134; *see also In re Pan Am Corp.,* 125 B.R.

372, 374 (S.D.N.Y. 1991) (quoting *In re Air Vermont,* 761 F.2d at 134).  Here, unlike with

regard to section 1110, the plain language in sections 560 and 561 and Congress' other

---

[11] At the time of the court's decision in *Air Vermont,* section 1110 stated that the right of certain parties to take
possession of certain aircraft equipment "is not affected by section 362 or 363 of this title or by any power of the
court to enjoin such taking of possession . . ."  *In re Air Vermont,* 761 F.2d at 132.  Section 1110 was amended in
2000 to read that such repossession "is not limited or otherwise affected by any other provision of this title or by any
power of the court.  *See* Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, Pub. L. No.
106-181, §744, 114 Stat. 61, 177 (2000).

enactments demonstrate that Congress did *not* intend that these provisions trump section 553(a) of the Bankruptcy Code.

As explained *supra* p. 12, Congress excluded certain safe-harbored setoffs protected by sections 560 and 561 from express limitations on the applicability of section 553(a)(1) found in sections 553(a)(2)(B)(ii), 553(a)(3)(C) and 553(b)(1).  The very fact that Congress excluded safe-harbored setoffs from those limitations demonstrates that Congress did not intend for all safe-harbored transactions to be exempt from the mutuality requirements of section 553(a)(1).  *See In re Pan Am Corp.,* 125 B.R. at 377 (holding that Congress' imposition of limitations on the applicability of section 1110 to secured parties and not lessors reflected Congress' intent that those limitations apply to secured parties, but not lessors).  No such exceptions exist in the Bankruptcy Code with regard to section 1110.  Moreover, the plain language of sections 560 and 561 demonstrate that they were intended to protect the exercise of pre-petition setoff rights only.

Additionally, as explained *infra* pp. 27-31, sections 560 and 561 allow "swap participants" as well as "master netting agreement participants" (among others not relevant here) to exercise certain contractual setoff rights "to cause the liquidation, termination, or acceleration of one or more swap agreements" or other derivative contract upon the bankruptcy filing of the other counterparty.  11 U.S.C. §§ 560, 561.  "Swap participants" and "master netting agreement participants" are defined by the Bankruptcy Code as parties that entered into certain derivative contracts with the debtor *prior* to the petition date.  11 U.S.C. § 101(38B), (53B).  Indeed, the setoff or netting of contractual obligations arising under derivative contracts permitted by sections 560 and 561 occurs upon the "liquidation, termination, or acceleration" of those agreements *upon or immediately following a counterparty filing for bankruptcy.*  Thus, those

contractual obligations, by their nature, must have arisen *pre-petition* under contracts executed prior to the commencement of the bankruptcy case and thus constitute *pre-petition* claims. Accordingly, unlike the circumstances in *Air Vermont,* there is significant evidence in the Bankruptcy Code that sections 560 and 561 were not intended to trump the mutuality requirement of section 553.[12]

C.   **The Bankruptcy Court Correctly Ruled that Legislative History Confirms that There Are No Exceptions to Mutuality for Safe-Harbored Transactions.**

1.   Congress Did Not Intend that Sections 560 and 561 Override the Mutuality Requirement of Section 553 of the Bankruptcy Code.

The legislative history of sections 553, 560 and 561 confirm that the safe harbor provisions do not override the mutuality requirement of section 553(a). *See Swedbank Decision*, 2010 WL 1783395, at *6-8. As explained *infra* pp. 27-38, in enacting sections 560 and 561, Congress did not intend to create any new rights upon a bankruptcy filing. *See* 136 Cong. Rec. S7535 (remarks of Sen. Concini) (noting need to maintain certain rights, including setoff rights, upon one counterparty's bankruptcy filing). In fact, as Mark Brickell, then Chairman of ISDA, testified in support of section 560, the safe harbor provisions do "*not interfere with the basic operation of the Bankruptcy Code* since the Code *already preserves the right of setoff,* although requiring a court hearing." *Interest Swap: Hearing Before the Subcomm. on Courts and Administrative Practice of the S. Comm. on the Judiciary*, 101st Cong. 29 (1989) (Statement of Mark Brickell, Chairman, ISDA) (emphasis added). Thus, the Bankruptcy Court correctly ruled that the safe harbor provisions "do not repeal or nullify the basic legal precepts that govern the

---

[12] Swedbank's additional argument that the safe harbor provisions "take[] precedence" over section 553 because statutes enacted later trump any earlier conflicting statutes, *see* Swedbank Br. at 23-24, fails for two reasons: (1) section 553 does not conflict with the safe harbor provisions in that they do not override the mutuality requirement of section 553; and (2) while section 553 was enacted prior to the safe harbor provisions, it has been amended numerous times, including in 2005 when Congress added the exceptions in sections in 553(a)(2)(B)(ii), 553(a)(3)(C) and 553(b)(1), at the same time that Congress amended section 560 and enacted Section 561. *See* BAPCPA, §§ 907(j), 907(k)(1), 907(n), 907(o)(10).

right to setoff in bankruptcy cases . . . ."  *See Swedbank Decision*, 2010 WL 1783395, at *7.

       2.     The Financial Netting Improvement Act of 2006 Supports the Bankruptcy Court's Conclusion that Sections 560 and 561 Do Not Override the Mutuality Requirement of Section 553.

Swedbank further argues that when Congress rewrote section 362(b)(17) of the Bankruptcy Code in connection with the Financial Netting Improvement Act of 2006, Pub. L. No. 109-390, 120 Stat. 2692 (2006) ("FNIA") and did not include the phrase "mutual debt and claim" but instead referred only to "any contractual right," *see* §5, 120 Stat. at 2696, Congress intended to "clarif[y] that safe-harbored setoffs would not be limited by "the concept of mutuality."[13]  Swedbank Br. at 18-20.  Swedbank's argument fails for at least three reasons.

First, Swedbank's argument that the FNIA amendments made substantive changes belies its argument that the clause "shall not stayed, avoided, or otherwise limited by operation of any provision of this title" in section 560 already exempts safe-harbored transactions from the mutuality requirement.  *See* Swedbank Br. at 20.  It would have been inconsistent to on the one hand require that all setoffs be mutual under section 362(b)(17), which was the stated requirement until 2006, while at the same time permitting non-mutual setoffs under section 560.

Second, the legislative history of the FNIA amendments reveals that when Congress rewrote section 362(b) as part of FNIA, it did so merely to make "technical changes to the netting and financial provisions" of the Bankruptcy Code in order "to update the language to reflect current market and regulatory practices," and intended to do no more than "protect, free from the automatic stay, all rights previously protected by sections 362(b)(6), (7) and (17)." H.R. Rep. No. 109-648, 2006 WL 6165926, at *1587, 1592 (2006).  The legislative history

---

[13] Section 362(b)(17) excludes from the operation of the automatic stay, the "exercise of a swap participant or financial participant . . . of any contractual right (as defined in section 560) to offset or net out any termination value, payment amount or other transfer obligation arising under or in connection with 1 or more such agreements." 11 U.S.C. § 362(b)(17).

contained no indication that Congress intended to make any fundamental or substantive change to the operation of the statute, let alone remove the mutuality requirement.  In fact, Congress explicitly defined the very "financial netting" that the FNIA amendments sought to protect as "the settling of *mutual* obligations at their net value as opposed to each obligation's gross dollar value."  S. Rep. No. 101-285, 1990 WL 259288, at *3 (emphasis added).  Accordingly, the Bankruptcy Court correctly ruled that legislative history demonstrates that sections 560 and 561 were intended to protect the setoff of only "*mutual* debts and claims" arising under or in connection with the termination, liquidation or acceleration of certain derivative contracts and that they "do not repeal or nullify the basic legal precepts that govern the right to setoff in bankruptcy cases . . . ."  *See Swedbank Decision*, 2010 WL 1783395, at *7.[14]

Third, even if the concept of "mutuality" had been removed from the requirements of section 362(b)(17), the requirement that the debts and claims arise "prior to the commencement of the case" is not implicated by the FNIA amendments to section 362.

D.   **The Bankruptcy Court Correctly Ruled that No Relevant Case Law Exists Supporting Swedbank's Position.**

The Bankruptcy Court's decision should be affirmed for the additional reason that Swedbank fails to cite a single case supporting its position that mutuality is not required for the setoff of safe-harbored transactions.  Specifically, Swedbank argues that because the Supreme Court in *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513 (1984) rejected the "theory" that a

---

[14] In connection with FNIA, Swedbank also argues that Congress' deletion of the "itemized list of property used to collaterize swap agreements" demonstrates Congress' intent "to permit swap participants to setoff obligations that do not arise from the termination of the Safe Harbor Transactions, and that setoff in connection with the Safe Harbor Transactions is permitted even where no master netting agreements cover such trades."  Swedbank Br. at 19-20.  Swedbank's argument, however, is refuted by the face of section 362(b)(17), which expressly limits safe-harbored setoffs to the offset of "any *termination value,* payment amount, or other transfer obligation *arising under of in connection with 1 or more [swap] agreements* . . . ."  11 U.S.C. § 362(b)(17)(emphasis added).  Additionally, Swedbank's argument defies logic.  If Swedbank were correct that section 362(b)(17) permits setoffs against obligations arising under a contract of any kind, then there would have been no need for section 362(b)(27) which protects cross-product setoffs arising under master netting agreements.  11 U.S.C. § 362(b)(27); *see also* discussion in *infra* pp. 27-38, regarding applicability of sections 560 and 561 to setoffs against commercial deposit accounts.

debtor becomes a new entity post-petition, mutuality "is preserved" because LBHI is the same

entity pre- and post-petition.  Swedbank Br. at 27-28.  Swedbank's reliance on *Bildisco* is

misplaced.  The holding in *Bildisco* was expressly limited to the question at hand – whether a

debtor-in-possession should reject a collective bargaining agreement under section 365 of the

Bankruptcy Code (which permits a debtor to assume or reject an executory contract or lease).  In

addressing whether the debtor should be permitted to reject a collective bargaining agreement,

the *Bildisco* Court held that:

> *For our purposes*, it is sensible to view the debtor-in-possession as
> the same "entity" which existed before the filing of the bankruptcy
> petition, but empowered by virtue of the Bankruptcy Code to deal
> with its contracts and property in a manner it could not have done
> absent the bankruptcy filing.

*Bildisco*, 465 U.S. at 528 (emphasis added).  The Court further stated that if the debtor-in-

possession "were a wholly 'new entity,' it would be unnecessary for the Bankruptcy Code to

allow it to reject executory contracts, since it would not be bound by such contracts in the first

place."  *Id.*  Thus, the Court's holding that the pre- and post-petition entity should be treated as

the same entity was specifically limited to its authority to reject executory contracts.  *See Fed.*

*Ins. Co. v. Cont'l Cas. Co.*, No. 2:05-cv-305, 2006 WL 3386625, at *11 (W.D. Pa. Nov. 22,

2006) (finding the "new entity" language in *Bildisco* was limited to the facts in *Bildisco*); *In re*

*Durrett*, 187 B.R. 413 (D.N.H. 1995) (same).

Swedbank's self-serving attempt to expand the holding of *Bildisco* is unsupported

and, in fact, contrary to long-standing bankruptcy jurisprudence.  It has long been recognized

that "[t]he debtor and debtor-in-possession are two separate and distinct entities which act in

different capacities pre- and post-petition."  *In re Genuity, Inc.*, 323 B.R. 79, 82 (Bankr.

S.D.N.Y. 2005); *see also Park East Corp. v. Blue Cross & Blue Shield of Greater N.Y.*, 470 F.

Supp. 147, 150 (S.D.N.Y. 1979) (finding that because the post-petition debtor-in-possession is

"separate and distinct" from the pre-petition debtor, the debts owed to the claimant before the

filing date "may not be set off against claimant's post-petition obligations"); *In re Worldcom,*

*Inc.*, 401 B.R. 637, 649 (Bankr. S.D.N.Y. 2009) ("[A] trustee in a straight bankruptcy proceeding

is *not* the same entity as the pre-bankruptcy company.  A new entity is created with its own

rights and duties (quoting *Shopmen's Local Union 455 v. Kevin Steel Prods. Inc.*, 519 F.2d 698,

704 (2d Cir. 1975))); *In re Shoppers Paradise, Inc.*, 8 B.R. 271, 278 (Bankr. S.D.N.Y. 1980)

(holding that a post-petition obligation for rent cannot be offset against a pre-petition obligation

of the debtor because the pre-petition debtor and the debtor-in-possession are "separate and

distinct entities"); *see also In re Smart World Techns., LLC*, 423 F.3d at 175 (holding that a

debtor-in-possession owes fiduciary duties to the bankruptcy estate).

The cases cited by Swedbank for the contrary proposition are inapposite.[15]

Moreover, the court's holding in one of the cases cited by Swedbank – *In re Mohawk Indus.* 82

B.R. 174, 177 (Bankr. D. Mass. 1987) – supports the conclusion that the setoff of pre-petition

debts against post-petition debts lacks mutuality.  *See* Swedbank Br. at 29, n.21.  After noting

that the Supreme Court rejected the new entity theory in *Bildisco,* the *Mohawk Industries* court

denied a creditor's request to setoff pre-petition obligations against post-petition obligations,

holding that the setoff lacked mutuality:

> *We do not, however, regard this view [in Bildisco] of the status of*
> *a debtor in possession as a rejection of the rule that prevents setoff*
> *of prepetition debts against postpetition debts due to absence of*
> *mutuality.*  The raison d'etre for any bankruptcy law is to provide a

---

[15] The holdings of those cases were confined to the specific issue at hand, none of which concern section 553 of the
Bankruptcy Code.  *See In re Durso Supermarkets, Inc.*, No. 92 B 43864, 1995 WL 739549 (S.D.N.Y. Dec. 14, 1995)
(res judicata); *In re Footstar*, 323 B.R. 566 (Bankr. S.D.N.Y. 2005) (executory contracts); *In re Cajun Elec. Power
Co-op, Inc.*, 230 B.R. 693, 705 (Bankr. M.D.La. 1999) (same); *In re Allen*, 135 B.R. 856 (Bankr. N.D. Iowa 1992)
(same); *In re Mohar*, 140 B.R. 273 (Bankr. D.Mont. 1992) (same); *Texaco, Inc. v. La. Land and Exploration Co.*,
136 B.R. 658 (M.D.La. 1992) (same); *In re Ontario Locomotive & Indus. Ry. Supplies*, (U.S.) Inc., 126 B.R. 146
(Bankr. W.D.N.Y. 1991) (same); *In re R.J. Reynolds Patrick County Mem'l Hosp. Inc.*, 315 B.R. 674 (Bankr.
W.D.Va. 2003) (payment of insurance proceeds).

> discharge of debts in order to grant the debtor a fresh start.  To permit the setoff of prepetition debts owed by the debtor against independent postpetition debts owed to the debtor would be a complete frustration of any fresh start.  *For our purposes in the present context, the right of the Debtor to a fresh start makes the Debtor sufficiently distinct from its former self so as to prevent the required mutuality.*

*In re Mohawk Indus.*, 82 B.R. at 177 (emphasis added).  Thus, for purposes of setoff under section 553, the debtor and debtor-in-possession are two separate and distinct entities.  Indeed, Swedbank's position, were it correct, would eviscerate the premise on which much of the Bankruptcy Code relies, that a separate estate that owns property apart from the debtor is created upon the commencement of a chapter 11 case.  *See, e.g.,* 11 U.S.C. § 541 (the commencement of a bankruptcy case "creates an estate"); 11 U.S.C. § 552 (property acquired by the "estate or by the debtor *after the commencement of the case* is not subject to any lien resulting from any security agreement entered into by the debtor *before the commencement of the case*") (emphasis added).  That could not have been– and was not – the Supreme Court's intention, which specifically limited its holding to the rejection of executory contracts under section 365.[16]

## II.   THIS COURT SHOULD AFFIRM THE BANKRUPTCY COURT'S RULING BECAUSE SWEDBANK'S PROPOSED SETOFF AGAINST A GENERAL DEPOSIT ACCOUNT IS NOT SAFE-HARBORED UNDER SECTIONS 560 AND 561 OF THE BANKRUPTCY CODE

The Bankruptcy Court's decision should also be affirmed because Swedbank's attempted setoff of LBHI's alleged pre-petition obligations arising under the ISDA Master Agreements against post-petition deposits in the Account is not within the safe harbor

---

[16] Swedbank's reliance on § 553.03[3][g][2] of Collier on Bankruptcy for the proposition that *Bildisco* "reject[ed] the prepetition requirement as a component of mutuality" is misplaced and overstates the conclusion stated in the treatise.  *See* Swedbank Br. at 27-28.  The author of § 553.03[3][g][2] relied on *Bildisco* to advocate his position that the pre-petition requirement for mutuality should be removed from section 553 because as "entirely unnecessary" because section 553 "already requires" that the claim and debt arise "before the commencement of the case."  *See* 5 Collier on Bankruptcy § 553.03 [3][g] (2010).  The author did not state, as Swedbank implies, that the *Bildisco* Court rejected the mutuality requirement. *See id.* at § 553.03[3][g][ii].

protections of sections 560 and 561 of the Bankruptcy Code.[17]  The plain meaning of the statutes,

the legislative history, and relevant case law lead to the conclusion that sections 560 and 561

apply only when *both the debt and claim* sought to be offset arise under or in connection with a

swap agreement or other derivative contract.  Here, Swedbank's obligations to LBHI do not arise

under swap agreements; hence, sections 560 and 561 do not come into play.

A.      **A Logical Reading of the Plain Language of Sections 560 and 561
        Demonstrates that Their Protections Are Limited to Setoffs of Obligations
        Arising Under or in Connection with Swap Agreements or Other Derivative
        Contracts – Not Setoffs Against Commercial Deposit Accounts.**

1.      <u>Sections 560 and 561 Protect Limited Contractual Rights of Setoff.</u>

The express terms of sections 560 and 561 of the Bankruptcy Code demonstrate

that these statutes protect only certain contractual rights of setoff.  Swedbank, however, argues

that "on its face" section 560 protects "any contractual right" of setoff, including the setoff of

LBHI's alleged obligations under the ISDA Master Agreements against "any obligation" of

Swedbank as the non-defaulting party, whether or not Swedbank's obligations arise under a swap

agreement.  Swedbank Br. at 30.  In fact, Swedbank contends that because "contractual right"

includes common law rights "any interpretation of the statute requiring both sets of obligations to

arise under swap agreements would read common law rights out of the statute. . . ."[18]  *Id.*  Under

---

[17] Although this issue was raised before the Bankruptcy Court, it was not the basis of the Bankruptcy Court's
decision.  *See Swedbank Decision*, 2010 WL 1783395, at *3, n.12.  Nevertheless, this Court in conducting a *de novo*
review may examine the issue and, if it determines that the setoff was not within the scope of protections in sections
560 and 561, affirm on this alternate ground.  *See, e.g., Jenkins v. City of New York*, 478 F.3d 76, 86, n. 6 (2d Cir.
2007) (sustaining dismissal on alternate grounds and noting that "a party need not cross-appeal in order to assert an
alternate ground" for support the lower court's order).

[18] Interestingly, under the same provision, amicus ISDA argues that "contractual right" is "any right of setoff that
may be *contracted for"* whether arising under common law or otherwise cannot be "stayed, avoided or otherwise
limited" by the Bankruptcy Code.  ISDA Br. at 24 (emphasis in original).  ISDA notes that "it can be argued" that
Swedbank did not contract for "the specific right of setoff that [it] seeks to exercise" – the setting off against post-
petition assets – and requests that this Court limits its decision to this specific issue.  *Id.*  Whether contracted for or
arising under common law, however, section 560 does not extend to protect setoff rights against deposit accounts
that are not "payment amounts" or "termination values" "arising under or in connection with" a swap agreement.
*See infra* pp. 31-33.  ISDA does not directly address this plain reading of the statute.

this rationale, Swedbank asserts that its freezing and proposed setoff against the Account was justified, even though it was neither a swap agreement nor related to a swap agreement. *Id.*

Swedbank's interpretation, however, ignores that the plain language in section 560 indicates that it does *not* protect the exercise of "*any* contractual right" but rather only certain contractual rights. Specifically, the exercise of "any contractual right . . . *to offset or net out termination values or payment amounts arising under or in connection with the termination liquidation or acceleration of one or more swap agreements*." 11 U.S.C. § 560 (emphasis added). It is a fundamental principle of proper grammar that the infinitive (here, "to offset or net out") *plus* its object and modifiers may be used as an adjective of the preceding subject. William A. Sabin, THE GREGG REFERENCE MANUAL, at 475 (7th ed. 1994). In other words, section 560 does not protect *any contractual right* of setoff; rather it protects *only* contractual rights to offset or net out "termination values or payment amounts" that "arise under or in connection with the termination, liquidation or acceleration of one or more swap agreements." Any other reading of section 560 impermissibly disregards the limiting language that follows "contractual right." Swedbank concedes that ignoring a modifying phrase would violate a basic canon of statutory construction by rendering the clause "superfluous, void or insignificant." *See* Swedbank Br. at 30 (quoting *TRW Inc. v. Andrews,* 534 U.S. 19, 31 (2001)). Notably, ISDA does not even raise this absurd interpretation of section 560 that Swedbank would have this Court adopt. *See generally* ISDA Br.

Perhaps anticipating that its reading of section 560 is unnatural and grammatically incorrect, Swedbank next argues that even if not permitted under section 560, its putative setoff against the Account would be permitted under section 561. *See* Swedbank Br. at 31-32. But this argument also fails. As a preliminary matter, it is important to note that section 561 was added

to permit *cross-product* setoffs, thereby allowing a counterparty to net its obligations with a debtor under any one or more of six <u>specified</u> types of contracts: "securities contracts, commodity contracts, forward contracts, repurchase agreements, swap agreements, or master netting agreements." 11 U.S.C. § 561(a).  It is self-evident that there would have been no need for section 561 if, as Swedbank contends, section 560 already permitted setoffs of swap obligations against *any* type of obligation.

Section 561 *is* similar to section 560, however, because the "contractual right" to offset in section 561(a) parallels the language in section 560 by being similarly limited to setoffs of "termination values, payment amounts, or other transfer obligations" *arising under or in connection with* the agreements identified in the statute.  *Id.*  Swedbank contends that, despite this clear narrow scope of section 561(a), the court should look to subsection 561(b) to read an implicit broader application.  Swedbank argues that subsection (b) restricts the exercise of contractual rights "*to accelerate, liquidate or terminate* only to the extent that [such party] could [exercise such a right] under section 555, 556, 559 or 560," but imposes no such restriction on the exercise of contractual rights to setoff or net.  Swedbank Br. at 31 (emphasis added).  But such reading is as myopic as Swedbank's misreading of section 560.  The contractual rights of setoff in section 561(a) *are* already limited by the terms of section 561(a) itself – the *sums* to be set off under 561(a) must have arisen "under or in connection with" *one of six* categories of transactions (swap agreement, repurchase agreement, commodities contract, forward contract, securities contract and master netting agreement) – not some *other unrelated* transaction.  11 U.S.C. § 561(a).  Notably, a "master netting agreement," under which Swedbank asserts there are broader setoff rights, *see* Swedbank Br. at 31, is narrowly defined as an agreement providing for the exercise of rights "including rights of netting, setoff . . . under or in connection with one or

more contracts that are described in paragraphs (1) through (5) of section 561(a)," and *not including* any "provisions relating to agreements or transactions that *are not* contracts described in paragraphs (1) through (5) of section 561(a)." 11 U.S.C. §101(38A)(A)-(B) (emphasis added). Thus, under section 561(a), a counterparty may setoff any obligation arising under one of the contracts listed in subsections 561(a)(1)-(5), and a master netting agreement but *only under those* portions of a master netting agreement that are related to agreements or transactions described in paragraphs (1) through (5) of section 561(a). If Swedbank were correct that section 561(a) protects contractual rights of setoff with respect to amounts arising under a contract *of any kind,* Congress would not purposefully have limited the definition of "master netting agreement" to mean an agreement providing for the exercise of rights in connection with only those five specified contracts listed in section 561(a)(1)-(5). This interpretation of section 561 is consistent with the drafters' intentions – Congressman James Leach noted, "[w]ith regard to the cross product netting provisions [in section 561], nothing in this title expands netting to any new contracts." *Bankruptcy Reform Act of 1999 Hearing (Part III), Hearing Before Subcomm. on Commercial and Administrative Law of the H. Comm. on the Judiciary*, 106th Cong. 6 (1999) (statement of Rep. James Leach). Section 561 merely takes the product-specific setoff rights in sections 555, 556, 559, 560, and combines them to allow counterparties to exercise cross product setoffs, but only to the extent such setoffs are permitted under each of these individual sections. Swedbank's interpretation to the contrary is incorrect.

> 2.    The Amounts Deposited in the Account Are Not "Transfer Obligations" or "Termination Values" "Arising Under or in Connection with" a Swap or Other Safe Harbored Contract.

Swedbank further argues that section 561 recognizes "broader rights of setoff" than those in section 560, through including rights to offset not only "termination values and payment amounts," as provided in section 560, but also setoffs of "other transfer obligations."

Swedbank Br. at 31.  Because section 561 is an umbrella statute intended to protect cross-product netting, *see infra* pp. 33-38, the reference to "other transfer obligations" in section 561 is intended to encompass obligations arising under or in connection with one of the *non-swap* derivative agreements, such as repurchase agreements, forward contracts or commodity contracts listed in section 561(a)(1)-(4).  *In re Enron Corp.*, 379 B.R. 425, 432 (S.D.N.Y. 2007) ("The Court must read the Bankruptcy Code as a whole, taking care that it does not construe any provision 'in a manner that would place it in conflict with other provisions.'" (quoting *In re Smart World Techs.,* 423 F.3d at 183)); *see also In re Nat'l Gas Distrib. LLC,*, 556 F.3d at 256 (looking to definition of forward contract in section 101(25) to understand meaning of forward agreement in section 101(53B)).

Sections 556 and 559 provide insight into the meaning of "transfer obligations" as both protect specified obligations of parties to transfer assets.  Section 556, for example, protects the right of a commodity broker, forward contract merchant or financial participant to receive a "variation or maintenance margin payment."  11 U.S.C. § 556.  Section 559 provides that where parties agree that a repo participant or financial participant must deliver the proceeds of any liquidation of assets that are the subject of the relevant repurchase agreements, such proceeds are deemed property of the estate that must be turned over "subject to available rights of setoff."  11 U.S.C. § 559.  In fact, the very nature of a repurchase agreement contemplates performance of "transfer obligations" because a repurchase agreement is defined as a transfer and retransfer of a security.  11 U.S.C. § 101(47)(A).  In the repurchase market "a single security may be transferred subject to a repo agreement and then may be retransferred in another repo entered into by the transferee."  *Bankruptcy Law and Repurchase Agreements: Hearing on H.R. 2852 and H.R. 3418 Before the Subcomm. on Monopolies and Commercial Law of the H. Comm. on*

*the Judiciary*, 98th Cong. 83 (1984) (statement of Robert Brown, Chairman, Public Securities Association).  The obligations to deliver such margin payments and proceeds of asset sales or any other "transfer obligation" connected with a repo agreement constitute "transfer obligations" as that term is used in section 561(a).  Thus, "transfer obligations" was only intended to cover the types of transfers related to repurchase agreements, forward contracts and commodity contracts and not encompass extraneous obligations such as payments of deposits made to a commercial account.

Nor are the amounts in deposit in the Account, as Swedbank contends, "termination values" arising under or in connection with the swap agreement.  Swedbank Br. at 32.  "Termination values," plainly interpreted, means amounts *derived from termination*.  There is no dispute that the sums deposited in the Account have no relationship to and are in no way derived from the termination of the ISDA Master Agreements or any obligations arising thereunder.  *See* Swedbank Br. at 30.  Rather, these sums were deposited in the ordinary course of LBHI's commercial business and do not constitute "termination values."

B.  **The Legislative History, Underlying Policy, and Case Law Support a Finding that Sections 560 and 561 Do Not Apply to Setoffs Against LBHI's Account.**

The legislative history and policy behind the adoption of sections 560 and 561 of the Bankruptcy Code confirms their exclusive application to "financial contracts" and their lack of any relationship with a creditor's rights under commercial deposit accounts such as the Account.  The safe harbor provisions for swap agreements, including section 560, were specific: their protections "ensure that the *swap and forward contract financial markets* are not destabilized by uncertainties regarding the treatment of *their financial instruments* under the Bankruptcy Code."  H.R. Rep. No. 101-484, 1990 WL 92539, at *1 (emphasis added).  The protections of the safe harbor provisions were intended to protect the ability of parties to resolve

33

"*financial transactions* . . . promptly and with finality." *Id.* at *2-3 (emphasis added).  Indeed, as

ISDA notes in its brief, the fear was that the termination and the setoff process would be

automatically stayed upon the bankruptcy filing of one of the counterparties, "whereupon the

trustee, after indefinitely postponing termination of the swap agreement, could then refuse setoff

and unfairly 'cherry-pick' only the portions of the agreement advantageous to the debtor." *Id.* at

3; *see also* ISDA Br. at 11  The setoff process Congress intended to protect, however, was the

netting of the parties' swap obligations – not netting of *other unrelated* obligations:

> At the end of the swap agreement term, or upon default, the total of
> the periodic fluctuations, measured at specified periods during the
> term, are calculated, the amounts the first party owes to the second
> are set off against the amounts the second party owes the first, and
> the net sum owing from one party to the other is "netted out."

H.R. Rep. No. 101-484, 1990 WL 92539 at *3.  Even Mark Brickell, then Chairman of ISDA,

did not contemplate setoffs against unrelated obligations.  He testified that the legislation would

> ensure that a bankruptcy filing by a party to a swap or forward
> foreign exchange agreement would not prevent a counterparty
> from exercising *critical contractual rights*.  These include the
> counterparty's right to *terminate* the agreement, *liquidate its
> position by determining a single net value*, and foreclose on any
> collateral it holds.

*Interest Swap: Hearing before Subcomm. on Courts and Administrative Practice of the S. Comm.

of Judiciary*, at 17 (emphasis added).  Indeed, in its amicus brief, ISDA recognizes that "netting

is normal" between swap participants in "the course of dealing in swap transactions[,]" and that

this is distinctly "unlike ordinary commercial transactions where setoff is an extraordinary

remedy."  ISDA Br. at 12 (quoting S. Rep. No. 101-285, 1990 WL 259288, at *3).

When Congress amended the safe harbor provisions for financial contracts in

2005 through the BAPCPA, it did so in large part to promote consistency, clarity and uniformity

to the protections for the different categories of protected agreements.  *See, e.g.,* Anthony C.

Gooch & Linda B. Klein, *Documentation for Derivative*, 304-05 (4th ed. 2002);  H.R. Rep. No.

109-31, pt.1, at 132 (2005) (noting amendments that would ensure rights to close out for

different categories of contracts regardless of terminology).  The most significant amendment in

2005 was the addition of protections for cross-product netting in section 561(a), which, as stated

*supra* pp. 28-31, allows two parties to net all of their obligations across derivative and financial

products upon the termination of such products as the result of one counterparty filing for

bankruptcy protection.  H.R. Rep. No. 109-31, at 125.  Such protections did not extend beyond

the allowance of "the expeditious termination or netting of *certain types of financial*

*transactions*" that netting was already permitted for each product under sections 555, 556, 559

and 560 of the Bankruptcy Code.  *Id.* at 20 (emphasis added).[19]  Section 561 did not extend

netting to *non-*swap agreements, and to this end, Congress noted that despite the expanded

definition of swap agreements (adopted through BAPCPA), "*[t]raditional commercial*

*arrangements, . . .* or other non-financial market transactions, such commercial, residential or

consumer loans, cannot be treated as 'swaps' . . . [just] because the parties purport to document

or label the transactions as 'swap agreements.'" *Id.* at 129 (emphasis added).  Such clarification

would not have been necessary if section 561 was intended to permit setoffs against any

commercial transaction.

      Additionally, protecting the cross-product setoffs "of *certain types of financial*

*transactions,*" it was believed, would reduce the likelihood of systemic risk, or:

> the risk that the failure of a firm or disruption of a market or
> settlement system will cause widespread difficulties at other firms,
> in other market segments or in the financial system as a whole. If
> participants in *certain financial activities* are unable to enforce

---

[19] ISDA notes that it attempted, but was unsuccessful in persuading Congress to pass similar provisions to protect cross-affiliate netting.  ISDA Br. at 25, n.20.  This Court should not read rights into the statute that were not adopted by Congress.

> their rights to terminate financial contracts with an insolvent entity
> in a timely manner, or to offset or net their various contractual
> obligations, the resulting uncertainty and potential lack of liquidity
> could increase the risk of an inter-market disruption.

H.R. Rep. No. 109-31, at 20, n.78 (citations omitted) (emphasis added).  Extending the safe

harbor protections to ordinary commercial transactions – such as Swedbank's seizure of the

LBHI's post-petition assets in a deposit account – does not further such policy concerns.  By

September 17, 2008, Swedbank had already closed out its swap transactions under the ISDA

Master Agreements and set off its positions to determine its net exposure with respect to each of

the transactions.  SD-3 ¶¶ 10-15.  As of that time, Swedbank was no longer subject to the risk of

markets' volatility or the uncertainty that the Debtors might cherry-pick certain transactions.

Thus, the threat of "systemic risk" ceased to exist.  Swedbank's subsequent freeze and setoff

against the Account was not necessary to protect Swedbank from volatile swap markets – its

swap transactions were already terminated with the net exposure determined.[20]  Swedbank has an

unsecured claim against LBHI, which should be treated the same as all other unsecured claims.

Nothing in the safe harbor provisions permit Swedbank to receive payment in priority to other

creditors and no policy is served reading protections of Swedbank's actions into these provisions.

On the contrary, if Swedbank and similarly situated counterparties were permitted

to look to assets from *non-financial transactions* and setoff against such assets without relief

from the automatic stay, chaos and mass stripping of debtors' estates would ensue as certain

creditors sought to improve their position to secured status in express violation of the Bankruptcy

Code protections.  Preventing such uncontrolled arrogation of estate property is a fundamental

---

[20] As noted by a practitioner in the Financial Services Area of Bingham McCutchen LLP, "if the justification for the exemption from the automatic stay is based on mitigating systematic risk [in the financial markets], one may question how permitting a setoff of a derivative close out obligation against a non-derivative obligation implicates any concern about systematic risk."  Edwin E. Smith, *Setoff Issues in Derivative Transactions: The Lehman Experience*, International Insolvency Institute (2010) at 15-16.

policy of the Bankruptcy Code that cannot be ignored.  *See In re Drexel Burnham Lambert Group, Inc.,* No. 90B-10421, 1990 WL 302177, at *5 (Bankr. S.D.N.Y. Dec. 14, 1990) ("The automatic stay also protects creditors' interests by preserving their relative positions and preserving the remains of the debtor's estate against unsupervised dissipation through a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts") (internal citations omitted).  As ISDA noted, where competing policies clash, courts are required to respect Congressional judgment by interpreting the specific statutory language.  ISDA Br. at 20.  Here, undoubtedly the bankruptcy policies regarding equal treatment to creditors and efficient administration of the estate far outweigh protecting Swedbank's right to seize post-petition assets that are wholly unrelated to the ISDA Master Agreements and wholly unaffected by the concerns implicated for financial transactions.

Indeed, for this reason the necessary limitations of the safe harbor protections have been recognized by courts – counterparties do not have "unqualified rights."  *In re Enron Corp.,* 306 B.R. 465, 473 (Bankr. S.D.N.Y. 2004).  Courts have repeatedly held that the safe harbor provisions protect the exercise of *only* those *specifically* stated rights with respect to the *specifically* protected contracts and *are not carte blanche* for creditors.  *See id.* (section 560 does not provide swap participants with "unqualified right[s]"); *Lehman Brothers Special Financing, Inc. v. BNY Corp. Trustee Servs. Ltd.,* 422 B.R. 407, 421 (Bankr. S.D.N.Y. 2010) (section 560 does not protect counterparty's right to terminate, liquidate or accelerate agreements that were not "swaps" under the statute); *Calpine Energy Servs. L.P. v. Reliant Energy Elec. Solutions, L.L.C.*, No. 05-60200, Adv. No. 08-1251, 2009 WL 1578282, *6-7 (Bankr. S.D.N.Y. May 7, 2009) (section 556 protects *only* the exercise of termination rights and not rights "ancillary to termination");  *In re Amcor Funding Corp.*, 117 B.R. 549 (D. Ariz. 1990) (the contractual right

to liquidate is protected *only* when done for the reasons specifically stated in the statute).[21]  For

these reasons, Swedbank cannot be permitted to cloak itself in the safe harbor provisions as

justification for its unfettered grab at LBHI's post-petition assets.

III.    **THE BANKRUPTCY COURT'S RULING SHOULD BE AFFIRMED BECAUSE
        SWEDBANK VIOLATED THE AUTOMATIC STAY**

        The Bankruptcy Court correctly ruled that, given that Swedbank's setoff is not

protected by sections 560 and 561, Swedbank violated the automatic stay by imposing an

indefinite administrative freeze on the Account.  *See Swedbank Decision*, 2010 WL 1783395, at

*8.  It is true that "[n]othing is more basic to bankruptcy law than the automatic stay and nothing

is more important to fair case administration than enforcing stay violations."  *Id.*  Indeed, the

automatic stay is one of the fundamental protections afforded to debtors under the Bankruptcy

Code, *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.,* 474 U.S. 494, 503 (1986), and is

necessary to "prevent[] disparate actions against debtors" and "protect[] creditors in a manner

consistent with the bankruptcy goal of equal treatment."  *Lincoln Sav. Bank, FSB v. Suffolk

County Treasurer,* 880 F.2d 1540, 1545 (2d. Cir. 1989).

        Without citing any relevant case law, Swedbank argues that the "administrative

freeze on the Account and [its] refusal to release funds" did not violate the automatic stay

because "Swedbank did not need to seek relief from the Bankruptcy Court lifting the stay in

order to permit it to exercise its setoff rights" under sections 560 and 561.  *See* Swedbank Br. at

32.  Swedbank, however, ignores that (1) setoff against the Account is not protected by sections

560 and 561, *see supra* pp. 27-38; and (2) even where a valid right of setoff may exist, a creditor-

---

[21] Swedbank's contention that section 558 of the Bankruptcy Code somehow supports its position that "expansive rights" exist for safe-harbored transactions also fails.  *See* Swedbank Br. at 25, n.17.  Section 558 preserves the defenses that may be asserted by a debtor, including setoff rights.  11 U.S.C. § 558.  It has nothing to do with a creditor's setoff rights, and thus, has no applicability here.  Moreover, Swedbank's citation to *In re Women First Healthcare, Inc.,* 345 B.R. 131, 134 (D. Del. 2006), for this proposition is meritless in that *Women First Healthcare* has nothing to do with setoffs protected by the safe-harbor provisions.

bank cannot place an indefinite administrative freeze on a bank account without moving for relief from the automatic stay. *See In re Adomah,* 340 B.R. 453, 458-59 (Bankr. S.D.N.Y. 2006) (finding violation of automatic stay where bank imposed indefinite administrative freeze over debtor's bank account, including post-petition deposits, and failed to move for relief from the automatic stay), *aff'd,* 368 B.R. 134 (S.D.N.Y. 2007); *LNC Invs., Inc. v. First Fid. Bank,* No. 92 Civ. 7584, 2000 WL 1072460, at *6 (S.D.N.Y. Aug. 3, 2000) (finding bank may "temporarily" withhold the return of debtor's deposit, but only if the bank moves "as quickly as possible in the bankruptcy court for more permanent relief"); *Eastern Airlines, Inc. v. Chem. Bank, Inc.*, No. 95 Civ. 3981, 1997 WL 282264, at *1 (S.D.N.Y. May 28, 1997) (holding creditor-bank's freeze of four years, during which time bank never moved for relief from the automatic stay, was a stay violation); *see also Strumpf,* 516 U.S. at 19 (finding creditor-bank did not violate automatic stay by temporarily freezing debtor's account because the bank did not freeze the account "permanently and absolutely, but only while it sought relief under § 362(d) from the automatic stay," which it did within five days).[22]

Such a stay violation is particularly egregious under circumstances, such as here, where no right of valid right of setoff exists. Indeed, the Bankruptcy Court recognized that "Swedbank's failure to comply with section 362 of the Bankruptcy Code is "particularly troublesome in light of the fact that it is well aware that *mutuality does not exist here.*" *Swedbank Decision,* 2010 WL 1783395, at *17-18 (emphasis added). Swedbank's failure to move for relief from the automatic stay, alone, constitutes sufficient grounds for denying its request for setoff. *See In re Ionosphere Clubs, Inc.,* 164 B.R. 839, 844 (Bankr. S.D.N.Y. 1994)

---

[22] The one case cited by Swedbank – *Policy Realty Corp. v. Treber Realty LLC,* 213 F.3d 626 (2d Cir. 2000) is inapposite. Not only was the contract at issue in *Policy Realty* terminated pre-petition, the party claiming that the automatic stay was inapplicable moved for an order in that regard. *Id.* Here, the ISDA Master Agreements were terminated post-petition and Swedbank imposed the administrative freeze without moving for relief from the Bankruptcy Court.

(denying setoff where creditor's proof of claim "clearly evidences a decision to exercise the right of setoff without obtaining relief from the automatic stay"); *Official Comm. of Unsecured Creditors of Operation Open City, Inc. v. N.Y. Dep't of State*, 148 B.R. 184, 192-194 (Bankr. S.D.N.Y. 1992) (denying setoff where creditor "blatantly violated the automatic stay"), *aff'd*, 170 B.R. 818 (S.D.N.Y. 1994); *Blava In-Line v. Midlantic Nat'l Bank/North*, 133 B.R. 33, 36 (Bankr. S.D.N.Y. 1991) ("The bankruptcy court should deny setoff to those creditors who violate the automatic stay." (citing *MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615, 618 (2d Cir. 1989))).  And, Swedbank flaunted this failure by maintaining the administrative freeze for *nearly twenty months.*  Accordingly, the Bankruptcy Court correctly concluded that Swedbank violated the automatic stay and was well within its discretion to prohibit Swedbank's from setting off LBHI's alleged pre-petition debt against the post-petition deposits in the Account.

## CONCLUSION

For the foregoing reasons, Appellees respectfully request that the Court affirm the Bankruptcy Court's decision.

Dated: August 18, 2010
New York, New York

/s Richard P. Krasnow
Richard P. Krasnow
Denise Alvarez
Eleanor H. Gilbane

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc., et al., – Appellees*