SALANS LLP
  Claude D. Montgomery
  Lee P. Whidden
  Paul C. Gunther
Rockefeller Center
620 Fifth Avenue
New York, NY 10020-2457
Tel: (212) 632-5500
Fax: (212) 632-5555

*Attorneys for Appellant Swedbank AB (publ)*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
In re                                                            :
                                                                 :
                                                                 :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al*.                      :
                                                                 :
                                **Debtors.**                     :
                                                                 :
                                                                 :
-----------------------------------------------------------------x
                                                                 :
**SWEDBANK AB (PUBL),**                                          :
                                                                 :
                                **Appellant,**                   :
                                                                 :   **1:10-cv-04532 (NRB)**
                                                                 :
                **v.**                                           :
                                                                 :   **Oral argument requested.**
**LEHMAN BROTHERS HOLDINGS, INC.,** *et al.*,                    :
**AND OFFICIAL COMMITTEE OF UNSECURED**                          :
**CREDITORS OF LEHMAN BROTHERS**                                 :
**HOLDINGS, INC.,**                                              :
                                                                 :
                                **Appellees.**                   :
                                                                 :
-----------------------------------------------------------------x

## APPELLANT SWEDBANK AB (PUBL)'S REPLY BRIEF ON APPEAL

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT .............................................................................................................2

I.   Swedbank Possesses Enforceable Setoff Rights Under Both English and New York Law 2

    A.   The LBHI Agreement Grants Swedbank Contractual Rights of Setoff That are Enforceable Under Both English and New York Law ...........................................................................................3

    B.   The LBHI Master Agreement Is Enforceable Under English Law.........................4

        1.   English Non-Insolvency Setoff Law  Governs Swedbank's Setoff Rights ................................................................................5

        2.   English Insolvency Law, If Applicable, Would Permit Swedbank's Setoff ............................................................................6

    C.   The LBHI Master Agreement "Any Obligation" Setoff Promise is Enforceable Under New York Law ...............................................8

    D.   Swedbank's Extra-Contractual Setoff Rights Are Enforceable Under Both English and New York Law ...............................................9

        1.   Swedbank May Exercise Its Setoff Under the English Law Doctrines of Legal Setoff and Transaction Setoff .....................................10

        2.   Swedbank May Exercise Its Setoff Rights Under New York Common and Statutory Law ...............................................................10

II.  The Bankruptcy Code Does Not Impose Any Limitations on Swedbank's Setoff Rights 12

    A.   Sections 560 and 561 Permit Setoff Notwithstanding Any Limitations in Section 553 ...............................................................12

    B.   Sections 560 and 561 Permit Setoff Against the SEK Account ...........................15

III. The Legislative History Supports Swedbank's Rights of Setoff .......................................18

    A.   Legislative History Evidences Congress's Overarching Goal To Protect Financial Contracts By Increasingly Expanding The Scope of Safe-Harbored Transactions ...............................................................18

    B.   Amendment of the Federal Deposit Insurance Act and Federal Credit Union Act in 1990 Illuminate Congress' Overarching Intent....................19

C.      The Legislative History And Enactment of 560 Reflects
        Congress's Intent to Override 553 as to Swap Transactions ................................21

D.      Enactment of Section 561 Further Confirms Congress's Intent ...........................22

E.      The 2006 Financial Netting Improvements Act Clarified Congress
        Longstanding Intention By Conforming Safe Harbor Provisions to
        FDIA and FCUA ...................................................................................................23

CONCLUSION ...........................................................................................................................25

NewYork 1369716.9

# TABLE OF AUTHORITIES

<u>CASES</u>

*Aectra Refining and Manufacturing Inc. v. Exmar N.V.*,
  [1994] 1 WLR 1643 ................................................................................................ 10

*Bank of New York v. Meridian BIAO Bank Tanzania Ltd.*,
  No. 95 Civ. 4856, 1997 WL 53172, at *2 (S.D.N.Y. Feb. 10, 1997) ..................................... 8-9

*British Eagle Int'l Airlines Ltd. v. Compagnie Nationale Air France*
  [1975] 1 W.L.R. 758 ................................................................................................ 5

*Chemical Bank New York Trust Co. v. Kheel*,
  369 F.2d 845 (2d Cir. 1966) ...................................................................................... 2

*Citizens Bank of Maryland v. Strumpf*,
  516 U.S. 16 (1995) .................................................................................................. 16

*Coca-Cola Fin. Corp. v. Finsat Int'l Ltd*,
  (1996) 3 W.L.R. 849 ............................................................................................... 6

*County of Los Angeles v. Shalala*,
  192 F.3d 1005 (D.C. Cir. 1999) ................................................................................. 3

*El Dorado Hotel Properties, Ltd. v. Mortensen*,
  665 P.2d 1014 (Ariz. Ct. App. 1983) .......................................................................... 3

*Eurospark Industries, Inc. v. Underwriters at Lloyds Subscribing to Risk on Cover No.
  97FA007101OA*,
  567 F. Supp.2d 345 (E.D.N.Y. 2008) ......................................................................... 13

*Fin. One Public Co. Ltd. v. Lehman Bros. Special Fin., Inc.*,
  414 F.3d 325 (2d Cir. 2005) ...................................................................................... 5

*Fox v. Fox*,
  (UK Ct. App.) (1925) ............................................................................................... 3

*Hanak v. Green*,
  [1958] 2 QB 9 ........................................................................................................ 10

*In re Air Vermont*,
  761 F.2d 130 (2d Cir. 1985) ...................................................................................... 14

*In re Applied Logic Corp.*,
  576 F.2d 952 (2d Cir. 1978) ...................................................................................... 8

NewYork 1369716.9

*In re Cenagro Intern.*, PLC,
   294 B.R. 571 (Bankr. S.D.N.Y. 2003) .................................................................. 11

*In re Lehman Bros. Holdings Inc.*,
   404 B.R. 752 (Bankr. S.D.N.Y. 2009) ................................................................... 6

*In re Millenium Seacarriers, Inc., et al.*,
   292 B.R. 25 (S.D.N.Y. 2003) ................................................................................ 5

*In re NW Airlines Corp.*,
   349 B.R. 338 (S.D.N.Y. 2006) ............................................................................. 11

*In re Revere Copper and Brass, Inc.*,
   32 B.R. 577 (Bankr. S.D.N.Y. 1983) ................................................................... 16

*In re Stoltz*,
   315 F.3d 80 (2d Cir. 2002) .................................................................................. 15

*In re United Healthcare Sys., Inc.*,
   200 F.3d 170 (3d Cir. 1999) ................................................................................ 11

*In re Whimsy, Inc.*,
   221 B.R. 69 (S.D.N.Y. 1998) ................................................................................. 2

*Jefferson County Nat. Bank v. Dusckas*,
   166 Misc. 720, 2 N.Y.S.2d 336 (N.Y. Sup. Ct 1938) ........................................... 9

*Kahn Lucas Lancaster, Inc. v. Lark Intern. Ltd.*,
   186 F.3d 210 (2d Cir. 1999) ................................................................................ 17

*Kemper Reins Co. v. Cocoran (In re Midland Ins. Co.)*,
   79 N.Y.2d 253 (N.Y. 1992) ................................................................................. 10

*Kramer v. Lockwood Pension Servs., Inc.*,
   653 F.Supp.2d 354 (S.D.N.Y. 2009) ..................................................................... 8

*M/S Bremen v. Zapata Off-Shore Co.*,
   407 U.S. 1 (1972) .................................................................................................. 5

*N.L.R.B. v. Bildisco and Bildisco*,
   465 U.S. 513 (1984) ............................................................................................. 11

*New England Mut. Life Ins. Co. v. Caruso*,
   73 N.Y.2d 74 (N.Y. 1989) ..................................................................................... 8

*New York County Nat'l Bank v. Massey*,
   192 U.S. 138 (1904) .............................................................................................. 2

iv

*People v. Bautista*,
    353, 85 Cal.Rptr. 688 (Cal. Ct. App. 1970) ........................................................... 3

*Perrin v. United States*,
    444 U.S. 37 (1979) ............................................................................................. 13

*Perry v. Commerce Loan Co.*,
    383 U.S. 392 (1966) ........................................................................................... 24

*Pierre v. McElroy*,
    200 F. Supp.2d 251 (S.D.N.Y. 2001) ................................................................. 15

*Pinto v. Bank One Corp.*,
    No. 02 Civ. 8477 (NRB), 2003 WL 21297300, *6 (S.D.N.Y. Jun. 4, 2003) ........... 13

*Steiner v. Mut. Alliance Trust Co. of New York*,
    139 A.D. 645 (1st Dep't 1910) ............................................................................ 9

*United States v. Ron Pair Enterprises, Inc.*,
    489 U.S. 235 (1989) ........................................................................................... 18

*Updike v. Manufacturer's Trust Co*,
    243 A.D. 15 (1st Dep't 1934) .............................................................................. 9

*W. Alton Jones Foundation, et al., v. Chevron U.S.A. Inc. (In re Gulf Oil/Cities Service Tender*
    *Offer Litigation)*,
    725 F. Supp. 712 (S.D.N.Y. 1989) ..................................................................... 13

*Wallace v. Merrill Lynch Cap. Servs, Inc.*,
    10 Misc.3d 1062[A], 2005 NY slip. Op. 52076[U], *3 (Sup.Ct.N.Y.Cty. 2005) ........... 3

*Wallace v. Merrill Lynch Cap. Servs. Inc.*,
    29 A.D.3d 382 (1st Dep't 2006) .......................................................................... 9

*Wolf v. Weinstein*,
    372 U.S. 633 (1963) ........................................................................................... 11

*Wright v. Seaboard Steel & Manganese Corp.*,
    272 F. 807 (2d Cir. 1921) ................................................................................... 9

## STATUTES

11 U.S.C. § 553 ............................................................................................... passim

11 U.S.C. § 555 ...................................................................................................... 17

11 U.S.C. § 556 ...................................................................................................... 17

v

11 U.S.C. § 559 ........................................................................................................ 17

11 U.S.C. § 560 .................................................................................................. passim

11 U.S.C. § 561 .................................................................................................. passim

11 U.S.C. § 1107 (a) ............................................................................................... 14

11 U.S.C. § 1110 ..................................................................................................... 14

12 U.S.C. § 1787(e)(8) ........................................................................................... 14

12 U.S.C. § 1821(e)(8) ........................................................................................... 14

136 Cong. Rec. H2281-06 (May 15, 1990) (statement of Rep. Jack Brooks) ............................. 18

136 Cong. Rec. H2281-06 (May 15,1990) (statement of Sen. Shumer)................................. 18

136 Cong.Rec. H2281-06 (May 15, 1990) (statement of Rep. Fish)................................. 19

136 Cong.Rec. S7534-01 (June 6, 1990) (statement of Sen. DeConcini) .......................... 19, 21

1982 Amendments to Bankruptcy Code, Pub. L. No. 97-222, 96 Stat. 235 .................................. 19

1984 Amendments to Bankruptcy Code, Pub. L. No. 98-353, §§ 391-396, 98 Stat. 333............. 19

FCA Regulation 12(1)................................................................................................. 8

FCA Regulation 12(2)................................................................................................. 8

Financial Institutions Reform, Recovery, and Enforcement Act of 1989, P.L. 101-73.......... 19, 20

Financial Netting Improvements Act of 2006, Pub. L. No. 109-390 ............................................ 23

H.R. Rep. No. 101-54 (I) (1989), reprinted in 189 U.S.C.C.A.N. 86........................................ 20

H.R. Rep. No. 101-484 (1990), reprinted in 1990 U.S.C.C.A.N. 223 ............................... 18, 19, 21

H.R. Rep. No. 109-31(I), (2005), reprinted in 2005 U.S.C.C.A.N. 88........................................ 17

H.R. Rep. No. 109-31, (2005), reprinted in 2005 U.S.C.C.A.N. 88........................................ 23

H.R. Rep. No. 109-648 (2006)..................................................................................... 23, 24

H.R. Rep. No. 97-420 (1982), reprinted in 1982 U.S.C.C.A.N. 583........................................ 19

Insolvency Rule 2.85 ................................................................................................. 5-8

Insolvency Rule 2.95 ................................................................................................... 7

NewYork 1369716.9

Insolvency Rule 4.90 ........................................................................................................... 5

Interest Swap: Hearing Before the Subcomm. on Courts and Administrative Practice of the
    Senate Comm. On the Judiciary, 101st Cong. 51 (1989).................................................... 22, 25

N.Y. Debtor-Creditor § 151 ................................................................................................ 12

S. Rep. No. 101-285, at 9 (1990) ....................................................................................... 1, 21

vii

## PRELIMINARY STATEMENT

Beginning in 1996, Lehman Brothers Holding Inc. (at that time still the successor to a venerable and highly regarded financial institution with broad international reach) and certain of its affiliates negotiated a series of sophisticated contracts with Swedbank using as a starting point form contracts designed by the International Swaps and Derivatives Association, which contracts expressly were designed to manage risks through currency swaps.  At the time Lehman expressly agreed to unlimited setoff rights in connection with the termination and acceleration of each of the ISDA agreements.  Congress clearly intended to bolster that effort through the notwithstanding language of Section 560 of the Bankruptcy Code, which "means that [] contractual rights are not to be interfered with by any court proceeding under the Code."  S. Rep. No. 101-285, at 9 (1990) (emphasis added).

Fourteen years later, in a coordinated effort to persuade this Court that neither the parties nor Congress meant what they said regarding contractual setoff rights, LBHI, its official Creditors Committee (the "Committee") and their economic ally, the Lehman Brothers Inc. SIPA Trustee (the "SIPA Trustee") as Amicus Curiae[1] reach far beyond the reasoning of the Bankruptcy Court.  They purport to favor general creditors of LBHI over its negotiated swap counterparties, contrary to Congressional intent; to limit the Notwithstanding Clause of Section 560 to the operation of the automatic stay; engage in a selective recitation of legislative history; and argue to merits of a triangular setoff case whose holding has no direct application to this one.  At bottom, these parties urge the Court to find that the result espoused by Swedbank is not fair or sensible.  However, "the argument that setoff should be denied to avoid the inequity of preferential

---

[1] On this issue, the SIPA Trustee is a counterparty in numerous Safe Harbor transactions with LBHI and other Lehman affiliates whose debts and claims are potentially subject to setoff.  The SIPA Trustee's position is not about protecting customer accounts *per se* but protecting its general estate to enhance shortfalls in customer accounts.  In other words, the SIPA Trustee is just another debtor trying to limit the contractual freedoms Congress sought to protect.

treatment is an argument against the very concept of setoff, not an argument against its application to the facts of this case." *In re Whimsy, Inc.*, 221 B.R. 69, 75 (S.D.N.Y. 1998) (Sweet, J.) (*citing New York County Nat'l Bank v. Massey*, 192 U.S. 138 (1904)). Perhaps more important, "[e]quality among creditors who have lawfully bargained for different treatment is not equity but its opposite." *Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845, 848 (2d Cir. 1966) (Friendly, J., concurring).

As shown in its opening brief and below, Swedbank has clear non bankruptcy rights to undertake the proposed setoff and the plain meaning of the Bankruptcy Code precluded the very judicial interference imposed by the Bankruptcy Court.

## **ARGUMENT**

### I.     **Swedbank Possesses Enforceable Setoff Rights Under Both English and New York Law**

As demonstrated below, Swedbank possesses contract and common law rights under English and New York Law to setoff the amounts due to Swedbank under the LBHI Master Agreement against the SEK Account. The Committee's conclusion to the contrary derives from two misconceptions (i) a refusal to recognize that LBHI freely committed to bind itself not only to benefits, but also obligations, under the LBHI Master Agreement, and (ii) the misapplication of law from both jurisdictions. A brief review of the LBHI Master Agreement, demonstrates that LBHI cannot shrink from its contractual obligations under *applicable* English or even New York Law. This Court need not reach the question of whether New York or English Law governs Swedbank's extra-contractual setoff rights, since Swedbank's setoff is permitted under its contract and the laws of both jurisdictions.

2

A.     **The LBHI Agreement Grants Swedbank Contractual Rights of
Setoff That are Enforceable Under Both English and New York Law**

The LBHI Master Agreement does not contain any limitations on the exercise of setoff rights after the occurrence of a trigger event (in this case LBHI's filing of a chapter 11 petition).  The Agreement unequivocally provides that "upon the occurrence of an Event of Default" a party may setoff "any obligation" of one party against "any obligation" of the other party, "whether or not matured or contingent and whether or not arising under [the] Agreement." "Any obligation" obviously includes swap agreement guarantees and deposit accounts both of which create "obligation" of someone.

The Committee's reliance on "upon" and "owed" to read an *implicit* temporal limitation in the LBHI Master Agreement is misplaced.  Courts in both the United States and the United Kingdom have recognized that the word "upon" is virtually useless as a temporal marker when read in isolation.  *See, e.g.*, *El Dorado Hotel Properties, Ltd. v. Mortensen*, 665 P.2d 1014, 1017-18 (Ariz. Ct. App. 1983) ("upon" may mean "before after or simultaneously with" depending on the context); *People v. Bautista*, 353, 85 Cal.Rptr. 688, 693 (Cal. Ct. App. 1970) (same); *Fox v. Fox*, (UK Ct. App.) (1925) (same).  Here, "upon" is more appropriately read as referencing a triggering event after which setoff rights accrue.  "Owed" is properly read not as an indicator of the past tense, but rather as an adjectival phrase that modifies the word "obligation" and allows "alternative temporal readings." *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1013 (D.C. Cir. 1999).  *See also Wallace v. Merrill Lynch Cap. Servs, Inc.*, 10 Misc.3d 1062[A], 2005 NY slip. Op. 52076[U], *3 (Sup.Ct.N.Y.Cty. 2005) (interpreting the phrase "owed or due" in an ISDA Master Agreement by reference to the time of setoff, and not the time of termination).

These archetyped interpretations from many states and the UK accord with common commercial sense.  As noted by ISDA, the master agreements are relied by the

overwhelming majority of swap participants as vital risk management tools.  ISDA Brief at 2.

They accomplish this function by permitting parties to streamline the settling of accounts.

Freezing the parties' obligations as of the occurrence of the trigger event would run counter to

this goal by prohibiting the global settling of "obligations" other than immediately after the

trigger.  Under the Committee's interpretation the parties would not even be able to setoff

subsequently accrued interest or attorneys' fees after a default.

       The implicit transitory limitation proposed by the Committee ignores both a plain

reading of the LBHI Master Agreement and commercial common sense.  Indeed, it would not

have been logical for the parties to view contract setoff rights that are "in addition to" common

law setoff rights as narrower in scope due to timing considerations.  LBHI and Swedbank are

sophisticated financial institutions that knew how to draft temporal limitations.  They did not

draft such clauses, because they did not intend them to exist.  The Committee's interpretation

runs contrary to the parties' intentions, as expressed by the plain meaning of the LBHI Master

Agreement, and should be rejected.

    **B.**      **The LBHI Master Agreement Is Enforceable Under English Law**

       The Committee is correct that "were this an English insolvency proceeding," *see*

Committee Brief at 21, 23 and 24, then English insolvency law regarding setoff would be

applicable.  Unfortunately for the Committee, LBHI elected *instead* to commence chapter 11

proceedings exclusively in the United States, despite the presence of a UK branch.[2]  The English

insolvency rules apply only to insolvency proceedings in England and Wales.  *See also* Totty and

Moss Insolvency from Sweet and Maxwell ("Totty"), Chapter H10.01 (2008) ("Insolvency set-

---

[2] The English High Court accepts jurisdiction over branches of foreign corporations in what are termed "non main" proceedings under the UNICTRAL Model Law on Cross Border Insolvency as adopted by the United Kingdom.  *See generally,* The Cross-Border Insolvency Regulations 2006 - Chapter III (Recognition of a Foreign Proceeding and Relief) and Article 2(g) in Schedule I.

off is only available in formal insolvency proceedings in circumstances prescribed by the insolvency legislations, namely r.4.90 of the Insolvency Rules 1986, r.2.85 of the Insolvency Rules 1986 and s.323 of the Insolvency Act 1986").  The Committee's reliance upon *British Eagle Int'l Airlines Ltd. v. Compagnie Nationale Air France* [1975] 1 W.L.R. 758 is misplaced for the same reason.  *British Eagle* was decided in the context of an English liquidation proceeding, and thus has little bearing on the question of whether contractual setoff rights are enforceable in England and Wales *outside* of such proceedings.

1.   **English Non-Insolvency Setoff Law Governs Swedbank's Setoff Rights**

The Committee acknowledges, as it must, that all but one of the Master Agreements are governed by English Law.  Committee Brief at 1, n.2.[3]  Indeed they must, since the setoff rights asserted by Swedbank under the LBHI Master Agreement are governed by English Law due to the choice of law clause providing for the application of that law.  *See Fin. One Public Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 336 (2d Cir. 2005) (concluding that setoff right created by ISDA Master Agreement and Schedule would be governed by choice of law clause, but applying "interest analysis" to extra-contractual setoff rights); *see also In re Millenium Seacarriers, Inc., et al.*, 292 B.R. 25, 28 (S.D.N.Y. 2003) (stating that choice of law clauses are "presumed valid and should control" and applying Norwegian law selected by parties) (*citing M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972)).  As noted above, English Law governs the setoff rights that Swedbank asserts under the LBHI Master Agreement. The Committee's erroneous conclusion that Swedbank may not exercise those rights derives from the erroneous application of English setoff law that is applicable only in pending English insolvency proceedings.  Since no English insolvency proceeding is pending, the only relevant

---

[3] The LBCC Master Agreement is governed by New York law.

question is whether Swedbank may enforce the setoff provisions terms of the LBHI Master Agreement as a matter of English law.  The answer to this question is a resounding "yes."

English Law permits parties to contract to rights of setoff.  *See* Totty, Chapter H-10-05 (2008) ("Freedom of contract dictates that the parties are permitted to stipulate for themselves the criteria for set-off, such as whether mutuality is required, whether contingent debts may be set off, and when the set-off may take effect.")  Indeed, it is typical for parties to commercial contracts in the United Kingdom to contain standardized provisions either permitting or prohibiting setoff.  Such provisions are not contrary to public policy and clearly are enforceable under English law.  *Coca-Cola Fin. Corp. v. Finsat Int'l Ltd*, (1996) 3 W.L.R. 849.  Parties may also contract to expand setoff rights beyond the limitations of common law setoff, such as legal or equitable setoff.  *Id.*  Any notion that the LBHI Master Agreement is not enforceable as a matter of applicable English contractual law, or that LBHI is not bound specifically by the contractual rights and obligations which it negotiated with Swedbank, including the expressly material provision allowing Swedbank to setoff "any obligations" owed to LBHI, is pure flight of fancy.[4]

## 2.  English Insolvency Law, If Applicable, Would Permit Swedbank's Setoff

In any event, were English Insolvency laws are applicable, Swedbank's setoff rights would be equally unassailable.[5]  The Committee's recitation of Insolvency Rule 2.85(3) omits any reference to Section 2.85(1), which unequivocally states that the setoff limitations of Rule 2.85(3) apply only after an administrator has given notice of a proposed distribution

---

[4] It is worth noting that the LBHI Master Agreement was the last to be negotiated in 2004.  The reference to "any obligations" in the context of prior swap agreements and guarantees is clearly intentional.  R. A 4, Ex. E (dated Nov. 29, 2004).

[5] Judge Peck's decision in *In re Lehman Bros. Holdings Inc.,* 404 B.R. 752, 757 (Bankr. S.D.N.Y. 2009) should not be relied upon by this Court as determinative of applicable English law.  First, the discussion of English law is *dicta.*  Second, decision is not a complete statement of English insolvency law as it omits any mention of English Insolvency Rules 2.85-2.89, which both the Creditors' Committee and Swedbank agree would be the controlling principles of English law were this an English insolvency proceeding.  *See* Reply at 7-8, *infra.*

6

pursuant to Insolvency Rule 2.95.  *See* Insolvency Rule 2.85(1) ("This Rule applies where the administrator, being authorised to make the distribution in question, has, pursuant to Rule 2.95 given notice that he proposes to make it.").  (*See also In the matter of Kaupthing, Singer and Friedlander Ltd. (In Administration)* [2009] EWHC 2308 (Ch), subsequently appealed on other issues: "It is to be noted that whereas in a liquidation or a bankruptcy the account is to be taken as at the date when the relevant insolvency regime commences, in an administration the account is taken at the date of the notice of intended distribution, not at the date of entry into administration").  Therefore, unless and until a notice of distribution has been given, the mandatory limitation on rights of setoff will not apply and all other rights of setoff which the parties may have, whether contractual or otherwise, may continue to be exercised as they are not suspended by Schedule B1 to the Insolvency Act 1986.

One of the primary functions of the English administrator is to realize the assets of the insolvent company and thereafter to distribute the realizations amongst the company's creditors.  Typically, the distribution, if any, takes place towards the end of the administration.  Paragraph 761(a) of Schedule B1 to the Insolvency Act 1986 provides that the administration ceases to have effect one year after it commences, but can, and often is, extended by court order or agreement of the creditors.  Thus, administrations can last several years.  Notwithstanding that an administrator has the authority to make distributions (provided he gives advance notice), in many cases no distribution is made and the net proceeds of asset realizations, if any, are distributed by a subsequently appointed liquidator.

Any fair comparison of the record of the Debtors' chapter 11 proceedings to that of an equivalent English law administration must acknowledge that no equivalent notice of distribution confirmation, either in the form of a confirmation order or an approved disclosure

7

statement, has been given in LBHI's case.[6]  For all of these reasons, were this an administration

under English insolvency law, it is likely that Rule 2.85(3) would not yet apply, if ever.

C.      **The LBHI Master Agreement "Any Obligation"**
        **Setoff Promise is Enforceable Under New York Law**

        The United States, like the United Kingdom, has a venerable tradition of setoff.

The rule allowing setoff, both before and after bankruptcy, is not one that courts are free to

ignore when they think application would be unjust.  *In re Applied Logic Corp.*, 576 F.2d 952,

957-58 (2d Cir. 1978) ("[Setoff] is a rule that has been embodied in every bankruptcy act that the

nation has had, and creditors, particularly banks, have long acted in reliance upon it.").  New

York also has a strong public policy in favor of freedom of contract.  *See*, *e.g.*, *Kramer v.*

*Lockwood Pension Servs., Inc.*, 653 F.Supp.2d 354, 378 (S.D.N.Y. 2009) ("Freedom of contract

itself is deeply rooted in public policy") (*citing New England Mut. Life Ins. Co. v. Caruso*, 73

N.Y.2d 74, 81 (N.Y. 1989)).

        Unsurprisingly, then, New York has also long permitted parties to contract to

rights of setoff beyond those available under common or statutory law.  *See*, *e.g.*, *Bank of New*

*York v. Meridian BIAO Bank Tanzania Ltd.*, No. 95 Civ. 4856, 1997 WL 53172, at *2 (S.D.N.Y.

---

[6] The Committee's attempt to find support in the Financial Collateral Arrangements (No. 2) Regulations (2003) (the "FCA Regulations") is also misguided.  Those regulations concern, *inter alia*, the enforcement of close-out netting provisions under financial collateral arrangements (whether through netting, set-off or otherwise).  FCA Regulation 12(1) provides that "a close-out netting provision shall, subject to paragraph (2), take effect in accordance with its terms notwithstanding that the collateral-provider or collateral-taker under the arrangement is subject to winding-up proceedings or reorganization measures."  *See* FCA Regulation 12(1).  FCA Regulation 12(2) further provides that a close-out netting provision will not take effect "if at the time that a party to a financial collateral arrangement *entered into such an arrangement* or that the relevant financial obligations came into existence, that party was aware or should have been aware that winding up proceedings or re-organization measures had commenced in relation to that other party."  *See* FCA Regulation 12(2)(a) (emphasis added).  The LBHI Master Agreement and the financial collateral arrangements therein, long predate LBHI's chapter 11 case.  R.A. 4, Ex. A-E; LBCC was first on December 17, 1996 and LBHI was last on November 29, 2004.  Swedbank is therefore fully entitled to exercise its contractual right of set-off under the Master Agreements, as those documents do not fall within the ambit of subsection 12(2)(a).  What is challenged by LBHI and the Committee is not the Lehman obligations (to Swedbank - "that other party"), which if they arose in 2008 could be challenged under this rule, but rather the portion of Swedbank's deposit account obligation which arose after the commencement of LBHI's chapter 11 case.  Swedbank's obligations in respect to the deposit account are not financial collateral arrangements and are therefore not subject to the constraints of the cited FCA Regulations.

8

Feb. 10, 1997) (J. Sotomayor) ("[I]f a contractual right exists between the parties to setoff unmatured or contingent liabilities, including attorneys' fees, such contractual right will be enforced by the courts, even if statutory and common law do not provide for the setoff of contingent obligations."); *Steiner v. Mut. Alliance Trust Co. of New York*, 139 A.D. 645, 646 (1st Dep't 1910) (upholding debtor's contractual right to setoff unmatured debt prior to statutory enactment permitting setoff of such debts).[7]  Further, "[i]t has long been the rule in this State that, when there is a deposit in a bank in a general account, as distinguished from a special account, the bank is at liberty, at will, in the absence of any agreement to the contrary, to apply the money on deposit upon an indebtedness then due at the bank from the depositor." *Jefferson County Nat. Bank v. Dusckas*, 166 Misc. 720, 724, 2 N.Y.S.2d 336 (N.Y. Sup. Ct 1938) (citations omitted).  *Wright v. Seaboard Steel & Manganese Corp.,* 272 F. 807, 812 (2d Cir. 1921) (allowing contractual setoff of unmatured obligations of insolvent party based on contractual acceleration clause prior to amendment of DCL 151 to permit setoff of unmatured obligations); *Updike v. Manufacturer's Trust Co,* 243 A.D. 15, 19 (1st Dep't 1934) (same).  In light of this history, the LBHI Master Agreement, which sets forth the parties' contractual setoff rights, does not violate New York's public policy and is therefore enforceable, notwithstanding any claimed limitations on such rights under New York statutory or common law.

   **D.      Swedbank's Extra-Contractual Setoff Rights
            Are Enforceable Under Both English and New York Law**

         Even assuming, *arguendo*, that Swedbank did not have an independent contractual right to setoff the SEK account, Swedbank's setoff satisfies both New York and English Law.

---

[7] *cf. Wallace v. Merrill Lynch Cap. Servs. Inc.*, 29 A.D.3d 382, 383 (1st Dep't 2006) (upholding trial court's determination not to allow setoff of contingent guarantee obligation against bond obligations where master agreement only allowed for setoff against matured and unmatured debts, and not contingent obligations at the time of setoff.)

1.      **Swedbank May Exercise Its Setoff Under the English
        Law Doctrines of Legal Setoff and Transaction Setoff**

To the extent that English Law may govern Swedbank's extra-contractual setoff

rights, English Law of legal and equitable setoff permits Swedbank to exercise those rights.

"Legal setoff" is available under English Law where two claims are liquidated, capable of

precise valuation and are both due and payable at the commencement of an action.  *Aectra*

*Refining and Manufacturing Inc. v. Exmar N.V.*, [1994] 1 WLR 1643.  At the time that LBHI

commenced the contested matter in the Bankruptcy Court requesting the turnover of the SEK

Account on January 22, 2010, the obligations of both LBHI and Swedbank were due and

ascertainable.  Swedbank asserted its right to setoff the amounts due from LBHI as a defense to

LBHI's demand.  All of the elements for legal setoff under English Law are therefore met here.

Swedbank's setoff is also permissible under the English Law equitable doctrine of

"transaction setoff", which also arises as a defense to a claim in litigation.  *Hanak v. Green*,

[1958] 2 QB 9.  In order for a right of transaction setoff to lie there must be an "inseparable

connection" between the claim and the cross claim, that is, they must arise out of the same

course of dealings and transactions.  Here, the LBHI Master Agreement governs Swedbank's

right to setoff the amounts owing under that agreement against any other obligations, thus

including its obligations in respect of the deposit account, thereby providing the inseparable

connection necessary for setoff.

2.      **Swedbank May Exercise Its Setoff Rights
        Under New York Common and Statutory Law**

New York law permits the setoff of mutual debts, provided that the debts and

credits are "due to and from the same person in the same capacity."  *Kemper Reins Co. v.*

*Cocoran (In re Midland Ins. Co.)*, 79 N.Y.2d 253, 259 (N.Y. 1992) (citation omitted).  The

Committee cites to over *thirty* cases for this uncontroversial proposition.  Committee Brief at

21.[8]  As a matter of corporate formality, both LBHI and Swedbank have obligations to one another in the same capacity as corporations in their respective jurisdiction.  Therefore, Swedbank's setoff would appear permissible.  *Id.*

The Committee and LBHI suggest that the latter is either recognized as a different entity pre and post petition based upon Section 553 or operating as a fiduciary as debtor-in-possession.  As Swedbank noted in its principal brief, the Supreme Court has the rejected "new entity" theory.  *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 528 (1984).  Thus, pre and post-petition LBHI remains the "same party" unless Section 553 compels a contrary result.  *Id.*  As argued in its principal brief, Section 560 renders Section 553 ineffective as a source of entity "separateness".  Similarly, the Committee's suggestion that LBHI, as debtor-in-possession, operates in a different capacity from pre-petition LBHI *i.e.,* as a fiduciary by virtue of its status as debtor-in-possession, is entirely dependent upon the Bankruptcy Code Section 1107 grant of authority to act as a "trustee".[9]  Separate capacity is, therefore, an intended result from the operation of a provision of the Bankruptcy Code and subject to the Notwithstanding Clause of Sections 560 and 561.  The Committee does not, cite any state law authority to support the view

---

[8] Notably, the Committee did not cite any case demonstrating that LBHI could not contract to, or out of, the mutuality requirements under New York law.

[9] Section 1107 (a) of the Bankruptcy Code provides *inter alia*: "(a) Subject to any limitations on a trustee serving in a case under this chapter, . . . a debtor in possession shall have all the rights, . . . and powers, and shall perform all the functions and duties, except the duties . . . of a trustee serving in a case under this chapter." 11 U.S.C. § 1107(a); *In re United Healthcare Sys., Inc.,* 200 F.3d 170, 177 n.9 (3d Cir. 1999) (*citing* Bankruptcy Code Section 1107).  The Second Circuit cases cited by the Committee for the proposition that the debtor-in-possession is a fiduciary to the estate and creditors, also rest on federal bankruptcy statute.  The two other cases referenced *In re NW Airlines Corp.*, 349 B.R. 338, 369 (S.D.N.Y. 2006) and *In re Cenagro Intern.,* PLC, 294 B.R. 571, 599 n. 32 (Bankr. S.D.N.Y. 2003), cite to a line of cases that trace back to the Supreme Court's decision in *Wolf v. Weinstein,* 372 U.S. 633, 649 (1963) (*citing* to s. 188 of the former Bankruptcy Act (predecessor to the Bankruptcy Code) for the proposition that "the duties which the corporate debtor-in-possession must perform during the proceeding are substantially [the same as] those imposed upon the trustee").

11

that the debtor-in-possession is expressly recognized by state law as an independent entity or fiduciary.[10]  Its analysis should be rejected.

Section 151 of the Debtor and Creditor Law permits the setoff asserted by Swedbank, since that statute does not impose any limitation on the obligation owing from the debtor, Swedbank, to the creditor, LBHI.  A precise reading of that statute makes it clear that the requirement that the "indebtedness" of the creditor (LBHI) must be either "matured or unmatured" prior to the commencement of the insolvency proceedings for the creditor.  No such restriction applies to "the amount owing" from the debtor (Swedbank) to the creditor.  Since the obligations of LBHI under the LBHI Master Agreement were either matured or unmatured as of the filing of LBHI's bankruptcy petition, Swedbank's setoff is permissible.  The other cases cited by the Committee are all distinguishable in that they involved the formal appointment of a receiver or liquidator or an assignment for the benefit of creditors, none of which situations applies here.

## II.     The Bankruptcy Code Does Not Impose Any Limitations on Swedbank's Setoff Rights

### A.     Sections 560 and 561 Permit Setoff Notwithstanding Any Limitations in Section 553

LBHI does not dispute, and therefore concedes, that the effect of a "notwithstanding" clause is to ensure that a statute will have effect in spite of the operation of any other statute.  LBHI Brief at 16.  LBHI's concession on this point is fatal to its argument.  Swedbank demonstrated in its principal brief that Sections 560 and 561 of the Bankruptcy Code contain notwithstanding clauses (the "Notwithstanding Clauses").  Swedbank Brief at 15-17

---

[10] All of the cases cited by the Committee in sections for its argument that pre post-petition LBHI are separate parties and act in separate capacities are easily distinguishable on their facts, because they involve official proceedings commenced under New York state law.  Committee Brief at 8-12 (citing cases involving receivership proceedings, liquidations, assignments for the benefit of creditors and the administration of decedents' estates)

(noting that Sections 560 and 561 provide that the exercise of any contractual Safe Harbor setoff right "shall not be stayed, avoided or otherwise limited by operation of any provision of this title"). Sections 560 and 561, therefore, operate in spite of any other provision of the Bankruptcy Code whose operation would potentially limit Sections 560 and 561.

LBHI argues that Sections 560 and 561 do not contain "Notwithstanding Clauses" simply because they lack the word "notwithstanding." LBHI Brief at 16. LBHI's failure (i) to argue that the dictionary definitions offered by Swedbank brief are incorrect or inaccurate and (ii) to offer alternative definitions constitute tacit admissions that the definitions proposed by Swedbank are sound and accurate. *Pinto v. Bank One Corp.*, No. 02 Civ. 8477 (NRB), 2003 WL 21297300, *6 (S.D.N.Y. Jun. 4, 2003) (Buchwald, J.) (*citing Perrin v. United States*, 444 U.S. 37, 42 (1979) ("Unless otherwise defined, words in a statute will be interpreted as taking their ordinary, contemporary, common meaning"). By glossing over the definitions as "selective", LBHI implies that despite the hundreds of thousand of words in the English language no word, or combination of words, is capable of meaning, or of having the same legal effect as, the word "notwithstanding." The English language is not so impoverished, and this Court should reject LBHI's invitation to so find. *See, e.g., W. Alton Jones Foundation, et al., v. Chevron U.S.A. Inc. (In re Gulf Oil/Cities Service Tender Offer Litigation)*, 725 F. Supp. 712, 730 (S.D.N.Y. 1989) ("Notwithstanding means take[s] precedence over and thus negates any contrary provision . . .") (internal citations omitted); *Eurospark Industries, Inc. v. Underwriters at Lloyds Subscribing to Risk on Cover No. 97FA007101OA,* 567 F. Supp.2d 345, 357-58 (E.D.N.Y. 2008) ("notwithstanding means without prevention or obstruction from or by; in spite of"); *see e.g.* H.R. REP. NO. 109-31(I), at 97-113 (2005), *reprinted in 2005 U.S.C.C.A.N. 88, 181-95* (conforming numerous provisions of the Bankruptcy Code with similar federal insolvency laws

containing parallel provisions that include notwithstanding clauses).[11]  LBHI similarly glosses

over the import of an almost identically worded section of the Bankruptcy Code, Section 1110.

The Second Circuit held that Section 1110 contains a Notwithstanding Clause despite the

absence of the word "notwithstanding" in the statute.  *In re Air Vermont*, 761 F.2d 130, 133-34

(2d Cir. 1985).[12]

        Faced with the inevitably unfavorable consequences arising from a plain reading

of the Notwithstanding Clauses in Sections 560, 561 and 1110, LBHI instead turns to a separate

section, Section 553.  However, Section 553 does not contain any language similar to a

"notwithstanding" clause, and therefore nothing in the text of Section 553 informs the definitions

of the Notwithstanding Clauses in Sections 560 and 561.  Of course, LBHI does not, because it

cannot, offer any case law to support this novel, and logically untenable, method of statutory

construction.  To the extent that LBHI intends by reference to Section 553 to engage in a

"structural" interpretation of Sections 560 and 561, such analysis also fails.  The setoff rights

exercisable under Sections 560 and 561 and 553 do not overlap but rather complement one

another.[13]  Bankruptcy Code Sections 553(a)(2), (a)(3) and (b) protect Safe Harbor setoff rights

acquired or exercised during the ninety-day preference period *prior* to the filing of a bankruptcy

---

[11] BAPCPA amended many provisions of the Bankruptcy Code and FDIA so that these provisions would read in harmony.  *See e.g.* H.R. Rep. No. 109-31(I), at 97-99 (2005), *reprinted in 2005 U.S.C.C.A.N. 88, 181-83*.  As further detailed in Part III, the Federal Deposit Insurance Act and Federal Credit Union Act both contain provisions that provide similar protection for derivative counterparties to enforce nearly identical rights in bank insolvency proceedings.  Each parallel provision contains a notwithstanding clause that preempts other federal law.  *See* 12 U.S.C. § 1821(e)(8)(A) & (E); 12 U.S.C. § 1787(e)(8)(A) & (E).

[12] LBHI notes that at the time *In re Air Vermont* was decided Section 1110 contained *less* preemptive language than the current version.  LBHI Brief at 20 n.11.  By such reference, LBHI perhaps intended to imply that *In re Air Vermont* is inapplicable to the current, more similarly worded, statute.  However, it would defy logic to interpret a *more* preemptive statute *more* restrictively.

[13] LBHI's misapprehension as to which statute is more specific to the "matter at issue" is perhaps what underlies their incorrect assertion that Swedbank's interpretation of the Notwithstanding Clauses renders the 553(b) setoff exceptions "superfluous."  LBHI Brief at 16.  The statutory provisions in Section 553 cannot be seen as superfluous under Swedbank's interpretation of Section 560, because they do not protect overlapping rights.  *See* Swedbank Opening Brief at 26, 27.

petition, whereas the Safe Harbor Provisions such as Sections 560 and 561 protect such rights acquired or exercised *upon* or *after* the filing of the petition.  Together, Sections 553 and the Safe Harbor provisions create a temporal continuum of protection for contractual and common law setoff rights arising in connection with Safe Harbor transactions regardless of when they are exercised.

Finally, LBHI's designation of Section 553 as the more "specific" statute reads the Notwithstanding Clauses out of 560 and 561, contrary to the fundamental principal that all statutory provisions are to be read as meaningful.  *Pierre v. McElroy*, 200 F. Supp.2d 251, 253 (S.D.N.Y. 2001).  In essence, LBHI views Section 553 (an arguably relevant provision lacking a Notwithstanding Clause) as the more specific provision over Sections 560 and 561 (relevant provisions containing Notwithstanding Clauses) because Section 553 lacks the Notwithstanding Clause.  Then LBHI also relies upon a deliberate misidentification of the "matter at issue" as the "retention or non-retention of setoff rights," LBHI Brief at 17, rather than the effects of the *ipso facto* clauses in the Swedbank Lehman ISDA agreements.  LBHI's attempt to distort Swedbank's position by focusing solely on the size of the group disregards the rights being asserted, the protection of agreed Safe Harbor transaction rights, and the *context* in which those setoff rights are asserted, *i.e.* upon the occurrence of an *ipso facto* trigger.  *See In re Stoltz*, 315 F.3d 80, 93 (2d Cir. 2002) (noting the importance of context).

   **B.**      **Sections 560 and 561 Permit Setoff Against the SEK Account**

On their faces, Sections 560 and 561 permit the exercise, free from any limitations imposed by the Bankruptcy Code, of "any contractual right," including common law rights of offset of "termination values," "payment amounts" and, solely with respect to Section 561, "transfer obligations" that "aris[e] under or in connection with" the "termination, liquidation

15

or acceleration" of swap agreements.  As previously shown,[14] Swedbank's "contractual rights" under the LBHI Master Agreement and the common law of England and Wales and New York permit the setoff of the SEK Account.  As shown below, the value of the SEK Account is properly alternatively characterized as a "payment amount," a "termination value" and a "transfer obligation" depending upon the context in which it is used.

A leading British authority has recognized that the setoff asserted by Swedbank is permissible under Section 6(f) of the 2002 form ISDA Master Agreement, which defines setoff rights much more narrowly than the Master Agreement at issue here:[15]

> [T]he non-defaulter (or equivalent in the case of non-default terminations) can initiate a set-off involving the early termination amount against any other amount whether arising under the master or not, even if contingent or in another currency or payable elsewhere.

PHILIP R. WOOD SET-OFF AND NETTING, DERIVATIVES, CLEARING SYSTEMS 239 (Sweet & Maxwell 2007) (1995).

New York and English Law both hold that a sum setoff is a sum paid, and therefore a payment amount.  *See In re Revere Copper and Brass, Inc.*, 32 B.R. 577, 583 n.3 (Bankr. S.D.N.Y. 1983) (setoff is a statutory form of preference that ensures payment on a claim); PHILIP R. WOOD, SET-OFF AND NETTING, DERIVATIVES, CLEARING SYSTEMS, 4 (Sweet & Maxwell 2007) (1995) ("Setoff . . . is a form of payment").  The SEK Account is also a termination value under the LBHI Master Agreement.  As previously noted, a deposit account is debt owed by Swedbank to LBHI.  *See Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 21 (1995).  Upon termination, the LBHI Master Agreement permits Swedbank to setoff "any

---

[14] *See* Swedbank Opening Brief at 6-11 and Reply, *supra* at 2-12.

[15] The LBHI Master Agreement permits any party to setoff "any obligations"; in contrast the 2002 ISDA Master Agreement only permit setoff against the Early Termination Amount.

16

obligation . . . (whether or not matured or contingent or *whether or not arising under* [the Master Agreement])." LBHI Master Agreement at 26 (emphasis added). The value of any obligation subject to setoff post termination becomes a termination value. Therefore, prior to effecting setoff, the amount of SEK Account debt is a termination value that both arises under and in connection with the termination of the LBHI Master Agreement.

In response to these facts regarding non bankruptcy law, LBHI relies on a misplaced grammatical rule of statutory construction, *see* LBHI Brief at 29-30[16] and, a straw man argument based upon an out of context and selective quotation from Swedbank's brief.[17]

LBHI's further argument that Section 561(b) does not afford greater protections to setoff rights because Section 561(a) already limited the rights by reference to the contract categories in Section 561(a)(1) - (5) is faulty reasoning, because it improperly conflates the reference to multiple categories with the entirety of the protections granted to those contracts in Section 561. To the extent that Section 561 grants additional protections for the offset of transfer obligation not contained in sections 555, 556, 559 and 560, such rights are clearly broader than, and are not limited by, those other sections.

---

[16] Lehman asserts Swedbank's construction of Section 560 and 561 is "absurd" (LBHI Brief at 29), based on a discretionary grammatical principle that is unsupported by case law. Seeking to limit the effect of the phrase "any contractual right" LBHI argues that the word "offset" is modified by the phrase "arising or in connection with one or more … swap agreements." This statutory construction should be rejected, because it wholly ignores the doctrine of the last antecedent, which provides that qualifying words and phrases generally apply only to the *nearest* word or phrase. *See* e.*g., Kahn Lucas Lancaster, Inc. v. Lark Intern. Ltd.*, 186 F.3d 210, 216 (2d Cir. 1999) (applying the doctrine of the last antecedent). The phrase "arising under in connection with one or more … swap agreements" is properly construed as modifying its antecedent phrase, "termination values, payment amounts, or other transfer obligations," not "to offset or net."

[17] LBHI's assertion that Swedbank believes "a contract of any kind" is protected by 561 is a gross distortion. LBHI Brief at 29-30. Section 561 protects "any contractual right" found within the listed protected agreements regarding rights of setoff , including rights of "set off" against "any obligation" as provided in the LBHI Master Agreement.

### III.     The Legislative History Supports Swedbank's Rights of Setoff

LBHI and the SIPA Trustee argue that Sections 560 and 561 present the "rare case[]"[18] where plain meaning is "demonstrably at odds" with the intentions of the drafter. Trustee Brief at 11-12 (analogizing the plain terms of Sections 560 and 561 to an "error" in enactment); *see* LBHI Brief at 22.  The legislative perspective proposed by LBHI and the SIPA Trustee attempts to camouflage Congress's unequivocal and overarching intent – to protect and enforce contractual rights in Safe Harbor transactions reflected in Congress' choice of powerful and sweeping language contained in the Notwithstanding Clauses.

#### A.     Legislative History Evidences Congress's Overarching Goal To Protect Financial Contracts By Increasingly Expanding The Scope of Safe-Harbored Transactions

Since the inception of the Bankruptcy Code, Congress has recognized the need to afford "special treatment" to certain financial transactions.[19]  Congress has repeatedly exempted them from the uniform application of the Bankruptcy Code and other federal insolvency laws, including the principle that creditors be treated equitably.  ISDA Brief at 5-6.  Central to Congress's policy choice is the unique risk management functions performed by these contracts,[20] which insulate the financial markets from uncertainty and the "ripple effect" that

---

[18] *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989).

[19] *See* 136 CONG. REC. H2281-06 (May 15,1990) (statement of Rep. Jack Brooks, Chairman, Subcom. on Economic and Commercial Law) ("Congress has concluded certain rapid, high volume financial transactions warrant *special bankruptcy treatment* so as not to disrupt capital markets") (emphasis added); H.R. REP. 101-484, at 2 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 224 ("US bankruptcy law has long accorded *special treatment* to transactions involving financial markets . . . ."); 136 CONG. REC. H2281-06 (May 15, 1990) (statements of Sen. Schumer) (high volume financial transactions deserve "different treatment" and are in a "different category" under the Bankruptcy Code) (emphases added).  In addition to preventing risk, Congress found additional protections for swap agreements would help to ensure the international competitiveness and success of America's capital markets. 136 CONG. REC. H2281-06 (May 15, 1990) (statement of Sen. Schumer).

[20] Congress has expressly recognized that swap agreements are "vital risk management tools" used by financial institutions, corporations and even governments to manage interest rate and currency risks.  136 CONG. REC. H2281-06, (May 15, 1990) (statement of Sen. Schumer); *see also* H.R. REP. NO. 101-484, at 3 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 224 (swap agreements permit entities to minimize borrowing costs and hedge fluctuations in interest and foreign exchange rates).

could result if a bankruptcy prevented derivative counterparties from enforcing their *contractual rights* upon default.[21]

### B.   Amendment of the Federal Deposit Insurance Act and Federal Credit Union Act in 1990 Illuminate Congress' Overarching Intent

As a matter of policy, Congress has continually responded to innovations in the financial markets "to keep pace in promoting speed and certainty in resolving complex financial transactions." H.R. REP. NO. 101-484, at 2 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 224. After enacting the first Safe Harbor provisions to the Bankruptcy Code in 1982[22] and 1984[23], Congress expanded its protection of financial contracts beyond the Bankruptcy Code to other insolvency statutes. In 1989, Congress amended both the Federal Deposit Insurance Act (the "FDIA")[24] and the Federal Credit Union Act[25] (the "FCUA") to protect the contractual rights of derivatives counterparties in bank insolvency proceedings. In addition to the classes of

---

[21] H.R. REP. No. 97-420, at 2 (1982), *reprinted in* 1982 U.S.C.C.A.N. 583, 583 (stating that the safe harbor protections for commodities and securities contracts were enacted to prevent a party's insolvency from "threatening the collapse of the market"); *see also* H.R. REP. No. 101-484, at 2 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 224 (purpose of Section 560 is to ensure that the swap financial markets are not "destabilized" by their then "uncertain" treatment under the Bankruptcy Code). Protection for swap agreements was aimed at eliminating the "needless uncertainty about the potential impact of a bankruptcy filing on the right to terminate and net out" such transactions. 136 CONG.REC. H2281-06 (May 15, 1990) (statement of Rep. Fish) ("[t]he stability of the swap market depends on the ability of a non-defaulting participant to terminate outstanding transactions quickly"); 136 CONG.REC. S7534-01 (June 6, 1990) (statement of Sen. DeConcini) ("The effect of the swap provisions will be to provide certainty for swap transactions by and thereby stabilize domestic markets by *allowing the terms of a swap agreement to apply notwithstanding* the bankruptcy filing") (emphasis added).

[22] In 1982, Congress amended the Bankruptcy Code to add safe-harbor provisions exempting payments made in the securities, commodities, and forward contract trades from the bankruptcy avoidance powers (except in cases of actual fraud) and providing that rights to liquidate such contracts in the event of bankruptcy cannot be "stayed, avoided, or otherwise limited by operation of any provision of this title." *See* 1982 Amendments to Bankruptcy Code, Pub. L. No. 97-222, 96 Stat. 235 (now codified, as amended, at 11 U.S.C. §§ 362(b)(6), 546(e), 555, 556).

[23] In 1984, Congress clarified that the Bankruptcy Code's safe-harbor protections extended to repurchase agreements. *See* 1984 Amendments to Bankruptcy Code, Pub. L. No. 98-353, §§ 391-396, 98 Stat. 333 (now codified, as amended, at 11 U.S.C. §§ 362(b)(7), 546(f)), 559).

[24] *See* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, P.L. 101-73 § 212, 103 Stat. 183, 237-39 (now codified, as amended, at 1281(e)(8); H.R. REPORT NO. 101-54 (1989)*, reprinted in* 1989 U.S.C.C.A.N. 86).

[25] *See* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, P.L. 101-73 § 1217, 103 Stat. 183 (now codified, as amended, at 12 U.S.C. § 1787(e)(8); H.R. REPORT NO. 101-54 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86.)

derivatives contracts previously protected under the Bankruptcy Code Safe Harbor Provisions, the FDIA and FCUA amendments also extended protection to "swap agreements".  H.R. REP. NO. 101-54(I), at 332 (1989), *reprinted in 189 U.S.C.C.A.N. 86, 128.*

The amendments to the FDIA and FDUC provided broad protection to the contractual terms of derivatives agreements, going so far as to immunize the exercise of such rights from all other law.  The amendments expressly provided (subject to certain exceptions not relevant here): "*notwithstanding… any other Federal law or the law of any state, no person shall be stayed or prohibited from exercising … (iii) any right to offset or net out any termination value, payment amount or other transfer obligation arising under or in connection with*" one of the enumerated derivatives contracts.[26]  The legislative history of the banking insolvency amendments could not state Congress's purpose more clearly or concisely - to allow "counterparties to certain Financial Contracts …[to] exercise their termination, liquidation, netting and setoff rights under such contracts and related security agreements."  H.R. REP. NO. 101-54(I), at 332 (1989), *reprinted in 189 U.S.C.C.A.N. 86, 128.*

---

[26] As amended each the relevant sections of the FDIA and FCUA were substantially similar.  The relevant FDIA section provided, in relevant part:

"*[N]otwithstanding any other provision of this Act … any other Federal law, or the law of any State*, no person shall be stayed or prohibited from exercising—

"(i) any right to cause the termination or liquidation of any qualified financial contract with an insured depository institution which arises upon the appointment of the Corporation as receiver for such institution at any time after such appointment;

(ii) any right under any security arrangement relating to any contract or agreement described in clause (i); or

(iii) any right to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with one or more contracts and agreements described in clause (i), including any master agreement for such con-tracts or agreements.

Financial Institutions Reform, Recovery and Enforcement Act of 1989, P.L. 101-73 § 211, 103 Stat. 183, 237-39 (now codified, as amended, at 1281(e)(8)(A)).

C.    **The Legislative History And Enactment of 560 Reflects**
      **Congress's Intent to Override 553 as to Swap Transactions**

Consistent with the 1989 amendment of the insolvency laws applicable to banking

institutions just a year prior, Congress enacted Section 560 to extend similar protections to swap

agreements under the Bankruptcy Code.  136 Cong. Rec. S7534-01 (June 6, 1990) (statement of

Sen. DeConcini) ("The effect of the swap provisions will be to provide certainty for swap

transactions by and thereby stabilize domestic markets by allowing the terms of a swap

agreement to apply *notwithstanding the bankruptcy filing*") (emphasis added).

While urging a limited view of the 1990 Amendments Trustee Brief at 17, the

SIPA Trustee's reading of the legislative history surrounding the 1990 Bankruptcy Code

Amendments avoids the context of prior insolvency legislation and selectively ignores

transparent statements of a broader congressional intent to protect financial markets through

enforcement of a swap agreement contractual terms.  The 1990 House Report could not be

clearer, that the enactment of Section 560 is intended to "preempt" the relevant provisions of the

Bankruptcy Code.  H.R. REP. NO. 101-484, at 5-6 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223,

227-28 (1990).[27]  Further, the Senate report on 560 specifically addressed and interpreted Section

560's Notwithstanding Clause, stating the provision "means that [] contractual rights are not to

be interfered with by *any court proceeding under the Code*."  S. REP. NO. 101-285, at 9 (1990).

---

[27] The House Report provides in relevant part:

> [S]ection 560 . . . preserve['s] a swap participant's contractual right to terminate
> a swap agreement and offset any amounts owed under it in the event that one of
> the parties to the agreement files a bankruptcy petition or becomes insolvent, or
> in the event that a trustee or custodian is appointed for the party. Section 560
> provides that the exercise of any such right shall not be stayed, avoided, or
> otherwise limited by operation of the Bankruptcy Code or by order of any court
> or government agency in any proceeding under the Bankruptcy Code. . . . This
> provision is not intended to preempt the statute of frauds or any other provision
> of law, *except for the provisions of the Bankruptcy Code.*  H.R. Rep. No. 101-
> 484, at 5-6 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 227-28 (1990)
> (emphasis added).

The SIPA Trustee and LBHI fail to cite any legislative statement to contradict Congress's clear expression of intent to preempt all relevant provisions of the Bankruptcy Code, including Section 553(a), with the enactment of Section 560. The SIPA Trustee's and LBHI's reliance on an isolated statement concerning the automatic stay provision from an ISDA representative does not compel a contrary conclusion. Trustee Brief at 15; LBHI Brief at 22. The testimony of Mark Brickell ISDA's testimony reinforces Congress's broader legislative intent to enforce contractual agreements as written, specifically acknowledging the need to protect "action as contemplated by the standard agreements." *Interest Swap: Hearing Before the Subcomm. on Courts and Administrative Practice of the Senate Comm. On the Judiciary*, 101st Cong. 51 (1989) (statement of Mark Brickell). The testimony goes on to state that allowing the enforcement of contractual rights is consistent with the basic operation of the Bankruptcy Code in the sense that "the right setoff" is preserved for both safe-harbor and non safe-harbor transactions – even though different standards may govern.[28]

### D. Enactment of Section 561 Further Confirms Congress's Intent

The SIPA Trustee's Brief concedes the legislative history surrounding the enactment of Section 561 is similar to Section 560 in that it clearly indicates that Section 561 was intended "to protect the contractual right of a master netting agreement participant to enforce any rights of … offset or netting under a master netting agreement." Trustee Brief at 19.

---

[28] Mark Brickell, then Chairman of ISDA, testified in relevant part:

> Permitting the prompt termination of these agreements, the exercise of netting rights, and recourse to any collateral securing the debtor's obligations reduces the potential market impact of a bankruptcy filing by allowing immediate *action as contemplated by the standard agreements*. This exception to Section 362 of the Bankruptcy Code does not interfere with the basic operation of the Bankruptcy Code, since the code already preserves the right of setoff, although not requiring a court hearing.

*Interest Swap: Hearing Before the Subcomm. On Courts and Administrative Practice of the S. Comm. On the Judiciary*, 101st Cong. 29 (1989).

Further, Congress clarified that the "protection of netting and offset rights in Sections 560 and 561 is in addition to the protections afforded in Sections 362(b)(6), (b)(7), (b)(17), and (b)(28) of the Bankruptcy Code." H.R. REP. NO. 109-31, at 133 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 193 (emphasis added). This unequivocal congressional statement confirms Swedbank's argument that the phrase "shall not be stayed, avoided or otherwise limited" must be given independent meaning despite the SIPA Trustee's assertion that Swedbank's interpretation of congressional intent is just not "sensible". Trustee Brief at 20-21. Clearly, Swedbank's interpretation of Sections 560 and 561 is not "demonstrably at odds" with congressional intent.

### E.    The 2006 Financial Netting Improvements Act Clarified Congress Longstanding Intention By <u>Conforming Safe Harbor Provisions to FDIA and FCUA</u>

The SIPA Trustee acknowledges that the Safe Harbor amendments in 2006 in connection with the Financial Netting Improvements Act of 2006, were intended to "strengthen [] and clarify the enforceability of early termination and close-out netting provisions and related collateral arrangements in U.S. insolvency proceedings." Trustee Brief at 21 (*citing* H.R. REP. NO. 109-648 (2006), available at 2006 WL 6165926, at *1). Congress amended Sections 362(b)(17) to replace the previous language exempting a "setoff by a swap participant … of a mutual debt and claim" with amended language that mirrored the text of Section 560, thus exempting "the exercise by a swap participant … of any contractual right (as defined in Section 560) to offset or net our any termination value, payment, or other transfer obligation arising under or in connection with one or more such [swap] agreements."[29] While both LBHI and the SIPA Trustee mention Congress's amendment to the express terms of Sections 362(b), both fail

---

[29] Financial Netting Improvements Act of 2006, Pub. L. No. 109-390, §5, 120 Stat. 2692, 2697 (codified at 11 U.S.C. 362(b)(17)).

to cite Congress's explicit explanation.  The legislative history plainly explains the intent behind

this amendment:

> "[FNIA] amends section 362(b) of the Bankruptcy Code to protect
> enforcement, free from the automatic stay, of collateral, setoff or
> netting provisions in … swap agreements and in master netting
> agreements and security agreements or arrangements or other
> credit enhancements related to one or more swap agreements or
> master netting agreements.  *These changes conform the provisions
> of the Bankruptcy Code to parallel provisions of the FDIA and
> FCUA to confirm that Sections 362(b)(6), (b)(7) and (17), protect,
> free from the automatic stay, all rights previously protected by
> Sections 362(b)(6), (7), and (17), including… setoff rights and
> netting rights…*  The provisions protect the exercise of 'contractual
> rights' as defined in Sections 555, 556, 559, 560, as appropriate,
> which include not only rights evidenced by agreements between
> the parties, but other rights as set forth in those definitions*."*

H.R. REP. NO. 109-648 (2006), available at 2006 WL 6165926, at * 2 (emphasis added).

By replacing the phrase "mutual debt and claim" with the phrase "any contractual

right to offset", Congress clarified its intent that contractual setoff rights are not subject to

principles of mutuality contained within or imposed under the Bankruptcy Code.  Just like the

parallel provisions of the FDIA and FCUA the protections granted to financial contracts under

the Bankruptcy Code are meant to be given broad preemptive effect.

LBHI and the SIPA Trustee imply that the reference to the term "mutual" in

legislative history somehow confirms that Safe Harbor setoff rights remain subject to the

limitations of 553(a).  This interpretation of congressional intent is at odds with Congress's

express amendment to the statute.  Normally, the best indication of Congress intent is the

collection of the words chosen by Congress.  *Perry v. Commerce Loan Co.*, 383 U.S. 392, 400

(1966).  A more consistent analysis of Congress's legislative intent is that Congress intended to

exempt setoff rights from mutuality limitations set forth within the Bankruptcy Code (Congress

deleted "mutual" from 362), while acknowledging that the process of setoff and netting is still

subject to contract or common law mutuality considerations that may exist outside of the

Bankruptcy Code.[30]

## **CONCLUSION**

For the foregoing reasons advance here and in Swedbank's principal brief on

appeal, the Decision below should be reversed.

Dated:  New York, New York
September 8, 2010

SALANS LLP

By: /s/ Claude D. Montgomery
Claude D. Montgomery, Esq.
Lee P. Whidden, Esq.
Paul C. Gunther Esq.
620 Fifth Avenue
New York, New York  10020
(212) 632-5500

*Attorneys For Appellant Swedbank AB (publ)*

---

[30] The SIPA's Trustee analysis of ISDA's role in the legislative process is hardly dispositive of congressional intent.  While the SIPA Trustee is correct that the amendments to Section 560 and 561 were heavily influenced by ISDA, the failure of ISDA's cross-affiliate netting proposal does not indicate what the Code does say regarding issues of bankruptcy mutuality, but instead highlights the significance of the removal of the word "mutual" from Section 362(b).  The SIPA Trustee's assertion that ISDA would not have worked toward the inclusion of "specific statutory provisions" if it thought that such provisions were already protected by the Bankruptcy Code, disregards the recorded history of ISDA's legislative efforts.  Even where the organization believed the contractual provisions of swap agreements were likely protected under the Pre-1990 Bankruptcy Code, the organization advanced enactment of Section 560 where protection of swaps was not "entirely free from doubt." *See Interest Swap: Hearing Before the Subcomm. On Courts and Administrative Practice of the Senate Comm. On the Judiciary*, 101st Cong. 51 (1989) (statement of Mark Brickell).

NewYork 1369716.9